# **<u>EXHIBIT A</u>**

---

**FC Pioneer Holding Company, LLC**

**A Delaware Limited Liability Company**

**LIMITED LIABILITY COMPANY AGREEMENT**

**Dated as of December 9, 2016**

---

THE UNITS AND OTHER INTERESTS REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ....................................................................................................1

ARTICLE II FORMATION AND PURPOSE..........................................................................15

Section 2.1    Formation ...........................................................................................15
Section 2.2    Name .................................................................................................15
Section 2.3    Registered Office/Agent .....................................................................15
Section 2.4    Term ..................................................................................................15
Section 2.5    Purpose ..............................................................................................16
Section 2.6    Powers ...............................................................................................16
Section 2.7    Certificate ..........................................................................................16
Section 2.8    Principal Office ...................................................................................16
Section 2.9    No State-Law Partnership ....................................................................16

ARTICLE III MEMBERSHIP, CAPITAL CONTRIBUTIONS AND UNITS..........................17

Section 3.1    Members..............................................................................................17
Section 3.2    Unit Holder Interests and Units ...........................................................17
Section 3.3    Voting.................................................................................................19
Section 3.4    Special Rights .....................................................................................19
Section 3.5    Specific Limitations ............................................................................22
Section 3.6    Additional Members and Units.............................................................22
Section 3.7    Capital Contributions ..........................................................................22
Section 3.8    Certification ........................................................................................23
Section 3.9    Allocation of Class P Units ..................................................................23
Section 3.10   Earnout Issuances................................................................................23

ARTICLE IV CAPITAL ACCOUNTS ....................................................................................23

Section 4.1    Capital Accounts..................................................................................23
Section 4.2    Revaluations of Assets and Capital Account Adjustments ....................24
Section 4.3    Additional Capital Account Provisions.................................................24

ARTICLE V DISTRIBUTIONS AND ALLOCATIONS OF PROFIT AND LOSS...................25

Section 5.1    Distributions .......................................................................................25
Section 5.2    No Violation .......................................................................................32
Section 5.3    Withholding; Tax Indemnity ...............................................................32
Section 5.4    Property Distributions and Installment Sales ........................................33
Section 5.5    Net Profit or Net Loss..........................................................................33
Section 5.6    Regulatory Allocations........................................................................35
Section 5.7    Tax Allocations...................................................................................35
Section 5.8    Indemnification Events ........................................................................36

Section 5.9      Changes in Members' Interests ........................................................36

ARTICLE VI STATUS, RIGHTS AND POWERS OF UNIT HOLDERS ...............................36

Section 6.1      Limited Liability .................................................................................36
Section 6.2      Return of Distributions of Capital ....................................................36
Section 6.3      No Management or Control.................................................................37

ARTICLE VII DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES
AND DUTIES OF THE BOARD OF MANAGERS ............................................................37

Section 7.1      Board of Managers..............................................................................37
Section 7.2      Authority of Board of Managers........................................................38
Section 7.3      Reliance by Third Parties ...................................................................38
Section 7.4      Directors' and Officers' Insurance.....................................................38
Section 7.5      No Duties.............................................................................................38
Section 7.6      Corporate Opportunity .......................................................................39

ARTICLE VIII DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES
AND DUTIES OF OFFICERS AND AGENTS .................................................................39

Section 8.1      Officers, Agents .................................................................................39

ARTICLE IX BOOKS, RECORDS, ACCOUNTING AND REPORTS ...................................40

Section 9.1      Books and Records .............................................................................40
Section 9.2      Reports and Information......................................................................40
Section 9.3      Filings..................................................................................................40
Section 9.4      Non-Disclosure ...................................................................................41

ARTICLE X TAX MATTERS MEMBER .........................................................................42

Section 10.1     Tax Matters Member...........................................................................42
Section 10.2     Indemnity of Tax Matters Member.....................................................43
Section 10.3     Tax Returns .........................................................................................43

ARTICLE XI TRANSFER OF INTERESTS ......................................................................44

Section 11.1     Restricted Transfer..............................................................................44
Section 11.2     Permitted Transferees..........................................................................45
Section 11.3     Transfer Requirements ........................................................................46
Section 11.4     Consent................................................................................................47
Section 11.5     Withdrawal of Member .......................................................................47
Section 11.6     Additional Transfer Restrictions.........................................................47
Section 11.7     Amendment of Exhibit 3.1 .................................................................48
Section 11.8     Refinancing Option .............................................................................48
Section 11.9     Mandatory Redemption.......................................................................49

ARTICLE XII "TAG ALONG" AND "DRAG ALONG" RIGHTS .........................................50

Section 12.1    Tag Along ....................................................................................50
Section 12.2    Management Tag ........................................................................52
Section 12.3    Drag Along .................................................................................53
Section 12.4    Miscellaneous ............................................................................55

ARTICLE XIII PRE-EMPTIVE RIGHTS...............................................................59

Section 13.1    Pre-emptive Rights.....................................................................59
Section 13.2    Participation Notice....................................................................60
Section 13.3    Participation Commitment .........................................................60
Section 13.4    Acceptance .................................................................................61
Section 13.5    Failure to Consummate ..............................................................61
Section 13.6    Cooperation ................................................................................61
Section 13.7    Closing .......................................................................................61
Section 13.8    Post-Issuance Compliance .........................................................62
Section 13.9    Exceptions ..................................................................................62

ARTICLE XIV DISSOLUTION OF COMPANY .....................................................62

Section 14.1    Termination of Membership .......................................................62
Section 14.2    Events of Dissolution .................................................................63
Section 14.3    Liquidation .................................................................................63
Section 14.4    No Action for Dissolution ..........................................................63
Section 14.5    No Further Claim ........................................................................63
Section 14.6    Distribution of Subsidiary Equity ..............................................63

ARTICLE XV INDEMNIFICATION .......................................................................64

Section 15.1    Indemnification Rights...............................................................64
Section 15.2    Exculpation.................................................................................65
Section 15.3    Persons Entitled to Indemnity ...................................................65
Section 15.4    Procedure Agreements ...............................................................66

ARTICLE XVI REPRESENTATIONS AND COVENANTS BY THE MEMBERS.................66

Section 16.1    Investment Intent .......................................................................66
Section 16.2    Securities Regulation .................................................................67
Section 16.3    Economic Risk............................................................................67
Section 16.4    Binding Agreement ....................................................................67
Section 16.5    Tax Position ...............................................................................67
Section 16.6    Information .................................................................................67
Section 16.7    Tax and Other Advice ................................................................67
Section 16.8    Licenses and Permits .................................................................68
Section 16.9    Indemnities ................................................................................68
Section 16.10   Voting Agreements .....................................................................68

ARTICLE XVII COMPANY REPRESENTATIONS ...............................................................68

Section 17.1   Duly Formed ...........................................................................................68
Section 17.2   Valid Issue ..............................................................................................68

ARTICLE XVIII AMENDMENTS TO AGREEMENT ........................................................68

Section 18.1   Amendments ...........................................................................................68
Section 18.2   Corresponding Amendment of Certificate ..........................................69
Section 18.3   Binding Effect ........................................................................................69

ARTICLE XIX GENERAL ....................................................................................................69

Section 19.1   Public Offering; Right to Convert to Corporate Form .......................69
Section 19.2   Successors; Delaware Law; Etc ..............................................................71
Section 19.3   Notices, Etc .............................................................................................71
Section 19.4   Execution of Documents .........................................................................73
Section 19.5   Consent to Jurisdiction and Service of Process ..................................74
Section 19.6   Severability .............................................................................................74
Section 19.7   Construction ............................................................................................74
Section 19.8   Table of Contents, Headings .................................................................75
Section 19.9   No Third Party Rights .............................................................................75
Section 19.10  Entire Agreement ....................................................................................75
Section 19.11  Effect of Waiver or Consent ...................................................................75
Section 19.12  Counterparts and Facsimile ...................................................................75
Section 19.13  Waiver of Jury Trial ................................................................................76
Section 19.14  Offset ........................................................................................................76
Section 19.15  Adjustment of Numbers ..........................................................................76
Section 19.16  Business Days ..........................................................................................76
Section 19.17  Survival ....................................................................................................76
Section 19.18  Wills ..........................................................................................................76
Section 19.19  Spousal Consent .......................................................................................77
Section 19.20  Designees ..................................................................................................77
Section 19.21  Gender .......................................................................................................77
Section 19.22  Employment Agreement Put Right .........................................................77

Exhibits

Exhibit 1.1 – Investment Bank Selection Process
Exhibit 1.2 – Registration Rights Members
Exhibit 3.1 – Unit Holders of the Company
Exhibit 5.1 – Example Preferred Waterfall
Exhibit 7.1 – Board of Managers
Exhibit 8.1 – Officers
Exhibit 12.2 – Management Tag Holders
Exhibit 12.4(e)(i) – Formax Blocker Members
Exhibit 12.4(e)(ii) – STI/Schryver Blocker Members
Exhibit 12.4(e)(iii) – Class S Blocker Members

Schedules

Schedule 1 – Class S Unit Holders
Schedule 19.22 – Put Right Employees and Put Units

## FC PIONEER HOLDING COMPANY, LLC

## LIMITED LIABILITY COMPANY AGREEMENT

This Limited Liability Company Agreement (this "Agreement") of FC Pioneer Holding Company, LLC (the "Company") is dated as of December 9, 2016 (the "Original Date"), by and among Formax Health Holdings, LLC, a Delaware limited liability company ("Formax"), Schryver/Trident Investors, LLC, a Delaware limited liability company ("STI"), Schryver Medical Holdings, LLC, a Delaware limited liability company ("Schryver"), and the Persons set forth on Schedule 1 attached hereto, together with such other Persons who from time to time become party hereto by executing a counterpart signature page in accordance with the terms hereof.

## RECITALS

WHEREAS, the parties hereto desire to enter into this Agreement to provide for certain matters described herein.

NOW, THEREFORE, in consideration of the mutual promises made herein and other good and valuable consideration, the parties hereto agree as follows:

## AGREEMENT

## ARTICLE I

## DEFINITIONS

For purposes of this Agreement, (a) certain capitalized terms have specifically defined meanings set forth below, (b) references to "Articles," "Exhibits" and "Sections" are to Articles, Exhibits and Sections of this Agreement unless explicitly indicated otherwise, (c) references to statutes include all rules and regulations thereunder, and all amendments and successors thereto from time to time and (d) the word "including" will be construed as "including without limitation."

"Accounting Firm" is defined in Section 10.3.

"Act" means the Delaware Limited Liability Company Act (6 Del. C. § 16-101, et seq.).

"Affiliate" means with respect to any specified Person, (a) any Person that directly or through one or more intermediaries controls or is controlled by or is under common control with the specified Person or (b) any Person who is a general partner, member, managing director, manager, officer, director or principal of the specified Person. As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise; provided that for the purposes of the definition of "Approved Acquisitions" and Section 3.4, the term "Affiliate" will also mean (c) any Person who has the power to select one or more board members of the specified Person.

"Affiliate Indemnitors" is defined in Section 15.1(b).

"Affiliated Fund" means each Person controlling or under common control with Audax Fund III, Audax Fund IV, FC, NTH, STI, Schryver or any Class S Unit Holder, as applicable.

"Agreement" is defined in the Preamble.

"Allocation Excess" is defined in Section 5.1(a)(ii).

"Ancillary Documents" is defined in Section 12.4(a).

"Approved Acquisition" means an acquisition, whether by purchase, merger, reorganization or otherwise, which:

(a)     meets any one of the criteria below:

(i)     the entity or assets proposed to be acquired have an enterprise value, together with the enterprise values of each other proposed or completed acquisition of any entity or assets in the same fiscal year, of less than $20,000,000 and requires no additional equity investment; or

(ii)     requires an additional equity investment in the Company; or

(iii)     involves an acquisition of an entity that is an Affiliate of any Member or in which any Member has an equity investment at the time the acquisition is first proposed,

AND

(b)     meets all of the criteria below, as applicable:

(i)     (A) Mark Parrish has submitted to the Board of Managers in writing formal support of the acquisition or has voted at a meeting of the Board of Managers in favor of such acquisition or executed and delivered a written consent of the Board of Managers approving such acquisition, or (B) in the event of the death or incapacity of Mark Parrish or the transfer of all of his Units to an unaffiliated Third Party, the Chief Executive Officer of Trident Parent has submitted to the Board of Managers in writing formal support of the acquisition or, if a member of the Board of Managers, has voted at a meeting of the Board of Managers in favor of such acquisition or executed and delivered a written consent of the Board of Managers approving such acquisition; and

(ii)     any new equity investment, if applicable, is made relative to a valuation of the Company supported by an independent third party investment bank selected by (A) the Schryver Representative if (1) NTH, Audax Fund III or Audax Fund IV directly or indirectly co-invests and neither STI nor Schryver co-invests or (2) none of NTH, Audax Fund III, Audax Fund IV, STI and Schryver directly or indirectly co-invest or (B) by the NTH Representative if STI or Schryver co-invests and none of NTH, Audax Fund III or Audax Fund IV directly or indirectly co-invest, in each case, pursuant to the process set forth on Exhibit 1.1; provided that if such a valuation has been performed for another acquisition within the previous six (6) months,

2

such prior valuation shall be used (as adjusted for any subsequent changes to EBITDA using the same multiple); and

(iii)    such acquisition does not adversely affect any of the rights of NTH, STI or Schryver under this Agreement; provided that any direct or indirect pro rata dilution of the relative ownership of Class A Units of NTH, STI or Schryver, and any impact under this Agreement resulting therefrom, shall be deemed not to adversely affect any of the rights of NTH, STI or Schryver; and

(iv)    each of STI and Schryver are afforded the right to co-invest its pro rata share, if applicable; and

(v)    each of NTH, Audax Fund III and Audax Fund IV are afforded the right to co-invest (indirectly through FC PAC) their pro rata share, if applicable; and

(vi)    the new equity, if applicable, is issued in Class A Units with no preferences; and

(vii)    with respect to an acquisition of an Affiliate target of any Member, such acquisition is on an arm's length basis at a valuation from an independent third party investment bank selected by NTH and Schryver pursuant to the process set forth on Exhibit 1.1.

"Asset Value" of any property of the Company means its adjusted basis for federal income tax purposes unless:

(a)    the property was accepted by the Company as a contribution to capital at a value different from its adjusted basis, in which event the initial Asset Value for such property means the gross Fair Value of the property agreed to by the Company and the contributing Unit Holder; or

(b)    the property of the Company is revalued in accordance with Section 4.2, in which event the Asset Values for such property will equal the Fair Values established pursuant to such revaluation.

As of any date, references to the "then prevailing Asset Value" of any property means the Asset Value last determined for such property less the depreciation, amortization and cost recovery deductions taken into account in computing Net Profit or Net Loss in the Fiscal Year(s) (or other taxable year(s) or taxable period(s)) subsequent to such prior determination date.

"Assignee" is defined in Section 11.1(c).

"Assignor" is defined in Section 11.1(b).

"Assumed Tax Rate" is a tax rate (expressed as a percentage) equal to the highest marginal combined federal and New York or California income tax rates (as reasonably determined by the Board of Managers) applicable to any individual or corporate resident in the United States for the applicable tax year, taking into account the deductibility of state income

taxes for federal income tax purposes and the character of the income or gain, and applying the same rate to all Unit Holders.

"Audax Fund III" means AG Mobile Diagnostic Holdings, LLC, a Delaware limited liability company.

"Audax Fund IV" means, collectively, AG FCT Holdings, LLC, a Delaware limited liability company, Audax Private Equity Fund IV Trident Splitter, L.P., a Delaware limited partnership, Audax Private Equity Fund IV Clinical Splitter, L.P., a Delaware limited partnership, Audax Private Equity Fund IV NHH Splitter, L.P., a Delaware limited partnership, Audax Private Equity Fund IV AIV, L.P., a Delaware limited partnership.

"Board Member" is defined in Exhibit 7.1.

"Board of Managers" means the board of managers elected and determined as provided in Exhibit 7.1.

"Capital Account" is defined in Section 4.1.

"Capital Contribution" means with respect to any Unit Holder, the sum of (a) the amount of cash plus (b) the Fair Value of any other property (net of liabilities assumed or to which the property is subject) contributed to the Company with respect to the Interest held by such Unit Holder pursuant to this Agreement.

"Cash Inflows" means the sum of all Capital Contributions which are or are deemed to have been made (including by virtue of any Earnout Issuance) by the Class A Unit Holders (inclusive of amounts made or deemed made by such Class A Unit Holders' Permitted Transferees) from and after the Original Date with respect to or in exchange for such Class A Unit Holders' Class A Units.

"Cash Outflows" means the sum of all cash Distributions, Excess Advisory Fees and the Fair Value of all other Distributions made by the Company to the Class A Unit Holders (inclusive of amounts received by such Class A Unit Holders' Permitted Transferees) from and after the Original Date with respect to or in exchange for such Class A Unit Holders' Class A Units.

"Certificate" means the Certificate of Formation of the Company and any amendments thereto and restatements thereof filed on behalf of the Company with the Delaware Secretary of State pursuant to the Act.

"Class" when used with reference to a Unit, means the class of Units of which such Unit is a part.

"Class A Unit" is defined in Section 3.2(a).

"Class A Unit Holder" means a Person in regard to such Person's particular Interest in Class A Units.

4

"Class P Unit Holder" means a Person in regard to such Person's particular Interest in Class P Units.

"Class P Unit Return" is defined as the amount, as of any date, received by a Class P Unit Holder in respect of each Class P1 Unit held by such Class P Unit Holder.

"Class P Units" means each of the Class P1 Units, the Class P1.5 Units, the Class P2 Units, the Class P2.5 Units, the Class P3 Units, the Class P3.5 Units, the Class P4 Units, the Class P4.5 Units and the Class P5 Units.

"Class P1 Unit" is defined in Section 3.2(b).

"Class P1 Unit Holder" means a Person in regard to such Person's particular Interest in Class P1 Units.

"Class P1.5 Return Threshold" means Cash Outflows divided by Cash Inflows which yield a result greater than or equal to 1.5.

"Class P1.5 Unit" is defined in Section 3.2(c).

"Class P1.5 Unit Holder" means a Person in regard to such Person's particular Interest in Class P1.5 Units.

"Class P2 Return Threshold" means Cash Outflows divided by Cash Inflows which yield a result greater than or equal to 2.

"Class P2 Unit" is defined in Section 3.2(d).

"Class P2 Unit Holder" means a Person in regard to such Person's particular Interest in Class P2 Units.

"Class P2.5 Return Threshold" means Cash Outflows divided by Cash Inflows which yield a result greater than or equal to 2.5.

"Class P2.5 Unit" is defined in Section 3.2(e).

"Class P2.5 Unit Holder" means a Person in regard to such Person's particular Interest in Class P2.5 Units.

"Class P3 Return Threshold" means Cash Outflows divided by Cash Inflows which yield a result greater than or equal to 3.

"Class P3 Unit" is defined in Section 3.2(f).

"Class P3 Unit Holder" means a Person in regard to such Person's particular Interest in Class P3 Units.

"Class P3.5 Return Threshold" means Cash Outflows divided by Cash Inflows which yield a result greater than or equal to 3.5.

"Class P3.5 Unit" is defined in Section 3.2(g).

"Class P3.5 Unit Holder" means a Person in regard to such Person's particular Interest in Class P3.5 Units.

"Class P4 Return Threshold" means Cash Outflows divided by Cash Inflows which yield a result greater than or equal to 4.

"Class P4 Unit" is defined in Section 3.2(h).

"Class P4 Unit Holder" means a Person in regard to such Person's particular Interest in Class P4 Units.

"Class P4.5 Return Threshold" means Cash Outflows divided by Cash Inflows which yield a result greater than or equal to 4.5.

"Class P4.5 Unit" is defined in Section 3.2(i).

"Class P4.5 Unit Holder" means a Person in regard to such Person's particular Interest in Class P4.5 Units.

"Class P5 Return Threshold" means Cash Outflows divided by Cash Inflows which yield a result greater than or equal to 5.

"Class P5 Unit" is defined in Section 3.2(j).

"Class P5 Unit Holder" means a Person in regard to such Person's particular Interest in Class P5 Units.

"Class S Blocker Corporation" is defined in Section 12.4(e)(ii).

"Class S Blocker Member" is defined in Section 12.4(e)(ii).

"Class S Majority Holders" is defined in Section 11.8(b).

"Class S Percentage Interest" means, as of any particular time with respect to any Class S Unit Holder, a fraction, expressed as a percentage, the numerator of which is the number of Class S Units held by such Class S Unit Holder and the denominator of which is the aggregate number of then-outstanding Class A Units and Class S Units.

"Class S Portion" means, with respect to any Distribution made pursuant to Section 5.1(b)(iv), (vi), (viii), (x), (xii), (xiv), (xvi), (xviii) or (xx), an amount equal to the Class S Percentage Interest of such Distribution.

"Class S Return Threshold" means Cash Outflows divided by Cash Inflows which yield a result equal to 1.

"Class S Unit" is defined in Section 3.2(k).

6

"<u>Class S Unit Holder</u>" means a Person in regard to such Person's particular Interest in Class S Units.

"<u>Closing Date</u>" has the meaning given to such term in the Contribution Agreement.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Company</u>" is defined in the Preamble.

"<u>Confidential Information</u>" is defined in <u>Section 9.4(a)</u>.

"<u>Contribution Agreement</u>" means that certain Contribution Agreement, dated as of the date hereof, by and among the Company, Schryver and STI.

"<u>Credit Agreement</u>" means, collectively, (i) the First Lien Credit Agreement, dated as of July 31, 2013 among New Trident Holdcorp, Inc., a Delaware corporation ("<u>Trident Borrower</u>"), Trident Clinical Services Holdings, Inc., a Delaware corporation ("<u>Clinical Services Borrower</u>"), FCT Hospice, LLC, a Delaware limited liability company ("<u>FCT Borrower</u>" and, together with Trident Borrower and Clinical Services Borrower, the "<u>Borrowers</u>"), the Company, the lenders from time to time party thereto, and Citibank, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer and (ii) the Second Lien Credit Agreement, dated as of July 31, 2013, among the Borrowers, the Company, the Lenders from time to time party thereto, and Citibank, N.A., as Administrative Agent.

"<u>Deductible Loss</u>" is defined in <u>Section 5.8(b)</u>.

"<u>Distribution</u>" means cash or property (valued at its Fair Value and net of liabilities assumed or to which the property is subject) distributed by the Company to a Unit Holder in respect of the Unit Holder's Interest whether by liquidating distribution, dividend or otherwise (including Tax Distributions) and does not include (i) advisory fees, compensation or expense reimbursements paid to a Unit Holder or their Affiliates pursuant to any management services agreement or similar agreement that has been approved pursuant to this Agreement, (ii) any redemption or repurchase of securities from employees in connection with a termination of employment, or (iii) any subdivision (by Unit split or otherwise) or any combination (by reverse Unit split or otherwise) of any outstanding Units (to the extent the Class S Units participate in such subdivision or combination on a pro rata basis).

"<u>Drag Along Notice</u>" is defined in <u>Section 12.3(a)</u>.

"<u>Drag Along Sale</u>" is defined in <u>Section 12.3</u>.

"<u>Drag Along Sale Percentage</u>" is defined in <u>Section 12.3</u>.

"<u>Drag Along Seller</u>" is defined in <u>Section 12.3(a)</u>.

"<u>Earnout Class S Issuance</u>" is defined in <u>Section 3.10</u>.

"<u>Earnout Issuance</u>" is defined in <u>Section 3.10</u>.

"Earnout Provisions" means, collectively, Sections 3.05 and 8.07 of the Contribution Agreement and Exhibit C of the Contribution Agreement.

"Estimated Allocable Income" is defined in Section 5.1(a)(ii).

"Estimated Tag Price" is defined in Section 12.1(a)(i).

"Excess Advisory Fees" means (a) any advisory fees or compensation paid to any of FC, Audax Management Company, LLC, Frazier Management, LLC, Revelstoke Capital Management, LLC or their respective Affiliates by the Company or its Subsidiaries, in excess of $3,000,000 in the aggregate in any Fiscal Year and, without duplication, (b) certain transaction fees paid to any such entity in connection with any acquisition by the Company or its Subsidiaries, as follows:

(i)     where the total enterprise value of such acquisition is less than $25,000,000, all such fees;

(ii)     where the total enterprise value of such acquisition is $25,000,000 or greater but less than $50,000,000, all such fees in excess of 0.5% of the total enterprise value;

(iii)     where the total enterprise value of such acquisition is $50,000,000 or greater but less than $100,000,000, all such fees in excess of 1.0% of the total enterprise value; and

(iv)     where the total enterprise value of such acquisition is $100,000,000 or greater, all such fees in excess of 1.5% of the total enterprise value.

"Excess Tax Amount" is defined in Section 5.1(a)(ii).

"Excluded Member" means any Unit Holder (a) who is not an "accredited investor" (within the meaning of Rule 501(a) promulgated by the Securities and Exchange Commission), or (b) whose Participation Portion is less than $10,000 of the Subject Securities.

"Fair Value" means:

(a)     as applied to any asset constituting cash or cash equivalents will be the amount of such cash or cash equivalents,

(b)     as applied to any asset constituting publicly traded securities that may be immediately sold in the public markets without any restrictions or limitations will be the average, over a period of twenty-one (21) consecutive trading days consisting of the date of valuation and the twenty (20) consecutive trading days prior to that date, of the average of the closing prices of the sales of such securities on the primary securities exchange on which such securities may at that time be listed, or, if there have been no sales on such exchange on any day, the average of the highest bid and lowest asked prices on such exchange at the end of such day, or, if on any day such securities are not so listed, the average of the highest bid and lowest asked prices on such day in the domestic over the counter market as reported by the National Quotation Bureau Incorporated, or any similar successor organization,

(c)    as applied to any assets other than cash, cash equivalents, or publicly traded securities that may be immediately sold in the public markets without any restrictions or limitations will be the fair value of such assets, as determined by the Board of Managers, which will take into account any factors that it deems relevant,

(d)    as applied to any Unit will be the fair value of such Unit, as determined by the Board of Managers and which will be calculated as the amount of Distributions which would be made in respect of such Unit upon a hypothetical liquidation of the Company as of the date of determination in accordance with Section 14.3, and

(e)    as applied to the Members' initial Capital Contributions as of the Original Date, the amounts of which are set forth on Exhibit 3.1.

"Excess Loss" is defined in Section 5.8(a).

"FC" means FC Trident, LLC, a Delaware limited liability company.

"FC Managers" is defined in Exhibit 7.1.

"FC PAC" means FC PAC Holdings, LLC, a Delaware limited liability company.

"FC PAC LLC Agreement" means the Amended and Restated Limited Liability Company Agreement of FC PAC, dated as of the Original Date, as amended and in effect from time to time.

"FCT Health" means FCT Health Holdings, LLC, a Delaware limited liability company.

"Final Allocable Income" is defined in Section 5.1(a)(ii).

"Fiscal Year" means the fiscal year of the Company, which will be the calendar year, or such other fiscal year as determined by the Board of Managers.

"Formax" is defined in the Preamble.

"Formax Blocker Corporation" means a corporation that is a direct or indirect member of a Formax Blocker Member.

"Formax Blocker Member" means certain direct or indirect owners of Formax listed on Exhibit 12.4(e)(i).

"Formax Units" means the Units held by Formax.

"HCN" means Welltower Inc.

"HCN Managers" is defined in Exhibit 7.1.

"Indemnified Persons" is defined in Section 15.1(a).

"Interest" means, with respect to any Person as of any time, such Person's limited liability company interest in the Company, which includes the number of Units such Person holds and such Person's Capital Account balance.

"Investment Agreement" means the Investment Agreement, dated as of the date hereof, among the Company, Committed Advisors Secondary Fund II, FIPS, WP Natural Resources Co-Invest Fund, L.P., CORE*alpha* Private Equity Partners Co-Investment Fund V, L.P., GCM Grosvenor Co-Investment Opportunities Fund, L.P. and GCM Saint Paul SPV, LLC.

"Investor Representative Manager" is defined in Exhibit 7.1.

"IRS" is defined in Section 10.1(c).

"Issuance" is defined in Section 13.1.

"Liabilities" means all liabilities of the Company which in accordance with U.S. generally accepted accounting principles should be carried as liabilities on the balance sheet of the Company.

"Management Tag Along Notice" is defined in Section 12.2(a).

"Management Tag Along Offer" is defined in Section 12.2(b).

"Management Tag Along Transfer" is defined in Section 12.2.

"Management Tag Along Transfer Percentage" is defined in Section 12.2(a)(i).

"Management Tag Contributor" is defined in Section 12.2(b).

"Management Tag Holder" is defined in Section 12.2(a).

"Mandatory Redemption" is defined in Section 11.9(a).

"Mandatory Redemption Closing" is defined in Section 11.9(b).

"Member of the Immediate Family" means, with respect to any Member who is an individual, each parent, spouse or child (including those adopted) of such individual and each custodian or guardian of any property of one or more of such Persons in the capacity as such custodian or guardian.

"Members" means the Persons listed as Members on Exhibit 3.1 and any other Person that both acquires an Interest in the Company and is admitted to the Company as a Member, in each case so long as such Person continues to hold any Units.

"Net Loss" and "Net Profit" are defined in Section 5.5(a).

"New Partnership Audit Procedures" means Subchapter C of Chapter 63 of Subtitle F of the Code, as modified by Section 1101 of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, and any successor statutes thereto or Regulations promulgated thereunder.

10

"Non-Dragging Holder" is defined in Section 12.3.

"Non-Marketed Underwritten Shelf Take-Down" means any offering or sale of registrable securities by the Company in the form of an underwritten (or other registered) offering which does not include a customary "road show" or substantially similar marketing effort by the underwriters, placement agents or other securities intermediaries (such as "overnight" block trades, one-day marketed transactions and other transactions that do not include a "green shoe" option).

"Notes" has the meaning set forth in the Investment Agreement.

"Notice" is defined in Section 3.2(l)(i).

"NTH" means New Trident Health, LLC, a Delaware limited liability company.

"NTH Managers" is defined in Exhibit 7.1.

"NTH Representative" is defined in Exhibit 7.1.

"Original Date" is defined in the Preamble.

"Participating Seller" is defined in Section 12.4(a).

"Participation Buyer" is defined in Section 13.3.

"Participation Commitment" is defined in Section 13.3.

"Participation Notice" is defined in Section 13.2.

"Participation Portion" is defined in Section 13.2(a).

"Per Share Offering Price" is defined in Section 19.1(a).

"Permitted Transferee" is defined in Section 11.2.

"Person" means an individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership, unincorporated entity of any kind, governmental entity, or any other legal entity.

"Preferred Unit" means any Unit issued after the Original Date that ranks senior to the Class A Units in any respect, including with respect to Distributions pursuant to Section 5.1(b).

"Pre-Offering Company Value" is defined in Section 19.1(a).

"Proposed Change" is defined in Section 10.3.

"Prospective Drag Buyer" is defined in Section 12.3.

"Prospective Drag Seller" is defined in Section 12.3.

"Prospective Management Tag Buyer" is defined in Section 12.2.

"Prospective Management Tag Seller" is defined in Section 12.2.

"Prospective Subscriber" is defined in Section 13.2(a).

"Prospective Tag Buyer" is defined in Section 12.1.

"Prospective Tag Seller" is defined in Section 12.1.

"Public Offering" means a public offering and sale of the common equity of the Company or any direct or indirect Subsidiary of the Company for cash registered under the Securities Act filed with the Securities and Exchange Commission on Form S-1 (or a successor form adopted by the Securities and Exchange Commission); provided that the following will not be considered a Public Offering: (a) any issuance of common equity interests as consideration for a merger or acquisition or (b) any issuance of common equity interests or rights to acquire common equity interests to existing equity holders or to employees of the Company or its Subsidiaries on Form S-4 or Form S-8 (or a successor form adopted by the Securities and Exchange Commission) or otherwise.

"Put Right Employee" is defined in Section 19.22.

"Put Right Employment Agreement" is defined in Section 19.22.

"Refinancing" is defined in Section 11.8(a).

"Refinancing Notice" is defined in Section 11.8(a).

"Refinancing Option" is defined in Section 11.8(a).

"Refinancing Option Closing" is defined in Section 11.8(c).

"Refinancing Option Exercise Date" is defined in Section 11.8(b).

"Refinancing Option Exercise Notice" is defined in Section 11.8(b).

"Registration Rights Members" means, as of any applicable time, any Member (or Permitted Transferee of such Member) listed on Exhibit 1.2 who directly or indirectly holds at least 1% of the Interests of the Company at such time (and giving effect to any pro forma valuation of the Company implied in any transaction that implicated registration rights under this Agreement).

"Regulations" means the Treasury Regulations, including temporary regulations, promulgated under the Code.

"Regulatory Allocations" is defined in Section 5.6.

"Remainder Securities" is defined in Section 13.3.

"Representative" means, with respect to any Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"Required Interest" means a majority of the Class A Units, Class P Units and the Class S Units, voting together as a single class, as provided under Section 3.3.

"Residual" means, with respect to any Distribution made pursuant to Section 5.1(b)(iv), (vi), (viii), (x), (xii), (xiv), (xvi), (xviii) or (xx), an amount equal to the percentage of such Distribution equal to (a) 100 *minus* (b) the Class S Percentage Interest with respect to all Class S Unit Holders.

"Restricted Transfer Entity" means Formax, Schryver, STI and the Class S Unit Holders, and each of their direct and indirect equity owners; provided that such term shall not apply to any limited partners of any private equity sponsors owning a direct or indirect interest in Formax, Schryver, STI or any Class S Unit Holder.

"Revenue Procedure" is defined in Section 3.2(l)(i).

"Sale of the Company" means (a) a sale of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, to any Person (other than one of the Members or any Affiliate of any member) or (b) any other transaction, whether by sale of equity interests, sale of assets, merger, recapitalization, reorganization or otherwise, pursuant to which one or more Persons (other than one of the Members or any Affiliate of any Member) shall own in excess of 50% of the voting power of the Company or Trident Parent, in each case, in a single transaction or series of related transactions. A sale (or multiple related sales) of one or more Subsidiaries of the Company (whether by way of merger, consolidation, reorganization or sale of all or substantially all assets or securities) that constitutes all or substantially all of the consolidated assets of the Company shall be deemed a Sale of the Company.

"Schryver" is defined in the Preamble.

"Schryver Managers" is defined in Exhibit 7.1.

"Schryver Representative" is defined in Exhibit 7.1.

"Schryver Units" means the Units held by Schryver.

"Securities Act" means the Securities Act of 1933 and applicable rules and regulations thereunder.

"Securities and Exchange Commission" means the U.S. Securities and Exchange Commission and any successor governmental agency or regulatory body.

"STI" is defined in the Preamble.

"STI Units" means the Units held by STI.

"STI/Schryver Blocker Corporation" is defined in Section 12.4(e)(ii).

"STI/Schryver Blocker Member" is defined in Section 12.4(e)(ii).

 "Subject Securities" is defined in Section 13.1.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons will be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons will be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or will be or control any managing director or general partner of such limited liability company, partnership, association or other business entity. For purposes hereof, references to a "Subsidiary" of any Person will be given effect only at such times that such Person has one or more Subsidiaries, and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company.

"Tag Along Holder" is defined in Section 12.1(a).

"Tag Along Notice" is defined in Section 12.1(a).

"Tag Along Offer" is defined in Section 12.1(b).

"Tag Along Seller" is defined in Section 12.1(b).

"Tag Along Transfer" is defined in Section 12.1.

"Tag Along Transfer Percentage" is defined in Section 12.1(a)(ii).

"Tax Distribution" is defined in Section 5.1(a)(i).

"Tax Matters Member" is defined in Section 10.1(a).

"Tax Review Period" is defined in Section 10.3.

"Third Party" or "Third Parties" means any Person that is not (or is not an Affiliate of) (i) a direct or indirect Unit Holder, (ii) a member of the Board of Managers, (iii) an officer of the Company, (iv) the Company and its Subsidiaries or (v) a direct or indirect Unit Holder of the Company.

"Total Tag Units" is defined in Section 12.1(a)(i).

"Transfer" means a sale, assignment, pledge, encumbrance, abandonment, disposition or other transfer.

"Transferred Class S Units" is defined in Section 11.8(b).

"Trident Parent" means Trident Holding Company, LLC, a Delaware limited liability company.

"Trigger Date" is defined in Section 11.9(a).

"True-Up Provisions" means, collectively, Sections 3.03, 3.04, 8.02(b), 8.02(g), 8.07 and 9.05 of the Contribution Agreement and the Earnout Provisions.

"Unit Holder" means a Person in regard to such Person's particular Interest in Units.

"Units" means each of the Class A Units, the Class P Units and the Class S Units, and any other Class of units of the Company that are a measure of a Unit Holder's share of Net Profit and Net Loss of the Company as provided in Article V.

"Unvested Class P Units" is defined in Section 5.1(c).

## ARTICLE II

## FORMATION AND PURPOSE

Section 2.1    Formation. The Company was formed as of December 5, 2016 as a limited liability company in accordance with the Act by the filing of the Certificate with the Delaware Secretary of State. The rights and liabilities of the Unit Holders will be determined pursuant to this Agreement and, to the extent required by the Act, by the Act. To the extent that the rights or obligations of any Unit Holder are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement will, to the extent permitted by the Act, control.

Section 2.2    Name. The name of the Company is "FC Pioneer Holding Company, LLC." The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate. The Board of Managers will file, or will cause to be filed, any fictitious name certificates and similar filings, and any amendments thereto, that the Board of Managers considers appropriate.

Section 2.3    Registered Office/Agent. The registered office required to be maintained by the Company in the State of Delaware pursuant to the Act will initially be the office and the agent so designated on the Certificate. The Company may, upon compliance with the applicable provisions of the Act, change its registered office or registered agent from time to time in the determination of the Board of Managers.

Section 2.4    Term. The term of the Company will continue indefinitely unless sooner terminated as provided herein. The existence of the Company as a separate legal entity will continue until the cancellation of the Certificate as provided in the Act.

Section 2.5    Purpose. Subject to the provisions of this Agreement, the purposes for which the Company has been formed and the powers that it may exercise, all being in furtherance, and not in limitation, of the general powers conferred upon limited liability companies by the State of Delaware, are: (a) to invest in, own and manage the current business of Trident Parent and its Subsidiaries; (b) in general, to carry on any lawful business whatsoever that is calculated, directly or indirectly, to promote the interests of the Company or to enhance the value of its assets; (c) to engage in such other business as may be determined by the Board of Managers and (d) to do any and all things incidental to the accomplishment of the foregoing purposes, or incidental to the protection and benefit of the Company.

Section 2.6    Powers. The Company will possess and may exercise all of the powers and privileges granted by the Act or by any other law together with such powers and privileges as are necessary, advisable, incidental or convenient to, or in furtherance of the conduct, promotion or attainment of the business purposes or activities of the Company.

Section 2.7    Certificate. The filing of the Certificate is hereby ratified and confirmed and the Person filing such Certificate is hereby designated as an authorized person within the meaning of the Act to execute, deliver and file the Certificate, and said Person and such other Persons as may be designated from time to time by the Board of Managers are hereby designated as authorized persons, within the meaning of the Act, to execute, deliver and file any amendments or restatements of the Certificate or any certificate of cancellation of the Certificate and any other certificates and any amendments or restatements thereof necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

Section 2.8    Principal Office. The principal executive office of the Company will be located at such place as the Board of Managers will establish, and the Board of Managers may from time to time change the location of the principal executive office of the Company to any other place within or without the State of Delaware. The Board of Managers may establish and maintain such additional offices and places of business of the Company, either within or without the State of Delaware, as it deems appropriate.

Section 2.9    No State-Law Partnership. The Unit Holders intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Unit Holder be a partner or joint venturer of any other Unit Holder by virtue of this Agreement, for any purposes other than as set forth in the immediately following sentence, and neither this Agreement nor any document entered into by the Company or any Unit Holder will be construed to suggest otherwise. The Unit Holders intend that the Company be treated as a partnership for federal and, if applicable, state or local income tax purposes, and the Company and each Unit Holder will file all tax returns and will otherwise take all tax and financial reporting positions in a manner consistent with such treatment.

# ARTICLE III

## MEMBERSHIP, CAPITAL CONTRIBUTIONS AND UNITS

Section 3.1    <u>Members</u>. The Members of the Company will be listed on <u>Exhibit 3.1</u>, as from time to time amended and supplemented in accordance with this Agreement. As of the Original Date, each Member holds the number and Class(es) of Units set forth on <u>Exhibit 3.1</u>. <u>Exhibit 3.1</u> may be amended from time to time by or at the direction of the Board of Managers so that it sets forth the then current list of Members and/or such other information as the Board of Managers may determine to include from time to time in accordance with this Agreement. The Company will maintain a current list of Unit Holders, the total amount of Capital Contributions made by each such Unit Holder, the number and Class of Units held by such Unit Holder and each Unit Holder's Capital Account balance.

Section 3.2    <u>Unit Holder Interests and Units</u>. The Interests of the Unit Holders of the Company will be divided into Units. There will be multiple Classes of Units, which will initially consist of the following:

(a)    *Class A Units*. Each "<u>Class A Unit</u>" will represent an Interest in the Company, will be designated as a Class A Unit of the Company and will have the powers, preferences, rights and restrictions set forth in this Agreement for the Class A Units (including the right to Distributions provided for in <u>Article V</u>).

(b)    *Class P1 Units*. Each "<u>Class P1 Unit</u>" will represent an Interest in the Company, will be designated as a Class P1 Unit of the Company and will be entitled to the Distributions provided for in <u>Article V</u>.

(c)    *Class P1.5 Units*. Each "<u>Class P1.5 Unit</u>" will represent an Interest in the Company, will be designated as a Class P1.5 Unit of the Company and will be entitled to the Distributions provided for in <u>Article V</u>.

(d)    *Class P2 Units*. Each "<u>Class P2 Unit</u>" will represent an Interest in the Company, will be designated as a Class P2 Unit of the Company and will be entitled to the Distributions provided for in <u>Article V</u>.

(e)    *Class P2.5 Units*. Each "<u>Class P2.5 Unit</u>" will represent an Interest in the Company, will be designated as a Class P2.5 Unit of the Company and will be entitled to the Distributions provided for in <u>Article V</u>.

(f)    *Class P3 Units*. Each "<u>Class P3 Unit</u>" will represent an Interest in the Company, will be designated as a Class P3 Unit of the Company and will be entitled to the Distributions provided for in <u>Article V</u>.

(g)    *Class P3.5 Units*. Each "<u>Class P3.5 Unit</u>" will represent an Interest in the Company, will be designated as a Class P3.5 Unit of the Company and will be entitled to the Distributions provided for in <u>Article V</u>.

17

(h)    *Class P4 Units.* Each "Class P4 Unit" will represent an Interest in the Company, will be designated as a Class P4 Unit of the Company and will be entitled to the Distributions provided for in Article V.

(i)    *Class P4.5 Units.* Each "Class P4.5 Unit" will represent an Interest in the Company, will be designated as a Class P4.5 Unit of the Company and will be entitled to the Distributions provided for in Article V.

(j)    *Class P5 Units.* Each "Class P5 Unit" will represent an Interest in the Company, will be designated as a Class P5 Unit of the Company and will be entitled to the Distributions provided for in Article V.

(k)    *Class S Units.* Each "Class S Unit" will represent an Interest in the Company, will be designated as a Class S Unit of the Company and will be entitled to the Distributions provided for in Article V.  The Class S Units are being issued to the Class S Unit Holders in connection with the transactions contemplated under the Investment Agreement.  The Class S Units shall be treated and reported by the Company for all tax purposes in a manner consistent with Section 2.9(a) of the Investment Agreement.

(l)    Any Class P Units issued hereunder to an employee, consultant or service provider of the Company or any of its Subsidiaries have been issued in connection with and as a part of the compensation and incentive arrangements between the Company and such employee, consultant or service provider. The Class P Units have been granted in exchange for the consideration set forth in the agreement or certificate pursuant to which such Class P Units were issued and the services provided to the Company including management of the Company's investments and such other services as the Company may from time to time request and are intended to be "profits interests" for U.S. federal income tax purposes. The provisions of this Agreement will be interpreted in accordance with such intent. In furtherance of the foregoing:

(i)    By executing this Agreement, each Unit Holder authorizes the Company, at the election of the Board of Managers, to elect to have the "Safe Harbor" described in the proposed Revenue Procedure (the "Revenue Procedure") set forth in IRS Notice 2005-43 (the "Notice") apply to any Interest in the Company transferred to a service provider by the Company on or after the effective date of such Revenue Procedure in connection with services provided to the Company. For purposes of making such Safe Harbor election, the Tax Matters Member is hereby designated as the "partner who has responsibility for federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by the Tax Matters Member will constitute execution of a "Safe Harbor Election" in accordance with Section 3.03 of the Notice. The Company and each Unit Holder hereby agree to comply with all requirements of the Safe Harbor described in the Notice, to the extent such requirements are imposed in the Revenue Procedure, including the requirement that each Unit Holder will prepare and file all federal income tax returns reporting the income tax effects of each Interest in the Company issued by the Company covered by the Safe Harbor in a manner consistent with the requirements of the Revenue Procedure.

18

(ii)    Each Unit Holder authorizes the Tax Matters Member to amend <u>Section 3.2(l)(i)</u> to the extent necessary and advisable in the sole determination of the Board of Managers, to comply with the requirements of the Revenue Procedure as issued; <u>provided</u> that such amendment is not materially adverse to such Unit Holder (as compared with the after tax consequences that would result if the provisions of the Notice applied to all Interests in the Company transferred to a service provider by the Company in connection with services provided to the Company). A Unit Holder's obligations to comply with the requirements of this <u>Section 3.2(l)</u> will survive such Unit Holder's ceasing to be a Unit Holder of the Company and/or the termination, dissolution, liquidation and winding up of the Company, and, for purposes of this <u>Section 3.2(l)</u>, the Company will be treated as continuing in existence.

Section 3.3      <u>Voting</u>.

(a)      Notwithstanding the fact that a Unit Holder may hold any combination of Interests (including Units of more than one Class), the Class A Units, the Class P Units and the Class S Units will constitute the same Class of Interests for voting purposes under the Act and this Agreement, with each Class A Unit, each Class P Unit and each Class S Unit being entitled to one (1) vote per Unit (including for purposes of Sections 18-209(b), 18-213(b), 18-216(b), 18-301(b)(1), 18-302(a), 18-302(b), 18-304, 18-704(a), 18-801(a) and 18-803(a) of the Act) except to the extent this Agreement expressly provides otherwise. Except to the extent this Agreement expressly requires otherwise, all actions, consents and approvals required by the Members hereof (including for purposes of Sections 18-209(b), 18-213(b), 18-216(b), 18-301(b)(1), 18-302(a), 18-302(b), 18-304, 18-704(a), 18-801(a) and 18-803(a) of the Act) will be effective if taken by the holders of the Required Interest, and any such action, consent or approval may be taken without a meeting if at least the holders of the Required Interest consent thereto in writing or by electronic communication and such writing or writings are filed with the records of the Company with prompt notice of such action provided to Member's not executing such written consent. Such consent will be treated for all purposes as the act of the holders of the Required Interest.

(b)      Notwithstanding anything to the contrary contained in this Agreement, any affirmative vote or consent of the Class S Unit Holders shall require the affirmative vote or consent of the Class S Majority Holders.

Section 3.4      <u>Special Rights</u>.

(a)      Without the prior written consent of (x) NTH or the NTH Representative or (y) Schryver or the Schryver Representative, the Company may not, and shall cause its Subsidiaries not to:

(i)      approve the Company's annual budget; <u>provided</u> that if NTH, the NTH Representative, Schryver or the Schryver Representative, on the one hand, and the Board of Managers, on the other hand, are unable to agree on an annual budget for the Company, the Company's annual budget will revert to 110% of the prior year's annual budget;

(ii)   make any commitment to capital expenditures in excess of $1,000,000 individually or $25,000,000 per year unless such capital expenditure is already provided for in the Company's annual budget and approved in accordance with Section 3.4(a)(i);

(iii)   incur any indebtedness for borrowed money in excess of $5,000,000 or enter into any guaranty thereof other than indebtedness or guaranties in connection with any Approved Acquisitions or amend or modify in any material respect the terms of the Company's or its Subsidiaries material indebtedness;

(iv)   subject to Section 3.4(b)(i), dispose of assets outside the ordinary course of business;

(v)   settle litigation claiming damages in excess of $5,000,000 (excluding litigation in respect of any indemnity obligations which are contained in, or arise out of or related to, the Contribution Agreement (which shall be governed by such Agreement)); provided, however, that if any such settlement would have a disproportionate adverse impact on NTH, STI or Schryver, the Company may not agree to such settlement without the prior written consent of (A) NTH or the NTH Representative (in the case of a disproportionate adverse impact on NTH) and (B) Schryver or the Schryver Representative (in the case of a disproportionate adverse impact on STI or Schryver);

(vi)   terminate the Chief Executive Officer of Trident Parent;

(vii)   select or remove the independent financial auditor, or adopt or modify in any material respect, any accounting policy other than as required by U.S. generally accepted accounting principles or applicable law;

(viii)   file a registration statement in anticipation of, or consummate, a Public Offering;

(ix)   directly or indirectly sell, transfer, license, pledge or encumber any technology or intellectual property, other than pursuant to the Credit Agreement or licenses in the ordinary course of business;

(x)   enter into any material contracts, including material real property leases or amend or terminate any existing material contracts, including material real property leases; or

(xi)   subject to Section 3.4(b)(xi), purchase, redeem or otherwise acquire any Units, or otherwise return capital or make dividends or Distributions.

(b)      Without the prior written consent of (x) NTH or the NTH Representative and (y) Schryver or the Schryver Representative, the Company may not, and shall cause its Subsidiaries not to:

(i)    dispose of assets outside the ordinary course of business if disposition is of assets with a Fair Value in excess of $20,000,000;

(ii)    hire the Chief Executive Officer of Trident Parent;

(iii)    change the size of the Board of Managers;

(iv)    change the compensation of senior executive officers outside of the ordinary course of business;

(v)    issue, or amend the terms of, or undertake a split or exchange of, any security, other than (A) in connection with an Approved Acquisition or (B) pursuant to Section 3.10 or the True-Up Provisions, provided, however, that any security amendment, split or exchange that would adversely and disproportionately affect the Class S Units shall require the separate prior written consent of the Class S Majority Holders;

(vi)    decide to subject the Company or any Subsidiary to any proceedings under any bankruptcy or insolvency law, or dissolve, liquidate or take steps to wind up or terminate the Company's existence;

(vii)    change in any material respect the nature of the Company's and its Subsidiaries' business, including the formation of a partnership or joint venture other than in the ordinary course of business;

(viii)    enter into any transaction or agreement with a current officer, director, Member or any other Affiliate of the Company or its Subsidiaries, other than in connection with an Approved Acquisition; *provided, however*, that to the extent that all of Formax, NTH and Schryver are parties to such transaction or agreement (other than involving the Sponsor MSA (as defined in the Contribution Agreement)), the separate prior written consent of the Class S Majority Holders shall be required;

(ix)    purchase, or otherwise acquire, invest in, or make a loan to, any other companies or Persons, other than in connection with an Approved Acquisition;

(x)    except for Transfers permitted pursuant to Article XII, directly or indirectly Transfer the Company or any of its individual businesses, through any type of transaction with any other Person, including a sale, merger, consolidation or reorganization;

(xi)    except pursuant to Section 11.8, Section 11.9 or the True-Up Provisions, purchase, redeem or otherwise acquire any Units from Formax, STI, Schryver or any Class S Unit Holder, other than a pro rata purchase, redemption or acquisition from Formax, STI, Schryver and the Class S Unit Holders; or

21

(xii)    other than any amendments in connection with an Approved Acquisition, amend the Certificate, this Agreement or the organizational documents of any Subsidiary of the Company, including, for the avoidance of doubt, all member, director and officer indemnity provisions.

For the avoidance of doubt, this <u>Section 3.4</u> shall not be amended without the prior written consent of (A) NTH or the NTH Representative and (B) Schryver or the Schryver Representative.

(c)    Without the prior written consent of Schryver, the Company may not, and shall cause its Subsidiaries not to, contribute or otherwise Transfer any equity securities, or all or substantially all of the assets, of Schryver Medical Sales and Marketing, LLC to any direct or indirect Subsidiary of the Company that is a corporation or a limited liability company that has elected to be treated as a corporation for U.S. federal income tax purposes.

Section 3.5    <u>Specific Limitations</u>. No Unit Holder will have the right or power to: (a) withdraw or reduce its Capital Contribution except as provided by the Act or in this Agreement, (b) make voluntary Capital Contributions or contribute any property to the Company other than cash, (c) bring an action for partition against the Company or any Company assets, (d) cause the dissolution of the Company, except as set forth in this Agreement or as required by the Act, or (e) require that property other than cash be distributed upon any Distribution.

Section 3.6    <u>Additional Members and Units</u>. Subject to <u>Section 3.4</u> and <u>Section 13.1</u>, the Board of Managers may issue Units or Interests in the Company (including other Classes or series thereof having different rights) and admit Persons as Members in exchange for such contributions to capital (including commitments to make contributions to capital) or such other consideration (including past or future services) and on such terms and conditions (including vesting and forfeiture provisions) as the Board of Managers determines. Promptly following the issuance of Units or Interests, the Board of Managers will cause the books and records of the Company and <u>Exhibit 3.1</u> to reflect the number of Units or Interests issued, any Members or additional Members holding such Units or Interests, and in the case of Units or Interests issued other than solely in connection with the performance of services, the Capital Contribution per Unit or Interest. Upon the execution of this Agreement or a counterpart of this Agreement, together with any other documents or instruments required by the Board of Managers in connection therewith, and the making of the Capital Contribution (if any) specified to be made at such time, a Person will be admitted to the Company as a Member of the Company.

Section 3.7    <u>Capital Contributions</u>. Each Unit Holder's Capital Contribution, if any, whether in cash or in-kind, and the number of Units issued to such Unit Holders will be as set forth in <u>Exhibit 3.1</u> (as it may be amended from time to time) or in the writing pursuant to which such Units were issued to such Unit Holder. Any in-kind Capital Contributions will be effected by a written assignment or such other documents as the Board of Managers will direct. Any Unit Holder making an in-kind Capital Contribution agrees from time to time to do such further acts and execute such further documents as the Board of Managers may direct to perfect the Company's interest in such in-kind Capital Contribution.  Except as set forth in the final sentence of <u>Section 4.3</u> or pursuant to <u>Section 13.4</u>, no Unit Holder shall be required to make any

additional Capital Contributions to the Company, except as otherwise required by a subsequent agreement entered into between the Company and such Unit Holder.

Section 3.8    <u>Certification</u>. In the event that certificates representing the Units or other Interests in the Company are issued, such certificates will bear the following legend:

"THE UNITS OR OTHER INTERESTS REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS ("STATE ACTS") AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR STATE ACTS OR AN EXEMPTION FROM REGISTRATION THEREUNDER. THE TRANSFER OF THE UNITS REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE CONDITIONS SPECIFIED IN A LIMITED LIABILITY COMPANY AGREEMENT, DATED AS OF DECEMBER 9, 2016, AS IT MAY BE AMENDED FROM TIME TO TIME, GOVERNING THE ISSUER (THE "COMPANY") AND BY AND AMONG CERTAIN MEMBERS. A COPY OF SUCH AGREEMENT WILL BE FURNISHED BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST AND WITHOUT CHARGE."

Section 3.9    <u>Allocation of Class P Units</u>. Without limiting any other provision of this Agreement, the Board of Managers shall meet at least once per Fiscal Year with the Chief Executive Officer of Trident Parent to review the issuance of Class P Units at such date, including the reallocation of any previously issued Class P Units that have been forfeited (and not repurchased by the Company).

Section 3.10    <u>Earnout Issuances</u>.  In the event that the Company issues any Class A Units pursuant to the Earnout Provisions (any such issuance, an "<u>Earnout Issuance</u>"), the Company shall, concurrently with such Earnout Issuance, issue to each Class S Unit Holder a number of Class S Units (such issuance, an "<u>Earnout Class S Issuance</u>") such that, after giving effect to such Earnout Issuance and such Earnout Class S Issuance, such Class S Unit Holder's Class S Percentage Interest shall equal such Class S Unit Holder's Class S Percentage Interest as of immediately prior to the Earnout Issuance and Earnout Class S Issuance.

## ARTICLE IV

## CAPITAL ACCOUNTS

Section 4.1    <u>Capital Accounts</u>. A separate account (each, a "<u>Capital Account</u>") will be established and maintained for each Unit Holder which:

(a)    will be increased by (i) the amount of any Capital Contribution by such Unit Holder to the Company, (ii) such Unit Holder's allocated share of the Net Profit (or items thereof) of the Company, and (iii) such Unit Holder's allocated share of gain or income specially allocated under <u>Section 5.6</u>; and

(b)    will be reduced by (i) the amount of any Distribution to such Unit Holder, (ii) such Unit Holder's allocated share of the Net Loss (or items thereof) of the Company, and (iii) such Unit Holder's allocated share of loss or deduction specially allocated under Section 5.6.

In determining the amount of any liability for purposes of subclauses (a)(i) and (b)(i) of this Section 4.1, Section 752 of the Code and any other applicable provisions of the Code and Regulations will be taken into account. It is the intention of the Unit Holders that the Capital Accounts of the Company be maintained in accordance with the provisions of Section 704(b) of the Code and the Regulations thereunder and that this Agreement be interpreted consistently therewith.

Section 4.2    Revaluations of Assets and Capital Account Adjustments.

(a)    Unless otherwise determined by the Board of Managers, (i) immediately preceding the issuance of additional Units in exchange for a non-de minimis amount of cash, other property, or services to a new or existing Unit Holder, (ii) upon the redemption of the Interest of a Unit Holder or the liquidation of the Company, (iii) upon a Distribution in kind of the shares or equity interests of a direct or indirect Subsidiary of the Company pursuant to Section 12.4(e) hereof, (iv) a surrender of Units by Schryver pursuant to Section 8.02 or Section 9.05(a) of the Contribution Agreement or STI pursuant to Section 9.05(b) of the Contribution Agreement, or (v) the issuance of additional Units by Trident pursuant to Section 8.02 or Section 9.05(c) of the Contribution Agreement, the then prevailing Asset Values of the Company will be adjusted to equal their respective gross Fair Value and any increase in the net equity value of the Company (Asset Values less Liabilities) will be credited to the Capital Accounts of the Unit Holders in the same manner as Net Profits are credited under Section 5.5(b) (or, subject to Section 4.2(b) and Section 5.8, any decrease in the net equity value of the Company will be charged in the same manner as Net Losses are charged under Section 5.5(b)). Accordingly, as of any time Asset Values are adjusted pursuant to this Section 4.2, the Capital Accounts of Unit Holders will reflect both realized and unrealized gains and losses through such date and the net equity value of the Company as of such date.

(b)    In the event of a Loss (as defined in the Contribution Agreement) that does not give rise to an item of loss or deduction that may be allocated to Schryver, STI and/or Formax pursuant to Section 5.5(b) or specially allocated to Schryver, STI and/or Formax pursuant to Section 5.8(a), the Asset Value of the applicable property contributed to the Company shall be reduced to reflect the amount of such Loss and such reduction in Asset Value shall be charged against the Capital Account of Schryver, STI and/or Formax, as applicable. This Section 4.2(b) is intended to operate in the same manner as a purchase price adjustment and shall be interpreted and applied in a manner consistent with such intention.

Section 4.3    Additional Capital Account Provisions. Except as otherwise agreed to in writing by the Company and any Unit Holder, no Unit Holder will have the right to demand a return of all or any part of such Unit Holder's Capital Contributions. Any return of the Capital Contributions of any Unit Holder will be made solely from the assets of the Company and only in accordance with the terms of this Agreement. No interest will be paid to any Unit Holder with respect to such Unit Holder's Capital Contributions or Capital Account. In the event that all or a portion of the Units of a Unit Holder are transferred in accordance with this Agreement, the

24

transferee of such Units will also succeed to all or the relevant portion of the Capital Account of the transferor (based on the ratio of the number of Units held by the transferor immediately before the transfer to the number of Units transferred with appropriate adjustments to account for differences in Classes), and will be treated as having made any Capital Contributions, and received any Distributions, made or received with respect to such transferred Units while such Units were held by the transferor. Units held by a Unit Holder may not be transferred independently of the Interest to which the Units relate. No Unit Holder shall be required to lend funds to the Company or to guarantee any indebtedness of the Company. No Unit Holder shall be required to contribute capital to restore a negative or deficit balance in such Member's or the Company's Capital Account at any time (including upon the dissolution or liquidation of the Company) except in the case and to the extent of a Distribution made in violation of the express provisions of this Agreement.

**ARTICLE V**

**DISTRIBUTIONS AND ALLOCATIONS OF PROFIT AND LOSS**

Section 5.1    Distributions.

(a)    *Tax Distributions.*

(i)    To the extent the Company has available cash for Distribution by the Company under the Act and subject to any applicable agreement to which the Company or any of its Subsidiaries is a party governing the terms of indebtedness for borrowed money and subject to the retention and establishment of reserves, or payment to third parties, of such funds as the Board of Managers reasonably deems necessary with respect to the reasonable business needs and obligations of the Company, the Board of Managers shall cause the Company to make, on a quarterly basis (i.e., on or about April 1, June 1, September 1 and December 15 of the applicable Fiscal Year) (or more frequently as the Board of Managers reasonably determines), a Distribution to each Unit Holder equal to such Unit Holder's Tax Distribution for the applicable fiscal quarter (or other taxable period). With respect to the applicable Units, the "Tax Distribution" for a Unit Holder for a fiscal quarter (or other taxable period) is the amount reasonably determined by the Board of Managers to be sufficient such that such amount, together with any other Tax Distributions or other Distributions made to such Unit Holder with respect to the applicable Fiscal Year (or other taxable period), is equal to the product of (A) the Assumed Tax Rate, and (B) the Unit Holder's estimated allocable share of any Company net taxable income and gain for the applicable fiscal quarter, in aggregate with any preceding fiscal quarter of such Fiscal Year (or other taxable period), determined by assuming, without regard to such Unit Holder's actual tax liability, that such income or gain, as applicable, is taxable to the Unit Holder at the Assumed Tax Rate. For purposes of this Section, a Unit Holder's estimated allocable share of the Company's net taxable income and gain as determined by the Board of Managers will, to the extent permitted by law, (1) be equal to the sum of all items of income or gain estimated to be allocable to such Unit Holder for such fiscal quarter, in

25

aggregate with any preceding fiscal quarter of such Fiscal Year (or other taxable period) less all items of deduction, loss and the loss equivalent (determined using the applicable Assumed Tax Rate) of tax credits allocated to such Unit Holder (or, to the extent applicable, its predecessors in interest) for such fiscal quarter, in aggregate with any preceding fiscal quarter of such Fiscal Year (or other taxable period) and all prior fiscal quarters (or other taxable periods) to the extent not previously taken into account as a reduction of income or gain allocated to such Unit Holder (or, to the extent applicable, its predecessors in interest), and (2) include any items of income, gain, loss, or deduction specially allocated to (or required to be taken into account by) such Unit Holder under Section 704(c) of the Code and the Regulations promulgated thereunder.  If the Company does not have sufficient cash or other available funds or is otherwise limited in its ability to make a Tax Distribution in the full amount that all Unit Holders would otherwise be entitled pursuant to this Section 5.1(a) with respect to any Fiscal Year (or other taxable year or taxable period), then the Company shall, to the extent otherwise permitted, make such Tax Distribution on a pro rata basis to all Unit Holders based on the full amount each such Unit Holder would otherwise be entitled pursuant to this Section 5.1(a).

(ii)    If the net taxable income and gain allocated to a Unit Holder on the final Schedule K-1 delivered pursuant to Section 9.2 ("Final Allocable Income") exceed the estimates of the net taxable income and gain used to compute such Unit Holder's Tax Distributions pursuant to Section 5.1(a)(i) ((such estimated amount, the "Estimated Allocable Income"; such excess net taxable income, the "Allocation Excess"), upon delivery of the final Schedule K-1 for a taxable year or other taxable period pursuant to Section 9.2, the Company shall, subject to the restrictions set forth in the first sentence of Section 5.1(a)(i), distribute to such Unit Holder an amount of cash equal to the product of (A) the Assumed Tax Rate, and (B) the Allocation Excess. Any distribution pursuant to this Section 5.1(a)(ii) shall be treated as a Tax Distribution. If the Estimated Allocable Income exceeds the Final Allocable Income, (such excess, the "Excess Tax Amount"), the Company shall apply the product of (C) the Assumed Tax Rate and (D) the Excess Tax Amount against any future Tax Distributions and other Distributions that would otherwise be made to a Unit Holder in a manner consistent with Section 5.1(a)(iv).

(iii)    For purposes of applying this Section 5.1, the Board of Managers may treat a distribution made by the sixtieth day following the end of a Fiscal Year as occurring during the immediately preceding Fiscal Year (and not the Fiscal Year in which it is in fact made).

(iv)    Any Tax Distribution to a Unit Holder will be treated as an advance to such Unit Holder and will reduce future Distributions (excluding Distributions with respect to Section 5.1(b)(i) and Section 5.1(b)(ii)) that would otherwise be made to such Unit Holder and will similarly reduce such Unit Holder's allocable share of any proceeds on a sale of Units, including pursuant to Section 12 or on a Sale of the Company.

26

(v)    If the Company does not have sufficient cash or other available funds or is otherwise limited in its ability to make a Tax Distribution, and as a consequence thereof does not distribute to a Unit Holder the full amount to which such Unit Holder would otherwise be entitled pursuant to this Section 5.1(a) with respect to any Fiscal Year (or other taxable year or taxable period), then such undistributed amounts shall carry forward and be added to the amount otherwise distributable to such Unit Holder pursuant to this Section 5.1(a) with respect to the following Fiscal Year (or other taxable year or taxable period).

(b)    *Distribution of Net Cash Flow.* Subject to Sections 3.4 and 5.1(a), (x) the net cash flow of the Company will be distributed to the Unit Holders at such times as may be determined by the Board of Managers from time to time and (y) net proceeds of the Company received from a Sale of the Company will be distributed promptly following such Sale of the Company. Except as specifically set forth herein, all Distributions to a Class or Classes of Units will be made ratably among the holders of the applicable Class or Classes of Units in question, based on the number of Units of such Class owned by such holders. The amount of any Distributions of such net cash flow and such net proceeds will be made to the Unit Holders in the following order of priority:

(i)    First, to the Class A Unit Holders (in respect of their Class A Units), pro rata according to the number of Class A Units held, until the Class S Return Threshold has been achieved, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class S Return Threshold has been achieved;

(ii)    Second, to the Class A Unit Holders (in respect of their Class A Units) and Class S Unit Holders (in respect of their Class S Units), pro rata according to the number of Class A Units and Class S Units held, until each Class A Holder has been distributed an aggregate amount pursuant to Section 5.1(b)(i) and this Section 5.1(b)(ii) equal to the aggregate unreturned Capital Contributions made by such Class A Unit Holder with respect to the Class A Units owned by such Class A Unit Holder, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until such cumulative amount of the unreturned Capital Contributions in respect of such Class A Units has been distributed;

(iii)    Third, to the Class P Unit Holders (in respect of their Class P Units), until the cumulative amount distributed to the Class P Unit Holders pursuant to this Section 5.1(b)(iii) equals the aggregate unreturned Capital Contributions made by such Unit Holders, if any, with respect to the Class P Units owned by such Unit Holders, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until such cumulative amount of unreturned Capital Contributions in respect of Class P Units has been distributed;

27

(iv)   Fourth, (A) to the Class S Unit Holders (in respect of their Class S Units), the Class S Portion, pro rata in accordance with their pro rata share of the Class S Percentage Interest, and (B) the Residual, to the Class A Unit Holders (in respect of their Class A Units) and Class P1 Unit Holders (in respect of their Class P1 Units), pro rata according to the number of Class A Units and Class P1 Units held, until the Class P1.5 Return Threshold has been achieved, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P1.5 Return Threshold has been achieved;

(v)   Fifth, to the Class P1.5 Unit Holders (in respect of their Class P1.5 Units), pro rata according to the number of Class P1.5 Units held, until the Class P1.5 Unit Holders have each received the Class P Unit Return for each of the Class P1.5 Units held by such Class P1.5 Unit Holder, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P1.5 Unit Holders have each received the Class P Unit Return for each of the Class P1.5 Units held by such Class P1.5 Unit Holder;

(vi)   Sixth, (A) to the Class S Unit Holders (in respect of their Class S Units), the Class S Portion, pro rata in accordance with their pro rata share of the Class S Percentage Interest, and (B) the Residual, to the Class A Unit Holders (in respect of their Class A Units), Class P1 Unit Holders (in respect of their Class P1 Units) and Class P1.5 Unit Holders (in respect of their Class P1.5 Units), pro rata according to the number of Class A Units, Class P1 Units and Class P1.5 Units held, until the Class P2 Return Threshold has been achieved, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P2 Return Threshold has been achieved;

(vii)   Seventh, to the Class P2 Unit Holders (in respect of their Class P2 Units), pro rata according to the number of Class P2 Units held, until the Class P2 Unit Holders have each received the Class P Unit Return for each of the Class P2 Units held by such Class P2 Unit Holder, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P2 Unit Holders have each received the Class P Unit Return for each of the Class P2 Units held by such Class P2 Unit Holder;

(viii)   Eighth, (A) to the Class S Unit Holders (in respect of their Class S Units), the Class S Portion, pro rata in accordance with their pro rata share of the Class S Percentage Interest, and (B) the Residual, to the Class A Unit Holders (in respect of their Class A Units), Class P1 Unit Holders (in respect of their Class P1 Units), Class P1.5 Unit Holders (in respect of their Class P1.5 Units) and Class P2 Unit Holders (in respect of their Class P2 Units), pro rata according to the number of Class A Units, Class P1 Units, Class P1.5 Units and Class P2 Units held, until the Class P2.5 Return Threshold has been achieved, and no Distribution or any portion thereof will be made under any of the other

28

paragraphs of this Section 5.1(b) below until the Class P2.5 Return Threshold has been achieved;

(ix)   Ninth, to the Class P2.5 Unit Holders (in respect of their Class P2.5 Units), pro rata according to the number of Class P2.5 Units held, until the Class P2.5 Unit Holders have each received the Class P Unit Return for each of the Class P2.5 Units held by such Class P2.5 Unit Holder, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P2.5 Unit Holders have each received the Class P Unit Return for each of the Class P2.5 Units held by such Class P2.5 Unit Holder;

(x)   Tenth, (A) to the Class S Unit Holders (in respect of their Class S Units), the Class S Portion, pro rata in accordance with their pro rata share of the Class S Percentage Interest, and (B) the Residual, to the Class A Unit Holders (in respect of their Class A Units), Class P1 Unit Holders (in respect of their Class P1 Units), Class P1.5 Unit Holders (in respect of their Class P1.5 Units), Class P2 Unit Holders (in respect of their Class P2 Units) and Class P2.5 Unit Holders (in respect of their Class P2.5 Units), pro rata according to the number of Class A Units, Class P1 Units, Class P1.5 Units, Class P2 Units and Class P2.5 Units held, until the Class P3 Return Threshold has been achieved, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P3 Return Threshold has been achieved;

(xi)   Eleventh, to the Class P3 Unit Holders (in respect of their Class P3 Units), pro rata according to the number of Class P3 Units held, until the Class P3 Unit Holders have each received the Class P Unit Return for each of the Class P3 Units held by such Class P3 Unit Holder, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P3 Unit Holders have each received the Class P Unit Return for each of the Class P3 Units held by such Class P3 Unit Holder;

(xii)   Twelfth, (A) to the Class S Unit Holders (in respect of their Class S Units), the Class S Portion, pro rata in accordance with their pro rata share of the Class S Percentage Interest, and (B) the Residual, to the Class A Unit Holders (in respect of their Class A Units), Class P1 Unit Holders (in respect of their Class P1 Units), Class P1.5 Unit Holders (in respect of their Class P1.5 Units), Class P2 Unit Holders (in respect of their Class P2 Units), Class P2.5 Unit Holders (in respect of their Class P2.5 Units) and Class P3 Unit Holders (in respect of their Class P3 Units), pro rata according to the number of Class A Units, Class P1 Units, Class P1.5 Units, Class P2 Units, Class P2.5 Units and Class P3 Units held, until the Class P3.5 Return Threshold has been achieved, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P3.5 Return Threshold has been achieved;

(xiii)   Thirteenth, to the Class P3.5 Unit Holders (in respect of their Class P3.5 Units), pro rata according to the number of Class P3.5 Units held, until the Class P3.5 Unit Holders have each received the Class P Unit Return for each of the Class P3.5 Units held by such Class P3.5 Unit Holder, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P3.5 Unit Holders have each received the Class P Unit Return for each of the Class P3.5 Units held by such Class P3.5 Unit Holder;

(xiv)   Fourteenth, (A) to the Class S Unit Holders (in respect of their Class S Units), the Class S Portion, pro rata in accordance with their pro rata share of the Class S Percentage Interest, and (B) the Residual, to the Class A Unit Holders (in respect of their Class A Units), Class P1 Unit Holders (in respect of their Class P1 Units), Class P1.5 Unit Holders (in respect of their Class P1.5 Units), Class P2 Unit Holders (in respect of their Class P2 Units), Class P2.5 Unit Holders (in respect of their Class P2.5 Units), Class P3 Unit Holders (in respect of their Class P3 Units) and Class P3.5 Unit Holders (in respect of their Class P3.5 Units), pro rata according to the number of Class A Units, Class P1 Units, Class P1.5 Units, Class P2 Units, Class P2.5 Units, Class P3 Unit and Class P3.5 Units held, until the Class P4 Return Threshold has been achieved, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P4 Return Threshold has been achieved;

(xv)   Fifteenth, to the Class P4 Unit Holders (in respect of their Class P4 Units), pro rata according to the number of Class P4 Units held, until the Class P4 Unit Holders have each received the Class P Unit Return for each of the Class P4 Units held by such Class P4 Unit Holder, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P4 Unit Holders have each received the Class P Unit Return for each of the Class P4 Units held by such Class P4 Unit Holder;

(xvi)   Sixteenth, (A) to the Class S Unit Holders (in respect of their Class S Units), the Class S Portion, pro rata in accordance with their pro rata share of the Class S Percentage Interest, and (B) the Residual, to the Class A Unit Holders (in respect of their Class A Units), Class P1 Unit Holders (in respect of their Class P1 Units), Class P1.5 Unit Holders (in respect of their Class P1.5 Units), Class P2 Unit Holders (in respect of their Class P2 Units), Class P2.5 Unit Holders (in respect of their Class P2.5 Units), Class P3 Unit Holders (in respect of their Class P3 Units), Class P3.5 Unit Holders (in respect of their Class P3.5 Units) and Class P4 Unit Holders (in respect of their Class P4 Units), pro rata according to the number of Class A Units, Class P1 Units, Class P1.5 Units, Class P2 Units, Class P2.5 Units, Class P3 Units, Class P3.5 Units and Class 4 Units held, until the Class P4.5 Return Threshold has been achieved, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P4.5 Return Threshold has been achieved;

(xvii)    Seventeenth, to the Class P4.5 Unit Holders (in respect of their Class P4.5 Units), pro rata according to the number of Class P4.5 Units held, until the Class P4.5 Unit Holders have each received the Class P Unit Return for each of the Class P4.5 Units held by such Class P4.5 Unit Holder, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P4.5 Unit Holders have each received the Class P Unit Return for each of the Class P4.5 Units held by such Class P4.5 Unit Holder;

(xviii)    Eighteenth, (A) to the Class S Unit Holders (in respect of their Class S Units), the Class S Portion, pro rata in accordance with their pro rata share of the Class S Percentage Interest, and (B) the Residual, to the Class A Unit Holders (in respect of their Class A Units), Class P1 Unit Holders (in respect of their Class P1 Units), Class P1.5 Unit Holders (in respect of their Class P1.5 Units), Class P2 Unit Holders (in respect of their Class P2 Units), Class P2.5 Unit Holders (in respect of their Class P2.5 Units), Class P3 Unit Holders (in respect of their Class P3 Units), Class P3.5 Unit Holders (in respect of their Class P3.5 Units), Class P4 Unit Holders (in respect of their Class P4 Units) and Class P4.5 Unit Holders (in respect of their Class P4.5 Units), pro rata according to the number of Class A Units, Class P1 Units, Class P1.5 Units, Class P2 Units, Class P2.5 Units, Class P3 Units, Class P3.5 Units, Class P4 Units and Class P4.5 Units held, until the Class P5 Return Threshold has been achieved, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P5 Return Threshold has been achieved;

(xix)    Nineteenth, to the Class P5 Unit Holders (in respect of their Class P5 Units), pro rata according to the number of Class P5 Units held, until the Class P5 Unit Holders have each received the Class P Unit Return for each of the Class P5 Units held by such Class P5 Unit Holder, and no Distribution or any portion thereof will be made under any of the other paragraphs of this Section 5.1(b) below until the Class P5 Unit Holders have each received the Class P Unit Return for each of the Class P5 Units held by such Class P5 Unit Holder; and

(xx)    Twentieth, (A) to the Class S Unit Holders (in respect of their Class S Units), the Class S Portion, pro rata in accordance with their pro rata share of the Class S Percentage Interest, and (B) the Residual, to all of the other Unit Holders, pro rata according to the number of Units held.

Notwithstanding the foregoing, if after the Original Date, the Company issues any Preferred Units, the Board of Managers will be required to amend this Agreement, including this Section 5.1(b), to (1) provide for the Distributions to which such Preferred Units are entitled; (2) ensure that the issuance of such Preferred Units shall not result in any change to the Class S Return Threshold (for the avoidance of doubt, no Capital Contributions made in respect of such Preferred Units shall be treated as Cash Inflows for purposes of the Class S Return Threshold) and (3) allow for the Class S Units to begin receiving Distributions pursuant to this Section 5.1(b) with such Preferred Units pro rata according to the number of such Preferred Units and Class S Units held and senior in priority to any other Units in the event that the Class S Return

Threshold has been met prior to such Preferred Units having received 100% of their unreturned Capital Contributions and applicable preferred return.    Set forth on Exhibit 5.1(b) is an illustration of an example waterfall contemplated by the foregoing sentence.

(c)    *Class P Unit Distributions*. Notwithstanding anything contained herein to the contrary, (i) all Distributions (other than Tax Distributions) to any Class P Unit Holder with respect to Class P Units that have not yet become vested pursuant to the agreement pursuant to which such Class P Units were issued ("Unvested Class P Units") will be held in reserve by the Company and distributed to each holder of Unvested Class P Units (if and only so long as such holder is and has continued to be employed by the Company or any Subsidiary through such date) upon the earliest to occur of (A) the date the Unvested Class P Units vest and (B) the consummation of a Sale of the Company; provided that, if such holder ceases to be employed by the Company or any Subsidiary and, at such time, the conditions set forth in clauses (A) and (B) have not been met, then any amounts that have not been distributed with respect to such Unvested Class P Units will be Distributed to all other Unit Holders as if such Distribution were a new Distribution pursuant to Section 5.1(b) (and the Capital Accounts of the Unit Holders will be adjusted in accordance with Article IV); and (ii) (A) a Class P Unit will be issued with a Capital Account that equals the Capital Contribution made in association with such Class P Unit, if any, and (B) consistent with the foregoing, Distributions (other than Tax Distributions) will not be made on a Class P Unit under this Agreement until aggregate Distributions equal to the net equity value of the Company (i.e., Asset Values less Liabilities), which will be valued consistently with the valuation approach in Section 4.2, immediately prior to the issuance of such Class P Unit have been made upon previously issued Units, unless the Board of Managers decides otherwise at the time such Class P Unit is issued. The amount of any Distribution that would have been distributed to a Class P Unit Holder but for the immediately preceding sentence will be distributed to the other Unit Holder (subject, in the case of other Class P Units, to this Section 5.1(c)) in accordance with the other provisions of this Agreement.

(d)    *Erroneous Distributions*. If the Company has, pursuant to any clear and manifest accounting or similar error, paid any Unit Holder an amount in excess of the amount to which it is entitled pursuant to this Article V, such Unit Holder will reimburse the Company to the extent of such excess, without interest, within thirty (30) days after demand by the Company.

Section 5.2    No Violation. Notwithstanding any provision to the contrary contained in this Agreement, the Company will not make a Distribution to any Unit Holder on account of such Unit Holder's Interest in the Company if such Distribution would violate Section 18-607 of the Act or other applicable law.

Section 5.3    Withholding; Tax Indemnity. All amounts withheld pursuant to the Code or any federal, state, local or non-U.S. tax law with respect to any payment, Distribution or allocation to a Unit Holder, or which the Company is otherwise obligated to pay to any governmental agency because of the status of a Unit Holder of the Company (including any interest, penalties and expenses associated with such payments), will be treated as amounts paid to such Unit Holder for all purposes of this Agreement. The Board of Managers is authorized to withhold from Distributions to Unit Holders, or with respect to allocations to Unit Holders, and in each case to pay over to the appropriate federal, state, local or non-U.S. government any amounts required to be so withheld. The Board of Managers will allocate any such amounts to

the Unit Holders in respect of whose Distribution or allocation the tax was withheld and will treat such amounts as actually distributed to such Unit Holders. Each Unit Holder further agrees to indemnify the Company in full for any amounts required to be paid by the Company pursuant to the first sentence of this <u>Section 5.3</u> (including any interest, penalties and expenses associated with such payments), and to the extent such withholding does not otherwise reduce a Distribution the Unit Holder would have been entitled to, each Unit Holder will promptly upon notification of an obligation to indemnify the Company pursuant to this <u>Section 5.3</u> make a cash payment to the Company equal to the full amount to be indemnified (and the amount paid will be added to such Unit Holder's Capital Account under <u>Section 4.1(a)</u> but will not be treated as a Capital Contribution for any other purpose) with interest to accrue on any portion of such cash payment not paid in full when requested, calculated at a rate equal to 10% per annum, compounded as of the last day of each year (but not in excess of the highest rate per annum permitted by law).

Section 5.4    <u>Property Distributions and Installment Sales</u>. If any assets of the Company will be distributed in kind pursuant to this <u>Article V</u>, such assets will be distributed to the Unit Holders entitled thereto in the same proportions as the Unit Holders would have been entitled to cash Distributions. The amount by which the Fair Value of any property to be distributed in kind to the Unit Holders exceeds or is less than the then prevailing Asset Value of such property will, to the extent not otherwise recognized by the Company, be taken into account in determining Net Profit and Net Loss and determining the Capital Accounts of the Unit Holders as if such property had been sold at its Fair Value immediately prior to such Distribution. If any assets are sold in transactions in which, by reason of Section 453 of the Code, gain is realized but not recognized, such gain will be taken into account when realized in computing gain or loss of the Company for purposes of allocation of Net Profit or Net Loss under this <u>Article V</u> and, if such sales will involve substantially all the assets of the Company, the Company will be deemed to have been dissolved and terminated notwithstanding any election by the Unit Holders to continue the Company for purposes of collecting the proceeds of such sales.

Section 5.5    <u>Net Profit or Net Loss.</u>

(a)    The "<u>Net Profit</u>" or "<u>Net Loss</u>" of the Company for each Fiscal Year (or other taxable year or taxable period) an amount equal to the Company's taxable income or loss for federal income tax purposes for such period (including all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code) with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax will constitute Net Profits, and any expenses or expenditures of the Company which may neither be deducted nor capitalized for tax purposes (or are so treated for tax purposes) will constitute Net Losses.

(ii)    Gain or loss attributable to the disposition of property of the Company with an Asset Value different than the adjusted basis of such property for federal income tax purposes will be computed with respect to the Asset Value of such property, and any tax gain or loss not included in Net Profit or Net Loss

will be taken into account and allocated for federal income tax purposes among the Unit Holders pursuant to <u>Section 5.7</u>.

(iii)   Depreciation, amortization or cost recovery deductions with respect to any property with an Asset Value that differs from its adjusted basis for federal income tax purposes will be computed in accordance with Asset Value, and any depreciation allowable for federal income tax purposes will be allocated in accordance with <u>Section 5.7</u>.

(iv)   If the Company makes an election under Section 754 of the Code to provide a special basis adjustment upon the transfer of an Interest in the Company or the Distribution of property by the Company, Capital Accounts will be adjusted to the limited extent required by the Regulations under Section 704 of the Code following such transfer or Distribution. The Company shall make such an election only (A) on a transfer of an Interest in the Company pursuant to <u>Section 12.1</u>, <u>12.2</u> or <u>12.3</u>, at such transferee's request, (B) on any other transfer of an Interest in the Company, with the advance written consent of NTH and Schryver, which shall not be unreasonably withheld or delayed, and (C) on a Distribution of property by the Company, by the Board of Managers in consultation with NTH and Schryver.

(v)   Any items that are required to be specially allocated pursuant to <u>Section 5.6</u> or <u>Section 5.8</u> will not be taken into account in determining Net Profit or Net Loss.

(b)   *Allocations of Net Profit and Net Loss.* The Net Profit and Net Loss of the Company for any relevant Fiscal Year (or other taxable year or taxable period) or, to the extent necessary to accomplish the purpose of this <u>Section 5.5(b)</u>, items of income, gain, deduction, and loss constituting such Net Profit and Net Loss, will be allocated to the Capital Accounts of the Unit Holders so as to ensure, to the extent possible, that the Capital Accounts of the Unit Holders as of the end of such Fiscal Year (or other taxable year or taxable period), as increased by the Unit Holders' shares of "minimum gain" and "partner minimum gain" (as such terms are used in Regulation Section 1.704-2) not otherwise required to be taken into account in such period, are equal to the aggregate Distributions that Unit Holders would be entitled to receive (assuming all Units are vested) if all of the assets of the Company were sold for their Asset Values (assuming for this purpose only that the Asset Value of an asset that secures a non-recourse liability for purposes of Section 1.1001-2 of the Regulations is no less than the amount of such liability that is allocated to such asset in accordance with Section 1.704-2(d)(2) of the Regulations), all liabilities of the Company were repaid from the proceeds of sale and the net remaining proceeds were distributed as of the end of such accounting period in accordance with <u>Sections 5.1(b)</u> and <u>(c)</u>.

The allocations made pursuant to this <u>Section 5.5</u> are intended to comply with the provisions of Section 704(b) of the Code and the Regulations thereunder and, in particular, to reflect the Unit Holders' economic interests in the Company as set forth in <u>Section 5.1</u>, and this <u>Section 5.5</u> will be interpreted in a manner consistent with such intention.

Section 5.6    Regulatory Allocations. Although the Unit Holders do not anticipate that events will arise that will require application of this Section 5.6, provisions governing the allocation of taxable income, gain, loss, deduction and credit (and items thereof) are included in this Agreement as may be necessary to provide that the Company's allocation provisions contain a qualified income offset (as defined in Section 1.704-1 (b)(2)(ii)(d) of the Regulations) and comply with all provisions of the Code and applicable Regulations relating to the allocation of deductions attributable to "nonrecourse deductions" and "nonrecourse liabilities" (as defined in Section 1.704-2(b) of the Regulations) and the chargeback thereof, including "partnership minimum gain" (as defined in Section 1.704-2(b) and 1.704-2(d) of the Regulations) and "partner nonrecourse debt minimum gain" (as defined in Section 1.704-2(i)(3) of the Regulations) (collectively, the "Regulatory Allocations"). Accordingly, this Section 5.6 shall be interpreted as if each Regulatory Allocation has been specifically included herein. All adjustments to the Capital Accounts and the Company's allocation of Net Profits and Net Losses shall comply with the Regulations under Section 704(b) of the Code; provided, however, the Unit Holders intend that all Regulatory Allocations that may be required will be offset by other Regulatory Allocations or special allocations of tax items so that each Unit Holder's share of the Net Profit, Net Loss and capital of the Company will be the same as it would have been had the events requiring the Regulatory Allocations not occurred. For this purpose the Board of Managers, based on the advice of the Company's auditors or tax counsel, is hereby authorized to make such special curative allocations of tax items as may be necessary to minimize or eliminate any economic distortions that may result from any required Regulatory Allocations.

Section 5.7    Tax Allocations; Section 704(c) of the Code and Unrealized Appreciation or Depreciation.

(a)    Contributed Assets. In accordance with Section 704(c) of the Code, income, gain, loss and deduction with respect to any property contributed to the Company with an adjusted basis for federal income tax purposes different from the initial Asset Value at which such property was accepted by the Company will, solely for tax purposes, be allocated among the Unit Holders so as to take into account such difference in the manner permitted by Section 704(c) of the Code and the applicable Regulations.

(b)    Revalued Assets. If the Asset Values of any assets of the Company are adjusted pursuant to Section 4.2, subsequent allocations of income, gain, loss and deduction with respect to such assets will, solely for tax purposes, be allocated among the Unit Holders so as to take into account such adjustment in the manner permitted by Section 704(c) of the Code and the applicable Regulations.

(c)    Allocation for Tax Purposes. The allocations required by this Section 5.7 are solely for purposes of federal, state and local income taxes and will not affect the allocation of Net Profits or Net Losses as between Unit Holders or any Unit Holder's Capital Account.

(d)    Elections. All tax allocations required by this Section 5.7 will be made using the "traditional method" under Section 1.704-3(b) of the Regulations unless the Board of Managers select a different method that is permitted by Section 1.704-3 of the Regulations with the consent of Schryver or NTH.

(e)      *Allocations.* Except as set forth above or otherwise required by law, all items of income, deduction, loss and credit will be allocated for federal, state and local income tax purposes in the same manner such items are allocated for purposes of maintaining Capital Accounts.

Section 5.8      Indemnification Events.

(a)      If there is any Loss (as defined in the Contribution Agreement) in excess of the applicable Deductible (as defined in the Contribution Agreement) (such excess, the "Excess Loss") for which Schryver, STI, Formax and/or the Company is required to make any indemnification payment under Section 8.02 or Article IX of the Contribution Agreement, and such Excess Loss gives rise to an item of loss or deduction for U.S. federal income tax purposes, the amount of such item of loss or deduction attributable to such Excess Loss shall be allocated to the Capital Account of Schryver, STI or Formax, as applicable.

(b)      For the avoidance of doubt, to the extent the amount of any Loss (as defined in the Contribution Agreement) is less than or equal to the applicable Deductible ("Deductible Loss") and such Deductible Loss gives rise to an item of loss or deduction for U.S. federal income tax purposes, the amount of such item of loss or deduction attributable to such Deductible Loss shall be allocated to the Capital Accounts of the Unit Holders in accordance with Section 5.5(b).

Section 5.9      Changes in Members' Interests. If during any year there is a change in any Member's Interest in the Company, the Board of Managers will confer with the tax advisors to the Company and, in conformity with such advice allocate the Net Profit or Net Loss to the Members so as to take into account the varying interests of the Members in the Company in a manner that complies with the provisions of Section 706 of the Code and the Treasury Regulations thereunder; provided, however, the Company shall use the "interim closing of the partnership books" method described in Section 1.706-1(c) of the Regulations with respect to a more than de minimis sale or exchange of Class A Units.

**ARTICLE VI**

**STATUS, RIGHTS AND POWERS OF UNIT HOLDERS**

Section 6.1      Limited Liability. Except as otherwise provided by the Act, the debts, expenses, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, will be solely the debts, expenses, obligations and liabilities of the Company, and no Unit Holder or Indemnified Person will be obligated personally for any such debt, expense, obligation or liability of the Company solely by reason of being a Unit Holder or Indemnified Person. All Persons dealing with the Company will have recourse solely to the assets of the Company for the payment of the debts, expenses, obligations or liabilities of the Company.

Section 6.2      Return of Distributions of Capital. Except as expressly set forth in this Agreement or as otherwise expressly required by law, a Unit Holder, in such capacity, will have no liability for obligations or liabilities of the Company in excess of (a) the amount of such Unit Holder's Capital Contributions, (b) such Unit Holder's share of any assets and undistributed

profits of the Company and (c) to the extent required by law, the amount of any Distributions wrongfully distributed to such Unit Holder. Except as expressly set forth in this Agreement or as otherwise required by law, no Unit Holder will be obligated by this Agreement to return any Distribution to the Company or pay the amount of any Distribution for the account of the Company or to any creditor of the Company; provided, however, that if any court of competent jurisdiction holds that, notwithstanding this Agreement, any Unit Holder is obligated to return or pay any part of any Distribution, such obligation will bind such Unit Holder alone and not any other Unit Holder or any Board Member and provided, further, that if any Unit Holder is required to return all or any portion of any Distribution under circumstances that are not unique to such Unit Holder but that would have been applicable to all Unit Holders if such Unit Holders had been named in the lawsuit against the Unit Holder in question (such as where a Distribution was made to all Unit Holders and rendered the Company insolvent, but only one Unit Holder was sued for the return of such Distribution), the Unit Holder that was required to return or repay the Distribution (or any portion thereof) will be entitled to reimbursement from the other Unit Holders that were not required to return the Distributions made to them based on each such Unit Holder's share of the Distribution in question. The provisions of the immediately preceding sentence are solely for the benefit of the Unit Holders and will not be construed as benefiting any Third Party. The amount of any Distribution returned to the Company by a Unit Holder or paid by a Unit Holder for the account of the Company or to a creditor of the Company will be added to the account or accounts from which it was subtracted when it was distributed to such Unit Holder.

Section 6.3    No Management or Control. Except as expressly provided in this Agreement, no Unit Holder will take part in or interfere in any manner with the management of the business and affairs of the Company or have any right or authority to act for or bind the Company notwithstanding Section 18-402 of the Act.

## ARTICLE VII

## DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES AND DUTIES OF THE BOARD OF MANAGERS

Section 7.1    Board of Managers. The business of the Company will be managed by the Board of Managers, and the Board Members will be the "managers" of the Company for all purposes under the Act; provided that, except as otherwise provided herein, and notwithstanding the last sentence of Section 18-402 of the Act, no single member of the Board of Managers may bind the Company, and the Board of Managers will have the power to act only collectively in accordance with the provisions and in the manner specified herein and in Exhibit 7.1. The Board of Managers will initially be the individuals set forth in Exhibit 7.1. Thereafter, the individuals constituting the Board of Managers will be determined in accordance with the provisions of Exhibit 7.1. Exhibit 7.1 sets forth the procedures for the conduct of the affairs of the Board of Managers and decisions of the Board of Managers will be set forth in a resolution adopted in accordance with the procedures set forth in Exhibit 7.1. Such decisions will be decisions of the Company's "manager" for all purposes of the Act and will be carried out by officers or agents of the Company designated by the Board of Managers in the resolution in question or in one or more standing resolutions or with the power and authority to do so under Article VIII.

A decision of the Board of Managers may be amended, modified or repealed in the same manner in which it was adopted or in accordance with the procedures set forth in Exhibit 7.1 as then in effect; provided, however, that no such amendment, modification or repeal will affect any Person who has been furnished a copy of the original resolution, certified by a duly authorized officer of the Company, until such Person has been notified in writing of such amendment, modification or repeal; and provided, further that no such amendment, modification or repeal will invalidate actions previously authorized by such original resolution with respect to any Person if such original resolution has been relied upon by such Person.

Section 7.2    Authority of Board of Managers. Except as otherwise expressly provided in this Agreement, including in Section 3.4, the Board of Managers will have the exclusive power and authority to manage the business and affairs of the Company and to make all decisions with respect thereto. Except as otherwise expressly provided in this Agreement, the Board of Managers or Persons designated by the Board of Managers, including officers and agents appointed by the Board of Managers, will be the only Persons authorized to execute documents which will be binding on the Company. To the fullest extent permitted by Delaware law, but subject to any specific provisions hereof granting rights to Members, the Board of Managers will have the power to perform any acts, statutory or otherwise, with respect to the Company or this Agreement, which would otherwise be possessed by the Members under Delaware law, and the Unit Holders will have no power whatsoever with respect to the management of the business and affairs of the Company. As permitted by Sections 18-209(b), 18-213(b), 18-216(b), 18-301(b)(1), 18-302(a), 18-302(b), 18-304, 18-704(a), 18-801(a) and 18-803(a) of the Act, and subject to Section 3.4, the power and authority granted to the Board of Managers hereunder will include all those necessary, convenient or incidental for the accomplishment of the purposes of the Company and the exercise of the powers of the Company set forth in Section 2.6 and will include the power to make all decisions with regard to the management, operations, assets, financing and capitalization of the Company.

Section 7.3    Reliance by Third Parties. Any Person dealing with the Company or the Members may rely upon a certificate signed by a member of the Board of Managers as to: (a) the identity of the Unit Holders, (b) the existence or non-existence of any fact or facts which constitute a condition precedent to acts by Unit Holders or are in any other manner germane to the affairs of the Company, (c) the Persons which are authorized to execute and deliver any instrument or document of or on behalf of the Company, (d) the authorization of any action by or on behalf of the Company by the Board of Managers or any officer or agent acting on behalf of the Company or (e) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or the Unit Holders.

Section 7.4    Directors' and Officers' Insurance. The Company will ensure that its Board Members and officers are covered under a directors and officers' insurance policy for so long as it is available at commercially reasonable rates, as determined by the Board of Managers.

Section 7.5    No Duties. Notwithstanding anything to the contrary set forth in this Agreement or any duty (fiduciary or otherwise) that might otherwise have existed at law or in equity, and to the fullest extent permitted by applicable law, (i) the Board Members in their capacity as members of the Board of Managers shall not be deemed to owe any duty (including

fiduciary duties) to any Member or any other Person and (ii) a Board Member shall be entitled to act in its sole and absolute discretion and in the interests of the Member appointed by it.

Section 7.6    <u>Corporate Opportunity</u>. In the event that any Member or its Affiliates acquires knowledge of a potential transaction or matter that may be a corporate opportunity for the Company, its Subsidiaries or any of their Affiliates, no such Member or Affiliate will have any duty (contractual or otherwise) to communicate or present such corporate opportunity to the Company, its Subsidiaries or any of their Affiliates and, notwithstanding any provision of this Agreement to the contrary, will not be liable to the Company, its Subsidiaries, any of the Members or any of their respective Affiliates for breach of any duty (contractual or otherwise) by reason of the fact that such Member or Affiliate directly or indirectly pursues or acquires such opportunity for itself, directs such opportunity to another person, or does not present such opportunity to the Company, its Subsidiaries, any of the Members or any of their respective Affiliates.

## ARTICLE VIII

## <u>DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES AND DUTIES OF OFFICERS AND AGENTS</u>

Section 8.1    <u>Officers, Agents</u>. The Board of Managers by vote or resolution will have the power to appoint officers and agents to act for the Company with such titles, if any, as the Board of Managers deems appropriate and to delegate to such officers or agents such of the powers as are granted to the Board of Managers hereunder, including the power to execute documents on behalf of the Company, as the Board of Managers may determine; <u>provided, however</u>, that no such delegation by the Board of Managers will cause the Persons constituting the Board of Managers to cease to be the "managers" of the Company within the meaning of the Act. The officers so appointed may include persons holding titles such as Chairman, Chief Executive Officer, Chief Operating Officer, President, Chief Financial Officer, Executive Vice President, Vice President, Treasurer, Controller, Secretary or Assistant Secretary. Unless the authority of the officer in question is limited in the document appointing such officer or is otherwise specified by the Board of Managers, any officer so appointed will have the same authority to act for the Company as a corresponding officer of a Delaware corporation would have to act for a Delaware corporation in the absence of a specific delegation of authority and as more specifically set forth in <u>Exhibit 8.1</u>; <u>provided, however</u>, that unless such power is specifically delegated to the officer in question either for a specific transaction or generally in a separate writing, no such officer will have the power to lease or acquire real property, to borrow money, to issue notes, debentures, securities, equity or other interests of or in the Company, to make investments in (other than the investment of surplus cash in the ordinary course of business) or to acquire securities of any Person, to give guarantees or indemnities, to merge, liquidate or dissolve the Company or to sell or lease all or any substantial portion of the assets of the Company.

## ARTICLE IX

## BOOKS, RECORDS, ACCOUNTING AND REPORTS

Section 9.1    <u>Books and Records</u>. The Company will maintain at its principal office or such other office as the Board of Managers will determine such books and records with respect to the Company's business as the Board of Managers deems appropriate.

Section 9.2    <u>Reports and Information</u>.

(a)    The Company will use commercially reasonable efforts to provide each Member with a preliminary Schedule K-1 within seventy-five (75) days after the end of each year (or as soon as practicable thereafter), which Schedule K-1 shall provide the Company's reasonable best estimate of such Member's share of income, gains, loss, deductions and credits of the Company for the prior year. The Company will use commercially reasonable efforts to provide each Member with a final Schedule K-1 for a taxable year or other taxable period no later than August 1 of the immediately following year (but in any event not later than September 1 of the immediately following year). All Members will be entitled to inspect, review, obtain and receive any information about the Company and its Subsidiaries under Section 18-305 of the Act.

(b)    The Company shall furnish to the Class A Unit Holders and Class S Unit Holders (i) within forty-five (45) days after the end of each fiscal quarter of the Company which does not coincide with the end of the Fiscal Year, unaudited consolidated statements of income and cash flows of the Company and its Subsidiaries for such fiscal quarter and for the period from the beginning of the Fiscal Year to the end of such fiscal quarter, and consolidated balance sheets of the Company and its Subsidiaries as of the end of such fiscal quarter, together with comparisons to the corresponding periods in the preceding year, (ii) within 120 days after the end of each Fiscal Year, audited consolidated statements of income and cash flows of the Company and its Subsidiaries for such Fiscal Year, and consolidated balance sheets of the Company and its Subsidiaries as of the end of such Fiscal Year, together with comparisons to the corresponding period in the preceding Fiscal Year and a report with respect to such consolidated financial statements from a firm of certified public accountants selected by the Company and (iii) within sixty (60) days after the completion of each Fiscal Year, the annual budgets for the Company and its Subsidiaries. All such information shall be subject to <u>Section 9.4</u>.

Section 9.3    <u>Filings</u>. At the Company's expense, the Board of Managers will cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities and to have prepared and to furnish to each Member such information with respect to the Company (including a schedule setting forth such Member's distributive share of the Company's income, gain, loss, deduction and credit as determined for federal income tax purposes) as is necessary to enable such Member to prepare such Member's federal and state income tax returns. The Board of Managers, at the Company's expense, will also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative authorities, all reports required to be filed by the Company with those entities under then current applicable laws, rules and regulations. Upon the request of Schryver or STI, the Company shall provide Schryver or STI, as applicable, and its accountants with reasonable access to such information as may be reasonably requested by Schryver or STI in order for it to conduct an

40

audit of the financial statements of Schryver or STI, as applicable, for each Fiscal Year beginning with the year ending December 31, 2016, and the Company shall cooperate with Schryver or STI, as applicable, and its accountants in the conduct of such audit, including by providing such accountants with a letter of representation. The Company shall reimburse each of Formax, Schryver, STI, the Formax Blocker Corporations, the STI/Schryver Blocker Corporations and the Class S Blocker Corporations for the reasonable and documented out-of-pocket costs and expenses incurred by such Persons in connection with (a) the preparation and filing of their income tax returns, Schedules K-1 and, with respect to Schryver and STI, such audit and (b) the maintenance of their existence.

Section 9.4    Non-Disclosure.

(a)    Each Unit Holder (on behalf of itself and, to the extent that such Unit Holder would be responsible for the acts of the following Persons under principles of agency law, its directors, officers, affiliates, shareholders, partners, employees, agents and members) agrees that, except as otherwise consented to by the Board of Managers, all non-public information furnished to such Unit Holder pursuant to this Agreement, including confidential information of the Company and its Subsidiaries regarding identifiable, specific and discrete business opportunities being pursued by the Company or its Subsidiaries (collectively, "Confidential Information") will be kept confidential, will not be used for commercial or proprietary advantage and will not be disclosed by such Unit Holder (or, to the extent that such Unit Holder would be responsible for the acts of the following Persons under principles of agency law, its directors, officers, affiliates, shareholders, partners, employees, agents and members) in any manner, in whole or in part, except that each Unit Holder will be permitted to disclose such Confidential Information (i) to those of such Unit Holder's agents, representatives, employees, partners and equity holders who need to be familiar with such Confidential Information in connection with such Unit Holder's investment in the Company and who are charged with the same obligation of confidentiality, (ii) with respect to Audax Fund III, Audax Fund IV, FC, STI, Schryver or any Class S Unit Holder, or an Affiliate or an Affiliated Fund of such entities, as part of such entity's normal reporting or review procedure, or in connection with such entity's or its Affiliates' normal fund raising, marketing, investing, informational, reporting or operational activities, (iii) for general portfolio information that does not identify the Company or its Subsidiaries and (iv) to the extent required by law, so long as such Unit Holder will have first provided the Company a reasonable opportunity to contest (at the Company's sole expense) the necessity of disclosing such Confidential Information. Notwithstanding the foregoing, any Unit Holder and each of his, her, or its Representatives may disclose to any and all Persons, without limitation of any kind, the tax treatment, tax strategies and tax structure of the Company and all materials of any kind (including opinions or other tax analyses) that are provided to the Member and his, her, or its Representatives relating to such tax treatment, tax strategies and tax structure. Each Unit Holder agrees that he, she or it will be responsible for any breach or violation of the provisions of this Section 9.4(a) by any of his Representatives.

(b)    For purposes of this Section 9.4, "Confidential Information" will not include any information: (i) of which such Person (or its Affiliates) became aware prior to its affiliation with the Company or any Subsidiary thereof, (ii) of which such Person (or its Affiliates) learns from sources other than the Company or its Subsidiaries, whether prior to or after such information is actually disclosed by the Company or its Subsidiaries, or (iii) which is

disclosed in a prospectus or other documents available for dissemination to the public. Nothing in this Section 9.4 will in any way limit or otherwise modify any confidentiality covenants entered into by any Unit Holder pursuant to any other agreement to which such Unit Holder and the Company or any of its Subsidiaries are parties.

(c)    Notwithstanding anything to the contrary in this Agreement, the Class S Majority Holders and their Affiliates shall be entitled to disclose publicly that such Class S Majority Holders and their Affiliates are direct or indirect investors in the Company and its Subsidiaries, the size of such Class S Majority Holders' investment, the date of their investment and the structure and types (*e.g.*, asset classes) of such investment and, in connection therewith such Class S Majority Holders and their Affiliates are hereby granted the right to use and display the logos of (i) Revelstoke Capital Partners LLC, the Company and the Company's Subsidiaries, and (ii) Audax Group and Formation Capital, LLC, with the prior written consent of Audax Group and Formation Capital, LLC, which shall not be unreasonably withheld, in marketing and other similar materials published or disseminated by such Class S Majority Holders and their Affiliates.

# ARTICLE X

## TAX MATTERS MEMBER

Section 10.1    Tax Matters Member.

(a)    Unless and until another Member is designated as the tax matters partner by the Board of Managers, which designation shall require the consent of the NTH Representative and the Schryver Representative, (a) the "tax matters partner" of the Company as provided in the Regulations under Section 6231 of the Code and any analogous provisions of state law and (b) the "partnership representative" of the Company within the meaning of Section 6223 of the New Partnership Audit Procedures, in each case, will be Formax, and in such capacity is referred to as the "Tax Matters Member."

(b)    Except as otherwise provided herein, the Tax Matters Member may make all elections for federal income and all other tax purposes (including any tax elections related to the New Partnership Audit Procedures).

(c)    The Tax Matter Member is hereby authorized and empowered to act for and represent the Company and each of the Members before the Internal Revenue Service ("IRS") in any audit or examination of any Company tax return and before any court for judicial review of any adjustment assessed by the IRS; provided, however, (1) in exercising its authority as Tax Matters Member, the Tax Matters Member, except as otherwise required by law, shall be limited by the provisions of this Agreement affecting tax aspects of the Company; (2) without the prior written consent of the NTH Representative and the Schryver Representative (each such consent not to be unreasonably withheld or delayed), the Tax Matters Member, except as otherwise required by law, may not (i) enter into any settlement agreement with the IRS that purports to bind Members other than the Tax Matters Member, (ii) elect to have the New Partnership Audit Procedures not apply pursuant to Section 6221(b) of the Code (as enacted by the New Partnership Audit Procedures) or cause the provisions to apply in advance of their

effective date pursuant to Section 1101(g)(4) of the New Partnership Audit Procedures, (iii) apply the alternative procedure pursuant to Section 6226 of the Code (as enacted by the New Partnership Audit Procedures), (iv) extend the statute of limitations with respect to the Company pursuant to Section 6235(b) of the Code (as enacted by the New Partnership Audit Procedures) or otherwise or (v) file a petition for judicial review of an administrative adjustment request under Section 6228 of the Code, a petition for judicial review of a final partnership administrative judgment under Section 6226 of the Code, a petition for readjustment pursuant to Section 6234 (as enacted by the New Partnership Audit Procedures), or an administrative adjustment request pursuant to Section 6227 of the Code (as enacted by the New Partnership Audit Procedures); and (3) the Tax Matters member shall keep Members reasonably informed of the conduct and status of any audit, examination, adjustment, litigation or any administrative inquiry or proceeding regarding taxes, including by giving prompt notice to the Members of the receipt of any written notice that the IRS or any state or local taxing authority intends to examine Company income tax returns for any year, the receipt of written notice of the beginning of an administrative proceeding at the Company level relating to the Company under Section 6223 of the Code, the receipt of written notice of the final partnership administrative adjustment relating to the Company pursuant to Section 6223 of the Code, and the receipt of any request from the IRS for waiver of any applicable statute of limitations with respect to the filing of any tax return by the Company.

(d)    The Members acknowledge that the implementation of the New Partnership Audit Procedures may require amendments to this Agreement, and agree that the Members shall reasonably cooperate to amend this Agreement with their written consent (not to be unreasonably withheld or delayed) as necessary in connection with the implementation of such New Partnership Audit Procedures.

Section 10.2    <u>Indemnity of Tax Matters Member</u>. The Company will indemnify and reimburse, to the fullest extent permitted by law, the Tax Matters Member for all expenses (including legal and accounting fees) incurred as Tax Matters Member pursuant to this <u>Article X</u> in connection with any administrative or judicial proceeding with respect to the tax liability of the Unit Holders attributable to their Interests in the Company.

Section 10.3    <u>Tax Returns</u>. Unless otherwise agreed by the Board of Managers or provided otherwise in the Contribution Agreement, all tax returns of the Company will be prepared by the Company or prepared by the Company's independent certified public accountants. The Company shall provide all income tax returns prepared pursuant to this <u>Section 10.3</u> to NTH and Schryver for review and comment at least thirty (30) business days prior to the due date for filing such income tax return (including any extensions). Within fifteen (15) business days after the delivery of each such income tax return (the "<u>Tax Review Period</u>"), NTH and Schryver will advise the Company in writing of any proposed change (a "<u>Proposed Change</u>") taken on such income tax return. NTH and Schryver will be deemed to have approved such income tax returns as prepared by the Company if NTH or Schryver, as applicable, does not submit any Proposed Change within the Tax Review Period. If NTH or Schryver submits a Proposed Change within the Tax Review Period, NTH or Schryver, as applicable, and the Company will use good faith efforts to resolve any dispute in connection with such Proposed Change. If NTH or Schryver, as applicable, and the Company are unable to resolve the dispute prior to ten (10) business days before the due date for filing such income tax return, they shall

submit any unresolved Proposed Changes to KPMG or another independent national accounting firm mutually selected by the disputing parties (the "Accounting Firm"). In the event any unresolved Proposed Change is submitted to the Accounting Firm, each disputing party will submit its substantive view on such Proposed Change together with such supporting documentation as it deems appropriate, to the Accounting Firm within five (5) days after the date on which such unresolved Proposed Change was submitted to the Accounting Firm for resolution. The Accounting Firm will resolve such dispute as soon as practicable. If an income tax return is required to be filed while such a dispute remains unresolved, and the subsequent resolution of such dispute would require the filing of an amended income tax return, then the Company shall promptly file such amended income tax return. Each disputing party will bear its own costs and expenses in connection with the resolution of such dispute by the Accounting Firm. The costs and expenses of the Accounting Firm will be borne by the disputing party whose position results in the largest percentage difference in tax liability from the position taken by the Accounting Firm in its resolution of the dispute. In the event of a conflict between the terms hereof and the terms of the Contribution Agreement, the terms of the Contribution Agreement shall control.

## ARTICLE XI

## **TRANSFER OF INTERESTS**

Section 11.1    Restricted Transfer.

(a)    No Unit Holder will directly or indirectly make or permit any Transfer of all or any part of the economic or other rights that comprise such Unit Holder's Interest except in compliance with this Article XI and Article XII and any attempted Transfer not in compliance with the terms of this Article XI or Article XII will be null and void and the Company will not in any way give effect to any such Transfer. In addition to the foregoing, no Unit Holder will avoid the provisions of this Agreement by either making indirect Transfers or one or more Transfers to one or more Permitted Transferees and then disposing of all or any portion of such party's interest in any such Permitted Transferee or by Transferring the securities of any entity whose primary purpose is to hold (directly or indirectly) Units. For the avoidance of doubt, any Transfer of an economic or equity interest in any Restricted Transfer Entity or any change in capitalization of any Restricted Transfer Entity that results in the current equity owners owning a reduced interest in the assets or property of such Restricted Transfer Entity shall constitute a Transfer within the meaning of this Agreement (it being understood that Transfers by the limited partners covered by the proviso of the Restricted Transfer Entity definition shall be permitted); provided, however, that any Transfer either (i) contemplated by Section 11.1(b) or Section 11.2 of the FC PAC LLC Agreement or (ii) exclusively involving the direct or indirect ownership of FC Compassus, LLC or any of its Subsidiaries shall not be restricted by this Section 11.1(a).

(b)    Any Unit Holder who assigns any Units or other Interest in the Company (any such Member, an "Assignor") in accordance with this Article XI or Article XII will cease to be a Unit Holder of the Company with respect to such Units or other Interest and will no longer have any rights or privileges of a Unit Holder with respect to such Units or other interest (but will still be bound by this Agreement in accordance with this Article XI), including the power and right to vote (in proportion to the extent of the Interest Transferred) on any matter submitted

to the Members, and, for voting purposes, such Interest will not be counted as outstanding in proportion to the extent of the Interest Transferred unless and until the transferee is admitted as a Member in accordance with <u>Section 11.3</u>.

(c)    Subject to the terms of this <u>Article XI</u>, any Person who acquires in any manner whatsoever any Units or other Interest in the Company (any such Person, an "<u>Assignee</u>"), irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, will be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all of the terms, conditions and obligations (but will be entitled to none of the rights or benefits) of this Agreement that any transferor of such Units or other Interest in the Company of such Person was subject to or by which such transferor was bound.

(d)    Notwithstanding anything to the contrary in this Agreement (including <u>Section 11.2</u>), no Transfer will be made (directly or indirectly), which could, in the Tax Matters Member's reasonable discretion, cause the Company to be treated as a "publicly traded partnership" within the meaning of Section 7704(b) of the Code and/or Treasury Regulation Section 1.7704-1.

Section 11.2    <u>Permitted Transferees</u>. A Member will be entitled to directly or indirectly Transfer such Member's Interest to a Person (a "<u>Permitted Transferee</u>") in accordance with the following and subject to the other provisions of this <u>Article XI</u>:

(a)    *Members of the Immediate Family.* A Member who is an individual will be entitled to Transfer all or any portion of such Member's Interest to one or more Members of the Immediate Family of such Member, or to a trust, partnership, limited liability company or similar entity to be held for the benefit of such Member or one or more of the Members of the Immediate Family of such Member, so long as the Person controlling such trust or other entity is reasonably satisfactory to the Board of Managers; <u>provided</u>, <u>however</u>, that no such Transfer will be effective until the holders of the beneficial interests of such transferee will have delivered to the Company a written acknowledgement and agreement in form and substance reasonably satisfactory to the Company that they will not Transfer any such beneficial Interests or permit such transferee to issue any such beneficial interests except to the extent such Transfer or issuance (treating such issuance as a Transfer by such holders) would be permitted under this <u>Section 11.2</u> if the beneficial Interests were Units; <u>provided</u> <u>further</u> that, such Member will retain voting control of such transferred Units, whether by proxy or other arrangement. In no event will all or any part of an Interest be transferred to a minor or an incompetent except in trust or pursuant to the Uniform Gifts to Minors Act.

(b)    *Upon Death.* Upon the death of any Member who is a natural Person, such Member's Interest may be Transferred by the will or other instrument taking effect at death of such Member or by applicable laws of descent and distribution to such Member's estate, executors, administrators and personal representatives, and then to such Member's heirs, legatees or distributees, whether or not such recipients are Members of the Immediate Family of such Member.

45

(c)     *To Affiliates.* Each Member will be entitled to Transfer any portion of its Interest to an Affiliated Fund or other Affiliate or to any other Member, its Affiliated Fund or other Affiliate; provided that, for the purposes of this Section 11.2(c), (i) NTH, Audax Fund III and Audax Fund IV and their Affiliates will be considered Affiliates and (ii) STI and Schryver will be considered Affiliates.

(d)     *By Schryver.* Schryver will be entitled to Transfer any portion of its Interest to any of its direct or indirect equity holders, and each such direct or indirect equity holder of Schryver will be entitled to Transfer any portion of its Interest to any other direct or indirect equity holder of Schryver.

(e)     *Compliance with Agreement.* Each Member may Transfer all or any portion of its Interest in connection with such Member's exercise of the "tag along" rights set forth in Section 12.1 or Section 12.2 or exercise and/or compliance with the "drag along" provisions set forth in Section 12.3. Each Class S Unit Holder may Transfer Class S Units in compliance with Section 11.8 and Section 11.9.

(f)     *True-Up Provisions.* Each Member may Transfer all or any portion of its Interest pursuant to the True-Up Provisions.

(g)     *Discretionary Transfers.* Each Member will be entitled to Transfer such Member's Interest if such Member obtains the prior written consent of the Board of Managers, including the prior written consent of the NTH Representative and the Schryver Representative.

Section 11.3   Transfer Requirements. Subject to the provisions of Section 11.1, no Assignee (including a Permitted Transferee) will be admitted to the Company as a Member unless the following conditions are satisfied or such conditions are waived by the Board of Managers:

(a)     A duly executed written instrument of Transfer is provided to the Board of Managers, specifying the Interests being transferred and setting forth the intention of the Member effecting the Transfer that the transferee succeed to a portion or all of such Member's Interest as a Member;

(b)     If requested by the Board of Managers, an opinion of responsible counsel (who may be counsel for the Company) is provided to it, reasonably satisfactory in form and substance to the Board of Managers to the effect that:

(i)   such Transfer would not violate the Securities Act or any state securities or blue sky laws applicable to the Company or the Interest to be transferred;

(ii)   such Transfer would not cause the Company to be considered a publicly traded partnership under Section 7704(b) of the Code;

(iii)   such Transfer would not cause the Company to lose its status as a partnership for federal income tax purposes; and

(iv)   such Transfer would not cause a termination of the Company under Section 708 of the Code for federal income tax purposes.

(c)      The Member effecting the Transfer and the transferee execute any other instruments that the Board of Managers deems reasonably necessary or desirable for admission of the transferee, including the written acceptance by the transferee of this Agreement and such transferee's agreement to be bound by and comply with the provisions hereof and execution and delivery to the Board of Managers of a special power of attorney as provided in Section 19.4 and the Member effecting the Transfer and the transferee provide the Board of Managers any information necessary to comply with the requirements of Section 743(e) of the Code, if applicable;

(d)      In no event will any Transfer (other than pursuant to a Sale of the Company or following a Public Offering) be to any competitor of the Company or any of its Subsidiaries; provided that financial institutions and other entities formed solely for investment purposes which are acquiring Units for investment purposes and which are only holding Units will not constitute a competitor of the Company; and

(e)      The Member effecting the Transfer or the transferee pays to the Company a transfer fee in an amount sufficient to cover the reasonable expenses incurred by the Company in connection with the admission of the transferee and provides to the Company any information necessary for the Company to make required basis adjustments and comply with tax reporting requirements.

Section 11.4    Consent. Each Member hereby agrees that upon satisfaction of the terms and conditions of this Article XI with respect to any proposed Transfer, the Person proposed to be such Assignee may be admitted as a Member.

Section 11.5    Withdrawal of Member. If a Member Transfers all of its Interest pursuant to Section 11.1 and the Assignee of such Interest is admitted as a Member pursuant to Section 11.4, such Assignee will be admitted to the Company as a Member effective on the effective date of the Transfer or such other date as may be specified when the Assignee is admitted and, if such Assignor has not already ceased to be a Member pursuant to Section 11.1(b), then immediately following such admission the Assignor will cease to be a Member of the Company. Upon the Assignor ceasing to be a Member, the Assignor will not be entitled to any Distributions from and after the date of such Transfer. Notwithstanding the admission of an Assignee as a Member and except as otherwise expressly approved by the Board of Managers, the Assignor will not be released from any obligations to the Company as a Member (or otherwise) existing as of the date of the Transfer (other than obligations of the Assignor to make future capital contributions, if any), including the obligations set forth in Section 5.3 and Section 9.4.

Section 11.6    Additional Transfer Restrictions. Notwithstanding anything to the contrary contained herein, all pledges of Units held by a Unit Holder will only be made with the written consent of the Board of Managers.

Section 11.7    Amendment of Exhibit 3.1. In the event of the admission of any transferee as a Member of the Company, the Board of Managers will promptly amend Exhibit 3.1 to reflect such Transfer or admission, as the case may be.

Section 11.8    Refinancing Option.

(a)    *Refinancing Notice*. In the event that the Notes are repaid in full in accordance with the Investment Agreement, prior to consummating a refinancing of the indebtedness outstanding under the Credit Agreement (a "Refinancing"), the Company will deliver to each Class S Unit Holder a written notice of the Company's intention to consummate such Refinancing (a "Refinancing Notice") no later than fifteen (15) business days prior to such consummation.

(b)    *Refinancing Option Exercise*. On the terms and subject to the conditions of this Section 11.8, the Class S Unit Holders holding a majority of the Class S Units (the "Class S Majority Holders") shall have the right (the "Refinancing Option") to require the Company to purchase from the Class S Unit Holders all or a portion of the Class S Units held by the Class S Unit Holders (the "Transferred Class S Units") for an aggregate purchase price equal to the Fair Value of the Transferred Class S Units as of the Refinancing Option Exercise Date (less applicable tax withholdings, if any). The Class S Majority Holders shall be entitled to exercise the Refinancing Option only within the fifteen (15) business day period immediately following the date of the Refinancing Notice by delivering written notice of such exercise (the "Refinancing Option Exercise Notice") to the Company (the date on which the Refinancing Option Exercise Notice is delivered, the "Refinancing Option Exercise Date"), setting forth the number of Transferred Class S Units and the Class S Unit Holders thereof.  The Fair Value of the Transferred Class S Units shall be mutually determined by the Company and the Class S Majority Holders.  If the Company and the Class S Majority Holders cannot agree on Fair Value within ten (10) business days after the Refinancing Option Exercise Date, then the Company and the Class S Majority Holders shall mutually engage an independent, nationally recognized third party appraiser (the "Appraiser").  If the parties cannot agree upon the Appraiser, then the Company, on the one hand, and the Class S Majority Holders, on the other, shall each select an independent, nationally recognized third party appraiser, and the two appraisers so selected shall select the Appraiser.  The fees and expenses of the Appraiser shall be borne 50% by the Company and 50% by the Class S Unit Holders.  The Appraiser shall determine the Fair Value of the Transferred Class S Units in accordance with clause (d) of the definition of Fair Value after substituting the Appraiser for the Board of Directors therein.  The Fair Value of the Transferred Class S Units as determined by the Appraiser hereunder shall be final and binding on the parties.

(c)    *Cooperation*. The consummation of the purchases and sales to be effected pursuant to the Refinancing Option (the "Refinancing Option Closing") shall occur concurrently with the consummation of the Refinancing. In connection with the Refinancing Option Closing, each Class S Unit Holder shall execute documentation that is reasonably requested by the Company to evidence the Refinancing Option Closing and, if requested by the Company, shall make customary representations and warranties as to such Class S Unit Holder's authority to sell, good title to and the absence of liens (other than liens arising under this Agreement or U.S. federal or state securities laws) on the sale of such Class S Unit Holder's Transferred Class S Units; provided, however, that no Class S Unit Holder shall be required to make any

48

representations or warranties, or provide any indemnities, with respect to the Company, the Company's Subsidiaries or any of their respective businesses, assets, employees, permits, liabilities, operations, prospects or condition (financial or otherwise).

(d)       *Refinancing Option Closing*. At the Refinancing Option Closing, each Class S Unit Holder shall sell, assign, transfer and deliver to the Company, and the Company shall purchase from such Class S Unit Holder, all of such Class S Unit Holder's right, title and interest in and to such Class S Unit Holder's Transferred Class S Units, free and clear of all liens thereon (other than liens arising under this Agreement or U.S. federal or state securities laws). At the Refinancing Option Closing, in consideration for the purchase of such Transferred Class S Units, the Company shall pay to such Class S Unit Holder an amount in cash equal to the Fair Value of such Class S Units as of the Refinancing Option Exercise Date (less applicable withholdings). All Transferred Class S Units shall terminate upon the Refinancing Option Closing.

(e)       *Termination*. Notwithstanding anything to the contrary in this Section 11.8, the Company shall be permitted to terminate any Refinancing prior to the applicable Refinancing Option Closing, and in the event that the Company determines to terminate any Refinancing, the Company shall promptly deliver written notice thereof to the Class S Unit Holders. Upon delivery of such notice, the exercise of the applicable Refinancing Option shall be terminated and the Company shall not be required to purchase the Transferred Class S Units in accordance with this Section 11.8; provided, however, that this Section 11.8(e) shall not restrict the Class S Unit Holders from exercising their rights under this Section 11.8 with respect to any subsequent Refinancing.  In the event that the Company terminates any Refinancing Option pursuant to this Section 11.8, it shall pay 100% of the Class S Unit Holders' reasonable, out of pocket fees and expenses (including reasonable attorney's fees) incurred in connection therewith.

(f)       *Termination of Option*. The provisions of this Section 11.8 shall terminate upon the consummation of a Refinancing (if the Refinancing Option is not otherwise elected) and the Class S Unit Holders shall have no rights under this Section 11.8 thereafter.

Section 11.9    Mandatory Redemption.

(a)       *Mandatory Redemption*. In the event that a Liquidity Event (as defined in the Investment Agreement) occurs in accordance with the Investment Agreement (the date that such Liquidity Event occurs, the "Trigger Date"), the Company shall purchase all of outstanding Class S Units form the Class S Unit Holders on the terms and subject to the conditions of this Section 11.9 (the "Mandatory Redemption"). The aggregate purchase price for such Class S Units shall be equal to the Fair Value (determined in accordance with Section 11.8(b)) of the Class S Units as of the date of such Liquidity Event (less applicable tax withholdings).

(b)       *Cooperation*. The consummation of the purchases and sales to be effected pursuant to the Mandatory Redemption (the "Mandatory Redemption Closing") shall occur on a date designated in writing by the Company, which date shall not be later than sixty (60) days following the Trigger Date. In connection with the Mandatory Redemption Closing, each Class S Unit Holder shall execute documentation that is reasonably requested by the Company to evidence the Mandatory Redemption Closing and, if requested by the Company, shall make

49

customary representations and warranties as to such Class S Unit Holder's authority to sell, good title to and the absence of liens on the sale of such Class S Unit Holder's Class S Units; provided, however, that no Class S Unit Holder shall be required to make any representations or warranties, or provide any indemnities, with respect to the Company, the Company's Subsidiaries or any of their respective their respective businesses, assets, employees, permits, liabilities, operations, prospects or condition (financial or otherwise).

(c)     *Mandatory Redemption Option Closing.* At the Mandatory Redemption Closing, each Class S Unit Holder shall sell, assign, transfer and deliver to the Company, and the Company shall purchase from such Class S Unit Holder, all of such Class S Unit Holder's right, title and interest in and to such Class S Unit Holder's Class S Units, free and clear of all liens thereon (other than liens arising under this Agreement or U.S. federal or state securities laws). At the Mandatory Redemption Closing, in consideration for the purchase of such Class S Units, the Company shall pay to such Class S Unit Holder an amount in cash (or other form of consideration payable to the Members in connection with such Liquidity Event) equal to the Fair Value (determined in accordance with Section 11.8(b)) of such Class S Units as of the Trigger Date (less applicable withholdings, if any). All Class S Units shall terminate upon the Mandatory Redemption Closing.

# ARTICLE XII

# "TAG ALONG" AND "DRAG ALONG" RIGHTS

Section 12.1     Tag Along. If any Class A Unit Holder (a "Prospective Tag Seller") proposes to directly or indirectly Transfer any Class A Units to a Third Party (a "Prospective Tag Buyer") in a transaction pursuant to Section 11.2(g) (the "Tag Along Transfer"):

(a)     *Notice.* The Prospective Tag Seller will deliver a written notice (the "Tag Along Notice") to the Company, which the Company shall deliver to the other Class A Unit Holders and Class S Unit Holders (each, a "Tag Along Holder"), at least twenty (20) business days prior to such Tag Along Transfer. The Tag Along Notice will include:

(i)     The principal terms of the proposed Tag Along Transfer insofar as it relates to such Class A Units including (A) the number of Class A Units proposed to be sold to the Prospective Tag Buyer in the Tag Along Transfer (the "Total Tag Units"), (B) the estimated purchase price per Class A Unit (the "Estimated Tag Price"), (C) the anticipated form of consideration for each such Class A Unit, (D) the name and address of the Prospective Tag Buyer and (E) the expected closing date for the Tag Along Transfer; and

(ii)     An invitation to each Tag Along Holder to include in the Tag Along Transfer to the Prospective Tag Buyer a number of issued and outstanding Class A Units or Class S Units held by such Tag Along Holder (not in any event to exceed the product of (A) a fraction, expressed as a percentage, determined by dividing the number of Class A Units and Class S Units owned by such Tag Along Holder by the total number of Class A Units and Class S Units then

outstanding (each a "Tag Along Transfer Percentage"), multiplied by (B) the Total Tag Units), on the same economic terms and conditions that the Prospective Tag Seller will Transfer each of its respective Class A Units, subject to Section 12.1(e) below.

(b)     *Exercise.* Within twenty (20) business days after the delivery of the Tag Along Notice, each Tag Along Holder desiring to make an offer to include any outstanding Class A Units or Class S Units in the Tag Along Transfer (each a "Tag Along Seller") will furnish a written notice (the "Tag Along Offer") to the Prospective Tag Seller offering to include a number of issued and outstanding Class A Units or Class S Units (not in any event to exceed such Tag Along Holder's Tag Along Transfer Percentage of the Total Tag Units) which such Tag Along Seller desires to have included in the Tag Along Transfer. Each Tag Along Holder who does not timely accept the Prospective Tag Seller's invitation will be deemed to have waived all of its rights with respect to such Tag Along Transfer, and the Prospective Tag Seller and the Tag Along Sellers will thereafter be free to Transfer to the Prospective Tag Buyer, at a price per respective Class A Unit no more than 105% of the Estimated Tag Price, without any further obligation to such non-accepting Tag Along Holder.

(c)     *Irrevocable Offer.* The offer of each Tag Along Seller contained in his, her or its Tag Along Offer will be irrevocable, and, to the extent such offer is accepted, such Tag Along Seller will be bound and obligated to Transfer in the Tag Along Transfer at the same price and on the same terms and conditions as the Prospective Tag Seller and its Affiliated Funds, up to such number of Class A Units or Class S Units such Tag Along Seller will have specified in his, her or its Tag Along Offer; provided, however, that if the principal terms of the Tag Along Transfer change with the result that the price per Class A Unit will be less than 95% of the Estimated Tag Price, each Tag Along Seller will be permitted to withdraw the offer contained in his, her or its Tag Along Offer and will be released from his, her or its obligations thereunder.

(d)     *Prohibition on Tag Along Transfers.* The Prospective Tag Seller shall not be permitted to Transfer any Units to the Prospective Tag Buyer unless each Tag Along Seller that furnishes a Tag Along Offer in accordance with Section 12.1(b) is permitted to Transfer their respective Tag Along Transfer Percentages of the aggregate number of such Units to which the Tag Along Notice relates.

(e)     *Application of Proceeds.* The proceeds of any Tag Along Transfer which are paid to the Prospective Tag Seller, its Affiliated Funds and the Tag Along Sellers in their capacity as Unit Holders and to which this Section 12.1 applies will be allocated among the Prospective Tag Seller and the Tag Along Sellers based upon the number of Class A Units and Class S Units included or deemed to be included in the Tag Along Transfer and will be distributed to the Prospective Seller and the Tag Along Sellers in accordance with Section 5.1(b) as though the only Units outstanding were the Units that the holders thereof elected to have included in the Tag Along Transfer. Any amount allocable to the Prospective Tag Seller and the Tag Along Sellers under this Section 12.1(e) will be subject to reduction for any tax or other amounts required to be withheld under applicable law, if any.

(f)     *Cancellation of Class S Units.* Any Class S Units Transferred in a Tag Along Transfer shall terminate upon the closing of such Tag Along Transfer and payment of the

amount allocable to the applicable Class S Unit Holder in connection with such Tag Along Transfer.

(g)     For the avoidance of doubt, the term "Tag Along Holder" will not include any Class P Units held by any Unit Holder.

Section 12.2    Management Tag. If any Member or Members (a "Prospective Management Tag Seller") proposes to directly or indirectly Transfer, in the aggregate, more than 20% of the Class A Units to any other Person (a "Prospective Management Tag Buyer") in a transaction pursuant to Section 11.2(g) which is not a "drag along" transaction under Section 12.3 (a "Management Tag Along Transfer"); provided that such Management Tag Along Transfer is by or to Formax, STI, Schryver or any of their Affiliates:

(a)     Notice. The Prospective Management Tag Seller proposing to Transfer the most Units in such Transfer will deliver a written notice (the "Management Tag Along Notice") to those Members (or anticipated future Members) listed on Exhibit 12.2 (each, a "Management Tag Holder"), at least twenty (20) business days prior to such Management Tag Along Transfer. The Management Tag Along Notice will include:

(i)  the principal terms of the proposed Management Tag Along Transfer insofar as it relates to such Class A Units including (A) the number of Class A Units proposed to be purchased from the Prospective Management Tag Seller, (B) the aggregate consideration to be paid in the transaction, (C) the anticipated form of consideration for each such Class A Unit, (D) the name and address of the Prospective Management Tag Buyer and (E) the expected closing date for the Transfer; and

(ii)  an invitation to each Management Tag Holder to include in the Management Tag Along Transfer to the Prospective Management Tag Holder a number of issued and outstanding vested Class P Units held by such Management Tag Holder (not in any event to exceed the product of (A) a fraction, expressed as a percentage, determined by dividing the number of vested Class P Units owned by such Management Tag Holder by the total number of vested Class P Units then outstanding (each, a "Management Tag Along Transfer Percentage"), multiplied by (B) the total number of Class A Units proposed to be sold by the Prospective Management Tag Seller, on the same economic terms (subject to Section 12.2(d)) and conditions that the Prospective Management Tag Seller will Transfer each of its respective Class A Units.

(b)     Exercise. Within twenty (20) business days after the delivery of the Management Tag Along Notice, each Management Tag Holder desiring to include vested Class P Units in the Management Tag Along Transfer (each a "Management Tag Contributor") will furnish a written notice (the "Management Tag Along Offer") to the Company and the Prospective Management Tag Sellers electing to include a percentage of each Class (which shall be the same across each Class) of vested Class P Units held by such Management Tag Contributor (not in any event to exceed the Management Tag Along Transfer Percentage) in the Management Tag Along Transfer. Each Management Tag Holder who does not timely accept the

52

Prospective Management Tag Seller's invitation will be deemed to have waived all of its rights with respect to such Management Tag Along Transfer, and the Prospective Management Tag Seller will thereafter be free to Transfer to the Prospective Management Tag Buyer, at a price per respective Class A Unit no more than 105% of the price per Class A Unit set forth in the Management Tag Along Notice, without any further obligation to such non-accepting Management Tag Holder.

(c)     *Irrevocable Offer.* The offer of each Management Tag Contributor contained in his, her or its Management Tag Along Offer will be irrevocable and, to the extent such offer is accepted, such Management Tag Contributor will be bound and obligated to Transfer in the Management Tag Along Transfer at the same price (subject to Section 12.2(d)) and on the same terms and conditions as the Prospective Management Tag Seller and its Affiliated Funds, up to such number of vested Class P Units such Management Tag Contributor will have specified in his, her or its Management Tag Along Offer; provided, however, that if the principal terms of the Management Tag Along Transfer change with the result that the aggregate consideration will be less than 95% of the amount set forth in the Management Tag Along Notice, each Management Tag Contributor will be permitted to withdraw the offer contained in his, her or its Management Tag Along Offer and will be released from his, her or its obligations thereunder.

(d)     *Application of Proceeds.* The proceeds of any Management Tag Along Transfer will be allocated among the Prospective Management Tag Seller and the Management Tag Contributors based upon the number and Class of Units included or deemed to be included in such Management Tag Along Transfer and as if the proceeds of such Management Tag Along Transfer were paid to the Prospective Management Tag Seller and the participating Management Tag Contributors pursuant to Sections 5.1(b) and (c) of this Agreement in connection with a Distribution and the Units of the Prospective Management Tag Seller and the participating Management Tag Contributors included or deemed to be included in such Drag Along Sale were the only outstanding Units of the Company at the time of such Distribution. Any amount otherwise distributable to the Prospective Management Tag Seller and the participating Management Tag Contributors under this Section 12.2(d) will be subject to reduction for any tax or other amounts required to be withheld under the provisions of any documents executed in connection with the Management Tag Along Transfer or otherwise under applicable law.

(e)     *Cancellation of Class P Units.* All Class P Units included in connection with a Management Tag Along Transfer shall be terminated and cancelled immediately upon the completion of such Management Tag Along Transfer, with no further obligation of the Company in respect of such Units other than as set forth in Section 12.2(d).

Section 12.3     Drag Along. (i) At any time prior to the third anniversary of the Closing Date, with the consent of NTH and Schryver, FC may initiate, or (ii) (A) on or after the second anniversary of the Closing Date until the third anniversary of the Closing Date, if the aggregate proceeds therefrom would be no less than 200% of the aggregate Capital Contributions made to the Company as of the date of such initiation or (B) on or after the third anniversary of the Closing Date, any of FC, NTH or Schryver, without the consent of any other Person, may initiate (the initiating Person in clauses (i)–(ii) above, a "Prospective Drag Seller" and each non-initiating Person among FC, NTH and Schryver, a "Non-Dragging Holder"), a Sale of the

Company to a Third Party (a "Prospective Drag Buyer") which is not an Affiliate of the Prospective Drag Seller or controlled by the Prospective Drag Seller (a "Drag Along Sale") by delivering a Drag Along Notice to each other Unit Holder, provided, that such Drag Along sale process shall be managed exclusively by a nationally recognized investment bank selected by the Prospective Drag Seller and Non-Dragging Holder pursuant to the process set forth on Exhibit 1.1; provided, further, that such Drag Along Sale process shall expire on the five (5) month anniversary of the delivery of the Drag Notice unless the Prospective Drag Seller and the Prospective Drag Buyer shall have executed and delivered a definitive agreement or agreements with respect to the Drag Along Sale and the provisions of this Section 12.3 shall again apply as if no such Drag Along Notice shall have been delivered. In connection with any Drag Along Sale, each Unit Holder agrees to use reasonable best efforts to cooperate with, facilitate and maximize the value of the business in such sale. Subject to the conditions in this Section 12.3, each direct and indirect Unit Holder of the Company will be deemed to have provided any applicable consent to (and, if requested, to confirm such consent in writing to), and agrees to vote for (if such Unit Holder is entitled to vote thereon), and raise no objections against, such Drag Along Sale, and, if applicable, each Unit Holder will Transfer in such Drag Along Sale the same percentage of each Class of Units held by such Unit Holder as the percentage of any Class of Units the Prospective Drag Seller proposes to Transfer (a "Drag Along Sale Percentage"), directly or indirectly, to a Prospective Drag Buyer in the manner and on the terms set forth in this Section 12.3 in connection with such Drag Along Sale. Each Unit Holder will further comply with this Section 12.3 as follows:

(a)    *Exercise.* If the Prospective Drag Seller elects to exercise its rights under this Section 12.3, it will furnish a written notice (the "Drag Along Notice") to each other Unit Holder. The Drag Along Notice will set forth the principal terms of the proposed Drag Along Sale (including, if applicable, the terms of any related Transfer) insofar as it relates to Units including, if applicable, (i) the total number and Class of Units to be acquired by the Prospective Drag Buyer in the Drag Along Sale, (ii) the number and Class of Units to be acquired from the Prospective Drag Seller, (iii) the Drag Along Sale Percentage, (iv) the estimated consideration per Unit to be received in the proposed Transfer and (v) the name and address of the Prospective Drag Buyer. If the Prospective Drag Seller consummates the proposed Drag Along Sale to which reference is made in the Drag Along Notice, each Unit Holder (each a "Drag Along Seller") will be bound and obligated by the terms of such Drag Along Sale and, if applicable, will be bound and obligated to Transfer the Drag Along Sale Percentage of each Class of Units held by such Unit Holder in the Drag Along Sale on the same economic terms and conditions (subject to Section 12.3(b) and Section 12.3(b)), and the Prospective Drag Seller will Transfer each of its respective Class A Units in the Drag Along Sale.

(b)    *Application of Proceeds.* The proceeds of any Drag Along Sale received by any Unit Holder in his, her or its capacity as such to which this Section 12.3 applies will be allocated among the Prospective Drag Seller and the Drag Along Sellers based upon the number and Class of Units included or deemed to be included in such Drag Along Sale and as if the proceeds of such Drag Along Sale were paid to the Prospective Drag Seller and the Drag Along Sellers pursuant to Sections 5.1(b) and (c) of this Agreement in connection with a Distribution and the Units of the Prospective Drag Seller and the Drag Along Sellers included or deemed to be included in such Drag Along Sale were the only outstanding Units of the Company at the time of such Distribution. Any amount otherwise distributable to the Prospective Drag Seller and the

54

Drag Along Sellers under this Section 12.3(b) will be subject to reduction for any tax or other amounts required to be withheld under the provisions of any documents executed in connection with the Drag Along Sale or otherwise under applicable law. Notwithstanding anything to the contrary contained herein, at the Board of Managers' election, the proceeds with respect to a Sale of the Company may be withheld from any Unit Holder pending the execution of the deliveries set forth in Section 12.3(a) or the posting of such Unit Holder's pro rata share of any security as the Board of Managers deems necessary to cover any purchase price adjustments, indemnification or such other obligations of the Company or a Unit Holder as set forth in Section 12.3(a).

(c)    *Cancellation of Class S Units*. Any Class S Units Transferred in a Drag Along Transfer shall terminate upon the closing of such Drag Along Sale and payment to the Class S Unit Holders of the applicable portion of the proceeds of such Drag Along Sale.

(d)    *Approval Rights.* Each Unit Holder hereby acknowledges and agrees that, in connection with a Sale of the Company, such Unit Holder is not entitled to any dissenter's rights, appraisal rights or similar rights under Section 18-210 of the Act or otherwise, and hereby waives all related claims (including any claims for breach of fiduciary duty arising out of or related to any Sale of the Company, including claims relating to the fairness of such Sale of the Company, the amount, nature, form or terms of consideration paid for Units in such Sale of the Company even if such Sale of the Company results in no consideration being paid or payable to any or all of the Unit Holders, the process or timing of such Sale of the Company, or any similar claims).

Section 12.4    Miscellaneous. The following provisions will apply to any Tag Along Transfer or Drag Along Sale to which Section 12.1, 12.2 or 12.3, respectively, applies:

(a)    *Further Assurances.* The Company will, and will cause its Subsidiaries to, and each Prospective Tag Seller, Tag Along Seller, Prospective Management Tag Seller, Management Tag Contributor and Drag Along Seller (each, a "Participating Seller") will, and will cause each of its equity holders to, take or cause to be taken all such actions as may be necessary, reasonably desirable or otherwise requested by the Prospective Tag Seller, Prospective Management Tag Seller or Prospective Drag Seller, as applicable, in order to expeditiously pursue and consummate each Tag Along Transfer, Management Tag Along Transfer or Drag Along Sale pursuant to Section 12.1, 12.2 or 12.3 and any related transactions (including any auction or competitive bid process in connection with or prefaced in anticipation of such Transfer), including executing, acknowledging and delivering transfer agreements, sale agreements, escrow agreements, consents, assignments, releases of claims relating to their Interest in the Company, waivers, and any other documents or instruments which in each case are no more burdensome than those executed by the Prospective Tag Seller, Prospective Management Tag Seller or Prospective Drag Seller (provided that such Participating Sellers may be required to execute non-solicitation agreements and confidentiality agreements which are not executed by Audax Private Equity Fund III, L.P., Audax Private Equity Fund IV, L.P. and certain Affiliates of Audax Private Equity Fund III, L.P., Audax Private Equity Fund IV, L.P. or FC, FC Trident Investment, FC Neptune Investments, LLC, FC Trident Partners, LLC, Formation Capital, LLC, STI, Schryver, the Class S Unit Holders and each of their Affiliates or ZAC Capital Partners, LLC or any Affiliated Fund) (collectively, "Ancillary Documents")

(provided, further, that (i) no Participating Seller who is or was an employee of the Company shall be required to enter into an Ancillary Document that is broader or more restrictive in nature or scope than any agreement by which such Person is already bound at the time of the proposed Transfer and (ii) no Participating Seller that is not an employee of the Company or any of its Subsidiaries shall be required to be subject to any non-competition obligations); furnishing information and copies of documents; filing applications, reports, returns, filings and other documents or instruments with governmental authorities; and otherwise cooperating with the Prospective Tag Seller, Prospective Management Tag Seller or Prospective Drag Seller, as applicable, and the Prospective Tag Buyer, Prospective Management Tag Buyer or Prospective Drag Buyer and their respective Representatives; attending diligence meetings and responding to diligence requests; engaging outside advisors at the Company's expense (including investment banking, accounting and law firms), in each case acceptable to the Prospective Tag Seller, Prospective Management Tag Seller or Prospective Drag Seller, as applicable, in its sole discretion. Each Unit Holder will be obligated to join up to such Unit Holder's pro rata share in any purchase price adjustments, indemnification or other obligations that the sellers of Units, other equity interests or assets are required to provide in connection with a Tag Along Transfer, Management Tag Along Transfer or Drag Along Sale such that proceeds will be distributed as if they had been distributed after giving effect to such adjustments, indemnification and other obligations (other than any such obligations that relate solely to a particular Unit Holder, such as indemnification with respect to representations and warranties given by a Unit Holder regarding such Unit Holder's title to and ownership of securities, in respect of which only such Unit Holder will be liable); provided, that no Unit Holder shall have any liability in connection with a Tag Along Sale or Drag Along Sale in excess of the proceeds received by it in connection with such transaction. Each Participating Seller hereby grants to the Company a power of attorney to sign any and all agreements and instruments that are being executed in connection with a Tag Along Transfer pursuant to <u>Section 12.1</u>, a Management Tag Along Transfer pursuant to <u>Section 12.2</u> or a Drag Along Sale or Sale of the Company pursuant to <u>Section 12.3</u> and that are in accordance with the provisions of this <u>Section 12.4(a)</u> on behalf of such Participating Seller in its capacity as a Unit Holder of the Company.

(b)    *Process.* Neither Formax, STI, Schryver or any Class S Unit Holder, nor any of their respective Affiliates will have any liability to any other Unit Holder arising from, relating to or in connection with the pursuit, consummation, postponement, abandonment or terms and conditions of any Tag Along Transfer, Management Tag Along Transfer or Drag Along Sale except to the extent Formax, STI, Schryver or any Class S Unit Holder, or any of their respective Affiliates, will have failed to comply with the provisions of this <u>Article XII</u>.

(c)    *Expenses.* All reasonable costs and expenses incurred by the Prospective Tag Seller, Prospective Management Tag Seller or Prospective Drag Seller or the Company in connection with any proposed Tag Along Transfer, Management Tag Along Transfer or Drag Along Sale pursuant to this <u>Article XII</u> (whether or not consummated) including all attorneys' fees and expenses, all accounting fees and charges and all finders, brokerage or investment banking fees, charges or commissions, will be either (i) if not all Unit Holders are participating in such transaction, borne by the participating Unit Holders based upon such Unit Holders' pro rata share such that proceeds from any Transfer or Sale of the Company will be distributed as if they had been distributed after giving effect to such costs and expenses or (ii) otherwise, paid by the Company. Any other costs and expenses incurred by or on behalf of any or all of the other

Participating Sellers in connection with any proposed Tag Along Transfer, Management Tag Along Transfer or Drag Along Sale pursuant to this Article XII (whether or not consummated) will be borne by such Participating Sellers.

(d)     *Closing*. The closing of a Transfer or Sale of the Company to which Section 12.1, 12.2 or 12.3 applies will take place at such time and place as the Company, Prospective Tag Seller, Prospective Management Tag Seller or Prospective Drag Seller will specify by notice to each Participating Seller. At the closing of such Tag Along Transfer, Management Tag Along Transfer or Drag Along Sale, each Participating Seller will, if applicable, deliver the certificates evidencing the Units to be Transferred or contributed by such Participating Seller, duly endorsed for transfer with signature guaranteed, free and clear of any liens or encumbrances other than those arising under this Agreement or applicable securities laws, with any necessary transfer tax stamps affixed, against delivery of the applicable consideration.

(e)     *Sale of Capital Stock of Certain Entities*.

(i)     In the event that any of the Formax Blocker Members elects pursuant to Section 12.4(e) of the FC PAC LLC Agreement to sell the capital stock in a Formax Blocker Corporation in connection with any transaction, the Company will distribute to Formax the equity interests of the Company or the Company's direct or indirect Subsidiary that is due to such Formax Blocker Corporation, and Formax shall distribute such equity interest to its members. Such distribution shall not be treated as a Distribution for purposes of Section 5.1 of this Agreement; provided that amounts distributable to the Class P Unit Holders shall not be impacted by such transaction. The Board of Managers shall adjust the mechanics of this Section 12.4(e) in good faith to replicate, as closely as reasonably possible, the arrangement of Section 12.4(e) of the FC PAC LLC Agreement as applicable to the Company; provided that nothing in this Section 12.4(e)(i) or Section 12.4(e) of the FC PAC LLC Agreement shall require any Participating Seller to be liable for tax liabilities of any Formax Blocker Member; provided, further, that each Formax Blocker Member shall have the exclusive right to any Tax refund owing to such Formax Blocker Corporation.

(ii)     Certain direct or indirect owners of the Members listed on Exhibit 12.4(e)(ii) (the "STI/Schryver Blocker Members") may elect to sell the capital stock of corporations (or other entities taxed as corporations) that are direct or indirect members of such STI/Schryver Blocker Members and through which they indirectly hold interests in the Company (each an "STI/Schryver Blocker Corporation") in lieu of Units in connection with any transaction to which Section 12.1, Section 12.2 or Section 12.3 applies, any transaction for which the Formax Blocker Members may elect pursuant to Section 12.4(e) of the FC PAC LLC Agreement to sell the capital stock in a Formax Blocker Corporation in connection with any transaction or any other transaction involving the sale of the Company or one or more direct or indirect Subsidiaries of the Company. Such election shall be treated as having been made by each STI/Schryver Blocker Member with respect to its ownership by STI/Schryver

Blocker Corporations unless such STI/Schryver Blocker Member states otherwise in writing. If such an election is treated as having been made, the following provisions shall apply:

(1)    In the event of a transaction involving the sale of the Company or a direct or indirect Subsidiary of the Company which is a corporation or a limited liability company which is a disregarded entity or is itself taxed as a partnership, the Company shall redeem Company Interests for the shares or interests, as applicable, of such Subsidiary due to each STI/Schryver Blocker Member through any existing intermediate entities of the Company ultimately to the applicable STI/Schryver Blocker Corporation (and the applicable STI/Schryver Blocker Corporation and STI/Schryver Blocker Member agree to cause each upper-tier intermediate entity that indirectly owns Interests in the Company to do so also), such that the STI/Schryver Blocker Corporation shall directly hold the shares or interests, as applicable, of the Company or the Subsidiary being sold.

(2)    The STI/Schryver Blocker Member may elect to sell the capital stock of the STI/Schryver Blocker Corporation in lieu of receiving a cash distribution from the Company with respect to the sale of the Company or such Company Subsidiary. To the extent the sale is one to which Section 12.1, Section 12.2 or Section 12.3 applies, the provisions of Section 12.1, Section 12.2 or Section 12.3, as applicable, shall apply to any such sale of shares of capital stock, mutatis mutandis, with the shares of capital stock to be sold to be equivalent to the indirect interest in the interests to be sold pursuant to such sale of the Company or the Company's Subsidiary. The applicable notices may be delivered on this basis. Such sale will be made on the same terms and conditions as a sale of the underlying stock or interests, as applicable, as if the holders transferring such capital stock were instead transferring such stock or interests. Such shares of capital stock shall be sold for a purchase price equal to the purchase price for the stock or interests indirectly represented by such shares; provided, however, that the proceeds to the owners of the STI/Schryver Blocker Members will be increased, dollar for dollar, to the extent such STI/Schryver Blocker Corporation holds cash or cash equivalents at the closing and the STI/Schryver Blocker Member shall have the exclusive right to any Tax refund owing to such STI/Schryver Blocker Corporation.

(3)    Notwithstanding anything to the contrary in this Section 12.4(e)(ii), nothing in this Section 12.4(e)(ii) shall require any Participating Seller to be liable for tax liabilities of any STI/Schryver Blocker Member.

(iii)    Certain direct or indirect owners of the Members listed on Exhibit 12.4(e)(iii) (the "Class S Blocker Members") may elect to sell the capital stock of corporations (or other entities taxed as corporations) that are direct or indirect members of such Class S Blocker Members and through which they indirectly hold interests in the Company (each a "Class S Blocker Corporation") in lieu of Units in connection with any transaction to which Section 12.1, Section 12.2 or Section 12.3 applies, any transaction for which the Formax Blocker Members may elect pursuant to Section 12.4(e) of the FC PAC LLC Agreement to sell the capital stock in a Formax Blocker Corporation in connection with any transaction or any other transaction involving the sale of the Company or one or more direct or indirect Subsidiaries of the Company. Such election shall be

treated as having been made by each Class S Blocker Member with respect to its ownership by Class S Blocker Corporations unless such Class S Blocker Member states otherwise in writing. If such an election is treated as having been made, the following provisions shall apply:

(1)    In the event of a transaction involving the sale of the Company or a direct or indirect Subsidiary of the Company which is a corporation or a limited liability company which is a disregarded entity or is itself taxed as a partnership, the Company shall redeem Company Interests for the shares or interests, as applicable, of such Subsidiary due to each Class S Blocker Member through any existing intermediate entities of the Company ultimately to the applicable Class S Blocker Corporation (and the applicable Class S Blocker Corporation and Class S Blocker Member agree to cause each upper-tier intermediate entity that indirectly owns Interests in the Company to do so also), such that the Class S Blocker Corporation shall directly hold the shares or interests, as applicable, of the Company or the Subsidiary being sold.

(2)    The Class S Blocker Member may elect to sell the capital stock of the Class S Blocker Corporation in lieu of receiving a cash distribution from the Company with respect to the sale of the Company or such Company Subsidiary. To the extent the sale is one to which Section 12.1, Section 12.2 or Section 12.3 applies, the provisions of Section 12.1, Section 12.2 or Section 12.3, as applicable, shall apply to any such sale of shares of capital stock, mutatis mutandis, with the shares of capital stock to be sold to be equivalent to the indirect interest in the interests to be sold pursuant to such sale of the Company or the Company's Subsidiary. The applicable notices may be delivered on this basis. Such sale will be made on the same terms and conditions as a sale of the underlying stock or interests, as applicable, as if the holders transferring such capital stock were instead transferring such stock or interests. Such shares of capital stock shall be sold for a purchase price equal to the purchase price for the stock or interests indirectly represented by such shares; provided, however, that the proceeds to the owners of the Class S Blocker Members will be increased, dollar for dollar, to the extent such Class S Blocker Corporation holds cash or cash equivalents at the closing and the Class S Blocker Member shall have the exclusive right to any Tax refund owing to such Class S Blocker Corporation.

(iv)    Notwithstanding anything to the contrary in this Section 12.4(e)(ii), nothing in this Section 12.4(e)(ii) shall require any Participating Seller to be liable for tax liabilities of any Class S Blocker Member.

## ARTICLE XIII

## PRE-EMPTIVE RIGHTS

Section 13.1    Pre-emptive Rights. Subject to Section 3.4, none of the Company or any of its Subsidiaries will issue or sell any Units or other equity interests or issue any debt securities (each an "Issuance" of "Subject Securities") except (a) pursuant to Section 3.10 or the True-Up Provisions, or (b) in compliance with the provisions of this Article XIII.

Section 13.2    <u>Participation Notice</u>. Not fewer than twenty (20) business days prior to the consummation of the Issuance, a written notice (the "<u>Participation Notice</u>") will be given by the Company or its Subsidiaries pursuant to <u>Section 19.3</u> to each Class A Unit Holder and each Class S Unit Holder that is not an Excluded Member. The Participation Notice will include:

(a)    the principal terms of the proposed Issuance, including (i) the amount and kind of Subject Securities to be included in the Issuance, (ii) the number of Subject Securities, (iii) the price per unit of the Subject Securities, (iv) the portion of the Issuance equal to the number of Class A Units and Class S Units held by such Unit Holder immediately prior to the Issuance <u>divided by</u> the aggregate number of Class A Units and Class S Units outstanding immediately prior to the Issuance (the "<u>Participation Portion</u>") and (v) the name and address of each Person to whom the Subject Securities are proposed to be issued (each a "<u>Prospective Subscriber</u>"); and

(b)    an offer by the Company or any of its Subsidiaries to issue or cause to be issued, at the option of each Unit Holder to which a Participation Notice is required to be given, to such Unit Holder such portion of the Subject Securities to be included in the Issuance as may be requested by such Unit Holder (not to exceed the Participation Portion of the total amount of Subject Securities to be included in the Issuance), at the same price and otherwise on the same economic terms and conditions, with respect to each unit of Subject Securities issued to such Unit Holders, as the issuance to each of the Prospective Subscribers; <u>provided</u> that, if all Unit Holders entitled to purchase or receive any class or series of Subject Securities are required to also purchase any other class or series of Subject Securities, the Prospective Subscribers exercising their rights pursuant to this <u>Article XIII</u> will also be required to purchase the same strip of securities (on the same terms and conditions) that such other Unit Holders are required to purchase.

Section 13.3    <u>Participation Commitment</u>. Each Unit Holder desiring to accept the offer contained in the Participation Notice will send an irrevocable commitment (each, a "<u>Participation Commitment</u>") to the Company or its Subsidiaries, as applicable, within twenty (20) business days after the effectiveness (in accordance with <u>Section 13.2</u>) of the Participation Notice specifying the number (not in any event to exceed the product of the Participation Portion multiplied by the aggregated number of securities in the Issuance) or proportion (not in any event to exceed the Participation Portion) of Subject Securities which such Unit Holder desires to be issued (each, a "<u>Participation Buyer</u>"). Each Unit Holder which has not so accepted such offer, or that does not comply with <u>Section 13.6</u>, will be deemed to have waived all of such Unit Holder's rights with respect to the Issuance under this <u>Article XIII</u>. If at the end of such twenty (20)-business day period the Company or any Subsidiary, as applicable, has not received an acceptance for all such Subject Securities, then the Company shall notify the Participation Buyers of that fact, in which case each Participation Buyer desiring to accept the offer contained in the Participation Notice with respect to any Subject Securities that no other Unit Holder has elected to purchase (the "<u>Remainder Securities</u>") may send a Participation Commitment to the Company or such Subsidiary, as applicable, within fifteen (15) business days after the effectiveness (in accordance with <u>Section 13.2</u>) of the Participation Notice specifying the number (not in any event to exceed the product of the Participation Portion of such Participation Buyer multiplied by the Remainder Securities) or proportion (not in any event to exceed the

Participation Portion) of Remainder Securities such Participation Buyer desires to acquire. Each Participation Buyer which has not so accepted such offer with respect to the Remainder Securities, or that does not comply with <u>Section 13.6</u>, will be deemed to have waived all of such Participation Buyer's rights with respect to the Issuance under this <u>Article XIII</u>, and the Company or any of its Subsidiaries, as applicable, will thereafter be free to issue the remainder of the Subject Securities in such Issuance to the Prospective Subscribers and any Participating Buyers at a price not less than 95% of the price set forth in the Participation Notice, without any further obligation to such non-accepting Unit Holders under this <u>Article XIII</u>. If, prior to consummation, the terms of such proposed Issuance will change with the result that the price will be less than 95% of the price set forth in the Participation Notice, it will be necessary for a separate Participation Notice to be furnished, and the terms and provisions of this <u>Article XIII</u> separately complied with, in order to consummate such Issuance pursuant to this <u>Article XIII</u>; <u>provided</u>, <u>however</u>, that in the case of such a separate Participation Notice, each applicable period to which reference is made in this <u>Article XIII</u> will be the longer of (a) the remaining portion of the twenty (20) business day period applicable to the first Participation Notice distributed in connection with such proposed Issuance or (b) five (5) business days.

Section 13.4    <u>Acceptance</u>. The Participation Commitment of each Participating Buyer will be irrevocable except as hereinafter provided, and each such Participating Buyer will be bound and obligated to acquire in the Issuance on the same economic terms and conditions as the Prospective Subscribers, with respect to each share of Subject Securities issued, such number or proportion of Subject Securities as such Participating Buyer will have specified in such Participating Buyer's Participation Commitment(s).

Section 13.5    <u>Failure to Consummate</u>. If at the end of the 120th day following the date of the effectiveness (in accordance with <u>Section 13.2</u>) of the Participation Notice the Company or any of its Subsidiaries has not completed the Issuance on the terms and conditions specified in such Participation Notice, each Participating Buyer will be released from its obligations under such Participating Buyer's Participation Commitment, the Participation Notice will be null and void, and it will be necessary for a separate Participation Notice to be furnished, and the terms and provisions of this <u>Article XIII</u> separately complied with, in order to consummate any Issuance subject to this <u>Article XIII</u>.

Section 13.6    <u>Cooperation</u>. Each Unit Holder, whether in his, her or its capacity as a Participating Buyer, officer or Board Member of the Company, or otherwise, will take or cause to be taken all such reasonable actions as may be necessary, reasonably desirable or otherwise requested by the Company or any of its Subsidiaries in order expeditiously to consummate each Issuance pursuant to this <u>Article XIII</u> and any related transactions, including executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments, filing applications, reports, returns, filings and other documents or instruments with governmental authorities, and otherwise cooperating with the Company or its Subsidiaries, the Prospective Subscribers and the Participating Buyers (if any). Without limiting the generality of the foregoing, each such Participating Buyer and Unit Holder agrees to execute and deliver such Ancillary Documents to which the Prospective Subscriber will be party.

Section 13.7    <u>Closing</u>. The closing of an Issuance pursuant to this <u>Article XIII</u> will take place at such time and place as the Company or its Subsidiaries, as applicable, will

specify by notice to each Participating Buyer in accordance with Section 19.3. At the closing of any Issuance under this Article XIII, each Participating Buyer will be delivered the certificates or other instruments, if any, evidencing the Subject Securities to be issued to such Participating Buyer, registered in the name of such Participating Buyer or his, her or its designated nominee, free and clear of any liens or encumbrances, with any transfer tax stamps affixed, against delivery by such Participating Buyer of the applicable consideration.

Section 13.8    Post-Issuance Compliance. Notwithstanding the foregoing, the Company or its Subsidiaries, as applicable, may proceed with any Issuance prior to having complied with the provisions of Section 13.2; provided that the Company or its Subsidiaries, as applicable, will provide to each Unit Holder who would have been entitled to be given a Participation Notice in connection with such Issuance (i) with prompt notice of such Issuance and (ii) the Participation Notice described in Section 13.2 in which the actual price per share of Subject Securities will be set forth; and include in the subscription (or similar) agreement with the purchaser(s) of the Subject Securities a provision permitting the Company or its Subsidiaries, as applicable, to repurchase such securities, for a purchase price equal to the amount paid for such securities, in an amount necessary to satisfy the offers made by Unit Holders in accordance with the provisions of Section 13.3 in response to the Participation Notice furnished pursuant to this Section 13.8. Any purchase of the Subject Securities by any Unit Holder pursuant to this Section 13.8 shall be consummated within twenty (20) business days after the closing of the Issuance pursuant to this Article XIII. During such twenty (20)-business day period, neither the Company nor any Member shall take any material action that affects the Members, including, without limitation, any Distribution or Sale of the Company.

Section 13.9    Exceptions. For the avoidance of doubt, the preceding provisions of this Article XIII will not apply to (a) any Unit Holder who holds Class P Units (only in respect of such Class P Units and not with respect to any other Class of Units), (b) any Excluded Member, (c) the Issuance by the Company and its Subsidiaries of Units (including the Class S Units) on the Original Date, (d) issuances of Class P Units by the Company or its Subsidiaries, (e) any issuance of any Class P Units by the Company or its Subsidiaries to employees, officers or managers of the Company or its Subsidiaries, (f) any issuance of Units to lenders in connection with bona fide debt financings, approved in accordance with Section 3.4 to the extent applicable, (g) any issuance of Units by the Company or its Subsidiaries as consideration in connection with any business acquisition of any unaffiliated Third Party by the Company or its Subsidiaries, (h) any issuance of Units by a Subsidiary to the Company or another Subsidiary, (i) any equity interests issued in connection with a Public Offering of the Company or its Subsidiaries or (j) the Issuance by the Company of any Class S Units in accordance with Section 3.10.

## ARTICLE XIV

## DISSOLUTION OF COMPANY

Section 14.1    Termination of Membership. No Unit Holder will resign or withdraw from the Company except that, subject to the restrictions set forth in Article XI, any Unit Holder may Transfer its Interest in the Company to a transferee and a transferee may become a Unit Holder in place of the Unit Holder assigning such Interest. The death, retirement,

resignation, expulsion, bankruptcy or dissolution of any Unit Holder or the occurrence of any other event that terminates the continued membership of any Unit Holder will not in and of itself cause the Company to be dissolved or its affairs to be wound up, and upon the occurrence of any such event, the Company will be continued without dissolution.

Section 14.2    Events of Dissolution. The Company will be dissolved upon the happening of any of the following events: (a) the entry of a decree of judicial dissolution under Section 18-802 of the Act, (b) the determination of the Board of Managers, subject to Section 3.4, (c) the disposition of all of the Company's assets or (d) the termination of the legal existence of the last remaining Member or the occurrence of any other event which terminates the continued membership of the last remaining Member unless the business of the Company is continued in a manner permitted by this Agreement or the Act.

Section 14.3    Liquidation. Upon dissolution of the Company for any reason, the Company will immediately commence to wind up its affairs. A reasonable period of time will be allowed for the orderly termination of the Company's business, discharge of its liabilities, and distribution or liquidation of its remaining assets so as to enable the Company to minimize the normal losses attendant to the liquidation process. The Company's property and assets or the proceeds from the liquidation thereof will be distributed so as not to contravene the Act and will be otherwise distributed to the Unit Holders as set forth in Sections 5.1(b) and (c). A full accounting of the assets and liabilities of the Company will be taken and a statement thereof will be furnished to each Member promptly after the distribution of all of the assets of the Company. Such accounting and statements will be prepared under the direction of the Board of Managers.

Section 14.4    No Action for Dissolution. The Unit Holders acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Unit Holder should bring an action in court to dissolve the Company under circumstances where dissolution is not required by Section 14.2. This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Interests of all Unit Holders. Accordingly, except where the Board of Managers has failed to liquidate the Company as required by Section 14.3 and except as specifically provided in Section 18-802 of the Act, each Unit Holder hereby waives and renounces its right to initiate legal action to seek dissolution or to seek the appointment of a receiver or trustee to liquidate the Company.

Section 14.5    No Further Claim. Upon dissolution, each Unit Holder will have recourse solely to the assets of the Company for the return of such Unit Holder's capital, and if the Company's property remaining after payment or discharge of the debts and liabilities of the Company, including debts and liabilities owed to one or more of the Unit Holders, is insufficient to return the aggregate Capital Contributions of each Unit Holder, such Unit Holder will have no recourse against the Company, the Board of Managers or any other Unit Holder.

Section 14.6    Distribution of Subsidiary Equity. In the event that immediately prior to its dissolution the Company holds common stock or other equity interests in any direct Subsidiary of the Company with over 50% of the then outstanding ordinary voting power to elect members of such Subsidiary's board of directors or board of managers, the Company will cause such Subsidiary, prior to and in contemplation of such dissolution and the distribution to Unit Holders of the stock of such Subsidiary, to offer to enter into agreements with the Unit Holders

63

granting to such Unit Holders directly the same rights, subject to substantially the same obligations, with respect to such Subsidiary as they possess with respect to the Company and each other Unit Holder, immediately prior to such dissolution, with all rights of the Board of Managers being transferred to the board of directors (or similar governing body) of such Subsidiary. All Unit Holders hereby agree to take all reasonable actions in connection with the foregoing, including (a) the execution of all such agreements with such Subsidiary and the execution of such additional documents and instruments as may be requested by the Board of Managers and (b) if such common stock or other equity interests of such Subsidiary have been offered in a Public Offering, the execution of any holdback, lockup or similar agreement reasonably requested by Formax (and in the same form executed by Formax) in connection with such Public Offering.

## ARTICLE XV

## INDEMNIFICATION

Section 15.1    Indemnification Rights.

(a)    General. To the fullest extent permitted by law, the Company will indemnify, defend and hold harmless each member of the Board of Managers, each officer of the Company, Formax, Schryver, STI, the Class S Unit Holders, the Tax Matters Member and each of their respective Affiliates, including officers, directors, stockholders, partners, members, managers, employees, affiliates, representatives or agents of any Member (all indemnified persons being referred to as "Indemnified Persons" for purposes of this Article XV), from any liability, loss or damage incurred by the Indemnified Person by reason of any act performed or omitted to be performed by the Indemnified Person in connection with the business of the Company and from liabilities or obligations of the Company imposed on such Person by virtue of such Person's position with the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss or damage; provided, however, that if the liability, loss, damage or claim arises out of any action or inaction of an Indemnified Person, indemnification under this Section 15.1 will be available only if such action or inaction was not expressly prohibited by this Agreement above and (i) either (A) the Indemnified Person, at the time of such action or inaction, determined in good faith that its, his or her course of conduct was in, or not opposed to, the best interests of the Company or (B) in the case of inaction by the Indemnified Person, the Indemnified Person did not intend its, his or her inaction to be harmful or opposed to the best interests of the Company and (ii) the action or inaction did not constitute fraud or willful misconduct by the Indemnified Person; provided, further, however, that indemnification under this Section 15.1 will be recoverable only from the assets of the Company and not from any assets of the Unit Holders. The Company will advance reasonable attorneys' fees of an Indemnified Person as incurred; provided that such Indemnified Person executes an undertaking, with appropriate security if requested by the Board of Managers, to repay the amount so paid or reimbursed in the event that a final non-appealable determination by a court of competent jurisdiction finds that such Indemnified Person is not entitled to indemnification under this Article XV. The Company may pay for insurance covering liability of the Indemnified Persons for negligence in the operation of the Company's affairs. Notwithstanding anything in this Agreement to the contrary, it is understood that no Member, in exercising any of its consent rights granted under this Agreement, shall be deemed to owe any

fiduciary duties to the Company, any Member or any Unit Holder, and will otherwise not have any obligations other than such obligations as specifically provided by this Agreement.

(b)    <u>Indemnification Priority</u>. The Company hereby acknowledges that the rights to indemnification, advancement of expenses and/or insurance provided pursuant to this <u>Section 15.1</u> may also be provided to certain Indemnified Persons by Audax Private Equity Fund III, L.P., Audax Private Equity Fund IV, L.P. and certain Affiliates of Audax Private Equity Fund III, L.P., Audax Private Equity Fund IV, L.P., FC, FC Trident Investment, FC Neptune Investments, LLC, FC Trident Partners, LLC, Formation Capital, LLC, STI, Schryver, the Class S Unit Holders and their respective Affiliated Funds (other than direct or indirect Subsidiaries of the Company) (collectively, the "<u>Affiliate Indemnitors</u>"). The Company hereby agrees that, as between itself and the Affiliate Indemnitors (i) the Company is the indemnitor of first resort with respect to all such indemnifiable claims against such Indemnified Persons, whether arising under this Agreement or otherwise (*i.e.*, its obligations to such Indemnified Persons are primary and any obligation of the Affiliate Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such Indemnified Persons are secondary), (ii) the Company will be required to advance the full amount of expenses incurred by such Indemnified Persons and will be liable for the full amount of all expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement (or any other agreement between the Company and such Indemnified Persons), without regard to any rights such Indemnified Persons may have against the Affiliate Indemnitors, and (iii) the Company irrevocably waives, relinquishes and releases the Affiliate Indemnitors from any and all claims against the Affiliate Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company agrees to indemnify the Affiliate Indemnitors directly for any amounts that the Affiliate Indemnitors pay as indemnification or advancement on behalf of any such Indemnified Person and for which such Indemnified Person may be entitled to indemnification from the Company in connection with serving as a director or officer (or equivalent titles) of the Company or its Subsidiaries. The Company further agrees that no advancement or payment by the Affiliate Indemnitors on behalf of any such Indemnified Person with respect to any claim for which such Indemnified Person has sought indemnification from the Company will affect the foregoing and the Affiliate Indemnitors will be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Indemnified Person against the Company, and the Company will cooperate with the Affiliate Indemnitors in pursuing such rights.

Section 15.2    <u>Exculpation</u>. No Indemnified Person will be liable, in damages or otherwise, to the Company or to any Unit Holder for any loss that arises out of any act performed or omitted to be performed by it, him or her pursuant to the authority granted by this Agreement.

Section 15.3    <u>Persons Entitled to Indemnity</u>.

(a)    Any Person who is within the definition of "Indemnified Person" at the time of any action or inaction in connection with the business of the Company will be entitled to the benefits of this <u>Article XV</u> as an "Indemnified Person" with respect thereto, regardless of whether such Person continues to be within the definition of "Indemnified Person" at the time of such Indemnified Person's claim for indemnification or exculpation hereunder. The right to indemnification and the advancement of expenses conferred in this <u>Article XV</u> will not be

exclusive of any other right which any Person may have or hereafter acquire under any statute, agreement, by law, vote of the Board of Managers or otherwise. If this <u>Article XV</u> or any portion hereof will be invalidated on any ground by any court of competent jurisdiction, then the Company will nevertheless indemnify and hold harmless each Indemnified Person pursuant to this <u>Article XV</u> to the fullest extent permitted by any applicable portion of this <u>Article XV</u> that will not have been invalidated and to the fullest extent permitted by applicable law.

(b)    In addition to the other provisions of this <u>Article XV</u>, the Company will indemnify, defend and hold harmless each Class P Unit Holder from any liability, loss or damage incurred by such Person by reason of any claim against such Person solely in his or her capacity as a Class P Unit Holder:

(i)    by Formax, STI, Schryver, the Class S Unit Holders or the Company (or any Affiliate thereof) (other than in connection with enforcing direct obligations of such Class P Unit Holder under this Agreement); <u>provided</u>, that with respect to such claims and notwithstanding anything else in this <u>Article XV</u>, the Company will provide such Class P Unit Holder advances of reasonable legal expenses of such Class P Unit Holder (with reasonably appropriate bond or security posted if requested), which such advances will be immediately repaid by such Class P Unit Holder if such Person does not prevail in the underlying matter (as set forth in a final non-appealable determination by a court of competent jurisdiction); and

(ii)    by Third Parties (whether or not such claim is made against all Unit Holders) to the extent such claim is based upon actions of the Company or its Subsidiaries (including actions of such Class P Unit Holder undertaken in the performance of the such Person's ordinary course duties on behalf of any such entities), unless the Company also has a right of indemnification or recovery against such Class P Unit Holder in respect of such matter.

Section 15.4    <u>Procedure Agreements</u>. The Company may enter into an agreement with any of its officers, employees, consultants, counsel and agents, or the Board Members, setting forth procedures consistent with applicable law for implementing the indemnities provided in this <u>Article XV</u>.

## ARTICLE XVI

## <u>REPRESENTATIONS AND COVENANTS BY THE MEMBERS</u>

Each Member hereby represents and warrants to, and agrees with, the Board of Managers, severally and not jointly and solely on its own behalf, as follows:

Section 16.1    <u>Investment Intent</u>. Such Member is acquiring such Member's Interest with the intent of holding the same for investment for such Member's own account and without the intent or a view of participating directly or indirectly in any distribution of such Interests within the meaning of the Securities Act or any applicable state securities laws, or otherwise Transferring such Interests, in each case in violation of applicable law.

Section 16.2    Securities Regulation.

(a)    Such Member acknowledges and agrees that such Member's Interest is being issued and sold in reliance on the exemption from registration under the Securities Act and exemptions contained in applicable state securities laws, and that such Member's Interest cannot and will not be sold or transferred except in a transaction that is exempt under the Securities Act and applicable state securities laws or pursuant to an effective registration statement under the Securities Act and applicable state securities laws.

(b)    Except as otherwise set forth in this Agreement, such Member understands that such Member has no contractual right for the registration under the Securities Act of such Member's Interest for public sale and that, unless such Member's Interest is registered or an exemption from registration is available, such Member's Interests may be required to be held indefinitely.

Section 16.3    Economic Risk. Such Member is able to bear the economic risk of such Member's investment in such Member's Interest for an indefinite period of time, and such Member is aware that such Member may lose the entire amount of such Member's investment in the Company.

Section 16.4    Binding Agreement. Such Member has all requisite power and authority to enter into and perform this Agreement and this Agreement is and will remain such Member's valid and binding agreement, enforceable in accordance with its terms (subject, as to the enforcement of remedies, to any applicable bankruptcy, insolvency or other laws affecting the enforcement of creditors rights).

Section 16.5    Tax Position. Unless such Member provides prior written notice to the Company, such Member will not take a position on such Member's federal income tax return, in any claim for refund or in any administrative or legal proceedings that is inconsistent with this Agreement or with any information return filed by the Company.

Section 16.6    Information. Such Member has received all documents, books and records pertaining to an investment in the Company requested by such Member. Such Member has had a reasonable opportunity to ask questions of and receive answers concerning the Company, and all such questions have been answered to such Member's satisfaction and the determination of such Member to acquire any Units pursuant to this Agreement has been made by such Member independent of any such answers given or other statements made by the Company, its Subsidiaries and their respective Affiliates and representatives.

Section 16.7    Tax and Other Advice. Such Member has had the opportunity to consult with such Member's own tax and other advisors with respect to the consequences to such Member of the purchase, receipt or ownership of the Units, including the tax consequences under federal, state, local, and other income tax laws of the United States or any other country and the possible effects of changes in such tax laws. Such Member acknowledges that none of the Company, its Subsidiaries, Affiliates, successors, beneficiaries, heirs and assigns and its and their past and present directors, officers, employees, and agents (including their attorneys) makes or has made any representations or warranties to such Member regarding the consequences to

such Member of the purchase, receipt or ownership of the Units, including the tax consequences under federal, state, local and other tax laws of the United States or any other country and the possible effects of changes in such tax laws.

Section 16.8    Licenses and Permits. Such Member will cooperate in providing such information, in signing such documents and in taking any other action as may reasonably be requested by the Company in connection with obtaining any non-U.S., federal, state or local license or permit needed to operate its business or the business of any entity in which the Company invests.

Section 16.9    Indemnities. Such Member agrees to indemnify and hold harmless the Company from and against all losses, damages, liabilities and expenses (including reasonable attorneys' fees and charges) resulting from any breach of any representation, warranty or agreement of such Member in this Agreement or any misrepresentation by such Member in this Agreement.

Section 16.10    Voting Agreements. Other than the FC PAC LLC Agreement and the limited liability company agreements or limited partnership agreements of FC, FC Trident Investment, LLC, STI and its Affiliates, Schryver and the Class S Unit Holders, no Member or its voting power is subject to any internal voting agreements among its direct or indirect owners except as set forth in the organizational document of such Member provided to the other Members hereto.

## ARTICLE XVII

## COMPANY REPRESENTATIONS

In order to induce the Members to enter into this Agreement and to make the Capital Contributions contemplated hereby, the Company hereby represents and warrants to each Member as follows:

Section 17.1    Duly Formed. The Company is a duly formed and validly existing limited liability company under the Act, with all necessary power and authority under the Act to issue the Interests to be issued to the Members hereunder.

Section 17.2    Valid Issue. When the Interests are issued to the Members as contemplated by this Agreement and the Capital Contributions required to be made by the Members are made, the Interests issued to the Members will be duly and validly issued and no liability for any additional capital contributions or for any obligations of the Company will attach thereto.

## ARTICLE XVIII

## AMENDMENTS TO AGREEMENT

Section 18.1    Amendments. Subject to Section 3.4 and the last sentence of Section 5.1(b), this Agreement may be modified or amended by written action of the Board of Managers; provided, however, that (a) an amendment or modification that would affect any

Class of Units in a manner materially and disproportionately adverse to any other Class of Units in existence immediately prior to such amendment will be effective against the holders of that Class of Units so materially adversely and disproportionately affected only with the prior written consent of the holders of at least a majority of such Class of Units (it being understood and agreed that any increase in the number of authorized or issued Units or Interests or the number of Units or Interests available for issuance and the issuance of additional Units or Interests (including any resulting dilution) will not be deemed to materially adversely and disproportionately affect other Units and therefore will not require a separate vote of any other Unit Holders), (b) no amendment will alter or modify <u>Section 6.1</u>, to the extent that such amendment alters or modifies the limited liability of any Unit Holder, without the consent of such Unit Holder, (c) an amendment or modification that would affect any Member in a manner materially and disproportionately adverse to any other Member will be effective against such Member so materially and disproportionately adversely affected only with the prior written consent of such Member and (d) no amendment will require any Unit Holder to make additional Capital Contributions to the Company without the consent of such Unit Holder.

Section 18.2    <u>Corresponding Amendment of Certificate</u>. The Board of Managers will cause to be prepared and filed any amendment to the Certificate that may be required to be filed under the Act as a consequence of any amendment to this Agreement.

Section 18.3    <u>Binding Effect</u>. Any modification or amendment to this Agreement validly effected pursuant to this <u>Article XVIII</u> will be binding on all Unit Holders.

## ARTICLE XIX

## **GENERAL**

Section 19.1    <u>Public Offering; Right to Convert to Corporate Form</u>.

(a)    If the Company, pursuant to the decision of the Board of Managers, undertakes a Public Offering, then the Unit Holders will cooperate with each other in good faith to effectuate such Public Offering, including to the extent such Public Offering may involve converting the Company from a Delaware limited liability company to a corporation organized under the laws of Delaware or another jurisdiction, whether by merger, statutory conversion, a tax-free contribution under Section 351 of the Code or by such other form of transaction as may be available under applicable law, and the Unit Holders hereby agree to cooperate in all respects to effectuate the Public Offering, which may require the conversion of their Units into shares of common stock or other securities in the Company or another successor entity. The Board of Managers, in its sole discretion and without the requirement for any action or approval of any Member or Unit Holder, will have the exclusive power and authority to approve and authorize any such conversion. Upon such an election, the Unit Holders will, at the expense of the Company, as soon as practicable thereafter execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, all instruments and documents that may be reasonably requested by the Board of Managers to best effectuate the conversion of the Company to a corporation while continuing in full force and effect, to the extent consistent with such conversion, the terms, provisions, and conditions of this Agreement, including all rights, protections and benefits afforded to parties to this Agreement. All Unit Holders will work

together in good faith to accomplish the conversion in the most tax-advantageous manner reasonably available, including that any equity holders of a Formax Blocker Corporation, a STI/Schryver Blocker Corporation or a Class S Blocker Member does not receive disparate treatment because such equity holder was not a direct holder of equity interests in the Company. It is the intent of the Unit Holders that the conversion of the Company into corporate form is part of the Unit Holder's investment decision with respect to the Units. Immediately prior to the conversion to a corporation, the Board of Managers will determine the aggregate value of the Units immediately prior to the Public Offering (the "Pre-Offering Company Value") based on the per-share price at which common stock will be sold in the Public Offering, net of any underwriting discounts, fees and expenses (the "Per Share Offering Price"). Upon such conversion to a corporation, each Unit will be converted into a number of shares of common stock of such corporation having a value based on the Per-Share Offering Price equal to the amount that would be Distributed in respect of such Unit if all assets of the Company were sold for cash in an aggregate amount equal to the Pre-Offering Company Value and the proceeds were distributed in accordance with Sections 5.1(b) and (c).

(b)      All Unit Holders hereby agree to take all actions in connection with a Public Offering (whether or not such Public Offering involves a conversion of the Company as set forth in Section 19.1(a)), including the execution of all documents as may be requested by the Board of Managers and the execution of any holdback, lockup or similar agreement requested by any of Formax, STI, Schryver or the Class S Unit Holders in connection with such Public Offering. In connection with a Public Offering, the Company will also enter into a registration rights agreement with Formax, STI, Schryver, the Class S Unit Holders and the Registration Rights Members, which will be in a form customary for such agreements and which will provide that Formax, STI, Schryver, the Class S Unit Holders and their respective Affiliates will be entitled to "demand" and "piggyback" registration rights and that the Registration Rights Members will be entitled to "piggyback" registration rights on a pro rata basis; provided, however, that the Registration Rights Members shall not be entitled to registration rights with respect to Non-Marketed Underwritten Shelf Take-Downs.

(c)      The Company will indemnify and hold harmless each Member from and against all losses, damages, liabilities and expenses (including reasonable attorneys' fees and charges) resulting from any untrue statement (or alleged untrue statement) of a material fact contained in any registration statement, prospectus, offering circular, or other document (including any related registration statement, notification, or the like), or any amendment or supplement thereto, incident to any such registration, qualification, or compliance, or based on any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, or any violation by the Company of any securities law, rule or regulation, in each case applicable to the Company in connection with any such registration, qualification, or compliance.

(d)      Each Member will, to the extent securities held by such Member are included in the securities as to which such registration, qualification, or compliance is being effected, indemnify the Company, each of its directors, officers, partners, legal counsel, and accountants, and each underwriter, if any, of the Company's securities covered by such a registration statement, and each other Member, against all claims, losses, damages, and liabilities

70

(or actions in respect thereof) arising out of or based on any untrue statement (or alleged untrue statement) of a material fact contained in any such registration statement, prospectus, offering circular, or other document, or any omission (or alleged omission) to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse the Company, each other such Member, and each such underwriter, for any legal or any other expenses reasonably incurred in connection with investigating or defending any such claim, loss, damage, liability, or action, as such expenses are incurred, in each case to the extent, but only to the extent, that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such registration statement, prospectus, offering circular, or other document in reliance upon and in conformity with written information furnished to the Company by such Member and stated to be specifically for use therein. A Member's liability at law for indemnification under this <u>Section 19.1(d)</u> (other than for fraud) is expressly limited to the aggregate amount of consideration received by such Member in connection with or pursuant to such Public Offering.

(e)     All expenses incurred by the Company in complying with this <u>Section 19.1</u>, including all registration, qualification, listing and filing fees, printing expenses, escrow fees, fees and disbursements of counsel for the Company, fees and disbursements of not more than one counsel for all of the Members chosen by the Board of Managers registering securities in any given registration, blue sky fees and expenses, and the expense of any special audits incident to or required by any such registration (but excluding the compensation of regular employees of the Company which will be paid in any event by the Company), will be borne by the Company.

(f)     It is the intent of the parties that in the event of a Public Offering that raises additional capital for the Company but does not result in a Sale of the Company or change of control, the Company and Mark Parrish will each work in good faith to design and implement a new incentive equity program that preserves the originally intended economic benefits of the then existing Class P Unit structure. It is understood, however, that any such new program must be acceptable to both the Board of Managers and Mark Parrish (in their respective sole discretion). It is further understood that whether such originally intended economic benefits are extended in the new program to any specific Class P Unit Holder shall be determined by the Board of Managers following recommendations by Mark Parrish, based upon, without limitation, such Class P Unit Holder's job performance, title or responsibilities. Notwithstanding the foregoing, this <u>Section 19.1(f)</u> shall have no further force or effect upon the death or incapacity of Mark Parrish or the transfer of all of his Units to an unaffiliated Third Party.

Section 19.2   <u>Successors; Delaware Law; Etc</u>. This Agreement: (a) will be binding upon the executors, administrators, estates, heirs and legal successors of the Unit Holders and (b) will be governed by and construed in accordance with the laws of the State of Delaware (without regard to the principles of conflicts of law).

Section 19.3   <u>Notices, Etc</u>. All notices and other communications required or permitted hereunder will be in writing and will be deemed effectively given upon personal delivery or receipt (which may be evidenced by a return receipt if sent by registered mail or by signature if delivered by courier or delivery service), addressed:

71

(a) if to any Unit Holder, at the address of such Unit Holder on file with the Company (including any e-mail address) or at such other address (including any e-mail address) as such Unit Holder will have furnished to the Company in writing as the address to which notices are to be sent hereunder;

(b) if to the Company or to the Board of Managers to it at:

> FC Pioneer Holding Company, LLC
> 3500 Lenox Road, Suite 510
> Atlanta, Georgia 30326
> Attention:  Scott Brown
> Email:      sbrown@formationcapital.com

> With copies (which shall not constitute notice) to:

> Ropes & Gray LLP
> Prudential Tower
> 800 Boylston Street
> Boston, MA 02199-3600
> Attn:       Kendrick Chow
> Facsimile: (617) 235-0432

> Audax Fund IV
> c/o Audax Management Company, LLC
> 101 Huntington Avenue
> Boston, MA 02199
> Attn:       Adam Abramson and General Counsel
> Facsimile: (617) 859-1600

> Skadden, Arps, Slate, Meagher & Flom LLP
> 1440 New York Avenue, NW
> Washington, DC 20005
> Attn:       Jeremy London
>             Richard Oliver
> Facsimile: (202) 661-8299
>             (202) 661-0582
> Email:      jeremy.london@skadden.com
>             richard.oliver@skadden.com

> Revelstoke Capital Partners LLC
> 3033 East 1st Avenue, Suite 501
> Denver, CO 80206
> Attn:       Simon A. Bachleda
>             Arion Robbins
> Email:      sbachleda@revelstokecp.com
>             arobbins@revelstokecp.com

and (c) if to Schryver, STI or the Class S Unit Holders, to it or them at:

>Revelstoke Capital Partners LLC
>3033 East 1st Avenue, Suite 501
>Denver, CO 80206
>Attn:      Simon A. Bachleda
>            Arion Robbins
>Email:   sbachleda@revelstokecp.com
>            arobbins@revelstokecp.com

>GCM Customized Fund Investment Group, L.P.,
>767 Fifth Avenue, 14th Floor
>New York, NY 10153
>Attn:      General Counsel
>Facsimile: (646) 362-0919
>Email:   legal@gcmlp.com

>With copies (which shall not constitute notice) to:

>Winston & Strawn LLP
>200 Park Avenue
>New York, NY 10017
>Attn:      Bradley C. Vaiana
>            Jennifer C. Kurtis
>Email:   BVaiana@winston.com
>            JKurtis@winston.com

>McGuireWoods LLP
>EQT Plaza
>625 Liberty Avenue
>23rd Floor
>Attn:      Thomas E. Zahn
>Email:   tzahn@mcguirewoods.com

Section 19.4   Execution of Documents. From time to time after the Original Date, upon the request of the Board of Managers, each Unit Holder will perform, or cause to be performed, all such additional acts, and will execute and deliver, or cause to be executed and delivered, all such additional instruments and documents, as may be required to effectuate the purposes of this Agreement. Each Unit Holder (other than Formax, STI, Schryver and the Class S Unit Holders), including each new and substituted Unit Holder, by the execution of this Agreement or by agreeing in writing to be bound by this Agreement, irrevocably constitutes and appoints the Board of Managers or any Person designated by the Board of Managers to act on such Unit Holder's behalf for purposes of this Section 19.4 as such Unit Holder's true and lawful attorney-in-fact with full power and authority in such Unit Holder's name and stead to execute, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out this Agreement, including:

(a)      all certificates and other instruments (specifically including counterparts of this Agreement), and any amendment thereof, that the Board of Managers deems appropriate to qualify or to continue the Company as a limited liability company in any jurisdiction in which the Company may conduct business or in which such qualification or continuation is, in the opinion of the Board of Managers, necessary to protect the limited liability of the Unit Holders;

(b)      all amendments to this Agreement adopted in accordance with the terms hereof and all instruments that the Board of Managers deems appropriate to reflect a change or modification of the Company in accordance with the terms of this Agreement; and

(c)      all conveyances and other instruments that the Board of Managers deems appropriate to reflect the dissolution of the Company.

The appointment of each member of the Board of Managers as such Unit Holder's attorney-in-fact to act on its behalf for purposes of this Section 19.4 will be deemed to be a power coupled with an interest, in recognition of the fact that each of the Unit Holders under this Agreement will be relying upon the power of the Board of Managers to act as contemplated by this Agreement in any filing and other action by him, her or it on behalf of the Company, and will survive the bankruptcy, dissolution, death, adjudication of incompetence or insanity of any Unit Holder giving such power and the transfer or assignment of all or any part of such Unit Holder's Interests; provided, however, that in the event of a Transfer by a Member of all of its Interest, the power of attorney given by the transferor will survive such assignment only until such time as the transferee will have been admitted to the Company as a substituted Member and all required documents and instruments will have been duly executed, filed, and recorded to effect such substitution.

Section 19.5   Consent to Jurisdiction and Service of Process. The parties irrevocably consent to the jurisdiction and venue of the state and federal courts located in Delaware in connection with any action relating to this Agreement and agree that service of summons, complaint or other process in connection with any such action may be made as set forth in Section 19.3 and that service so made will be as effective as if personally made in the State of Delaware.

Section 19.6   Severability. If any provision of this Agreement is determined by a court to be invalid or unenforceable, that determination will not affect the other provisions hereof, each of which will be construed and enforced as if the invalid or unenforceable portion were not contained herein. Such invalidity or unenforceability will not affect any valid and enforceable application thereof, and each such provision will be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

Section 19.7   Construction. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto, the principle of *contra proferentum* will not apply to this Agreement and no presumption or burden of proof will arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.

Section 19.8    <u>Table of Contents, Headings</u>. The table of contents and headings used in this Agreement are used for administrative convenience only and do not constitute substantive matter to be considered in construing this Agreement.

Section 19.9    <u>No Third Party Rights</u>. Except as expressly provided herein, the provisions of this Agreement are solely for the benefit of the Company, the Board of Managers and the Unit Holders and no other Person, including creditors of the Company, will have any right or claim against the Company, the Board of Managers or any Unit Holder by reason of this Agreement or any provision hereof or be entitled to enforce any provision of this Agreement. Notwithstanding the foregoing, each of Audax Fund III, Audax Fund IV, FC, NTH, the Formax Blocker Members, the STI/Schryver Blocker Members and the Class S Blocker Members are express third-party beneficiaries of this Agreement, and each such Person shall have the right to exercise and to enforce the rights expressly given to such Person in this Agreement.

Section 19.10    <u>Entire Agreement</u>. This Agreement, each Unit Holder's respective purchase agreement, subscription agreement or unit certificate and the other agreements contemplated hereby and thereby constitute the entire agreement of the Unit Holders and their Affiliates relating to the Company and supersede all prior meetings, communications, representations, negotiations, contracts or agreements (including any prior drafts thereof) with respect to the Company, whether oral or written, none of which will be used as evidence of the parties' intent. In addition, each party hereto acknowledges and agrees that all prior drafts of this Agreement contain attorney work product and will in all respects be subject to the foregoing sentence.

Section 19.11    <u>Effect of Waiver or Consent</u>. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

Section 19.12    <u>Counterparts and Facsimile</u>. This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document. All counterparts will be construed together and constitute the same instrument. This Agreement, each Unit Holder's respective purchase agreement, subscription agreement or unit certificate and the other agreements contemplated hereby and thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument will raise the use of a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

Section 19.13 <u>Waiver of Jury Trial</u>. The Unit Holders waive their respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement or any dealings between them relating to the subject matter of this Agreement and the relationship that is being established. The Unit Holders also waive any bond or surety or security upon such bond which might, but for this waiver, be required of any of the other parties. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. The Unit Holders acknowledge that this waiver is a material inducement to enter into a business relationship, that each has already relied on the waiver in entering into this Agreement and that each will continue to rely on the waiver in their related future dealings. The Unit Holders further warrant and represent that each has reviewed this waiver with its, his or her, as the case may be, legal counsel, and that each knowingly and voluntarily waives its, his or her, as the case may be, jury trial rights following consultation with legal counsel. This waiver is irrevocable, meaning that it may not be modified either orally or in writing, and the waiver will apply to any subsequent amendments, renewals, supplements or modifications to this Agreement or to any other documents or agreements relating to the transactions completed hereby. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court. The substantially prevailing party in any action or proceeding relating to this Agreement will be entitled to receive an award of, and to recover from the other party or parties, any fees or expenses incurred by him, her or it (including reasonable attorneys' fees and disbursements) in connection with any such action or proceeding.

Section 19.14 <u>Offset</u>. Subject to compliance with Section 409A of the Code, whenever the Company is to pay any sum to any Unit Holder, any amounts that such Unit Holder owes to the Company or any of its Subsidiaries may be deducted from that sum before payment and the amount of such sum deducted will nonetheless be treated as paid to such Unit Holder.

Section 19.15 <u>Adjustment of Numbers</u>. Subject to <u>Section 18.1</u>, all numbers set forth herein that refer to Unit prices or amounts will be appropriately and equitably adjusted by the Board of Managers in good faith to reflect Unit splits, Unit dividends, combinations of Units and other recapitalizations or other extraordinary events affecting the subject class of equity.

Section 19.16 <u>Business Days</u>. If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday, or legal holiday in the Commonwealth of Massachusetts or the State of New York, or the jurisdiction in which the Company's principal office is located, the time period will automatically be extended to the business day immediately following such Saturday, Sunday, or legal holiday.

Section 19.17 <u>Survival</u>. <u>Section 5.3</u>, <u>Section 6.1</u>, <u>Section 9.4</u> and <u>Article XV</u> will survive and continue in full force in accordance with their terms notwithstanding any termination of this Agreement or the dissolution of the Company.

Section 19.18 <u>Wills</u>. Each Unit Holder who is a natural person agrees to execute a will which will contain a direction and authorization to his or her personal representative, executor or administrator to comply with the provisions of this Agreement and to sell his or her

Units, as the case may be, in accordance with this Agreement; provided, however, that the failure of any such Unit Holder to do so will not affect the validity or enforceability of this Agreement.

Section 19.19 Spousal Consent. If requested by the Board of Managers, each married Member, and each such Member who, subsequent to the date hereof, marries or remarries, will concurrently with his or her execution hereof deliver to the Board of Managers the written consent of his or her spouse; provided, however, that the failure of any such Member to do so will not affect the validity or enforceability of this Agreement.

Section 19.20 Designees. Each of the rights granted to a Unit Holder of Formax Units, STI Units or Schryver Units may, upon the request of such Unit Holder, be exercised in whole or in part from time to time by its Affiliates and other designees.

Section 19.21 Gender. Any reference to the masculine gender will be deemed to include the feminine and neuter genders unless the context otherwise requires.

Section 19.22 Employment Agreement Put Right. If any employee identified on Schedule 19.22 whose employment agreement as of the Original Date entitles such employee to a put right with respect to such employee's equity interests in the Company or NTH set forth on Schedule 19.22 (each, a "Put Right Employee") issues a Put Notice (as defined in such Put Right Employee's Employment Agreement by and among such Put Right Employee, a Subsidiary of the Company, and solely with respect to Section 5(e) thereof, FCT Health and NTH (a "Put Right Employment Agreement")) pursuant to Section 5(e) of such Put Right Employee's Put Right Employment Agreement, in respect of such employee's equity interests in the Company, FCT Health or NTH set forth on Schedule 19.22, the Company will purchase such equity interests in accordance with such Section 5(e) to effect the rights of such Put Right Employee under such Section 5(e).

*        *        *        *        *

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement of FC Pioneer Holding Company, LLC as of the date and year first above written.

FORMAX HEALTH HOLDINGS, LLC

By: _____

Name:     Scott Brown
Title:      Vice President

SCHRYVER/TRIDENT INVESTORS, LLC

By: Revelstoke Capital Partners LLC, its Manager

By: _____
Name: Simon Bachleda
Title: Managing Partner


SCHRYVER MEDICAL HOLDINGS, LLC

By: _____
Name: Simon Bachleda
Title: Secretary


[SIGNATURE PAGE TO LIMITED LIABILITY COMPANY AGREEMENT OF FC PIONEER HOLDING
COMPANY, LLC]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement of FC Pioneer Holding Company, LLC as of the date and year first above written.

**CLASS S UNIT HOLDER:**

GCM GROSVENOR CO-INVESTMENT OPPORTUNITIES FUND, L.P.

By: GCM CFIG Fund Partners IV, L.P., its General Partner

By: CFIG Holdings, LLC, its General Partner

By: _____
Name: Jonathan A. Jacoby
Title: Vice President

GCM SAINT PAUL SPV, LLC

By: CFIG Holdings, LLC, its Managing Member

By: _____
Name: Jonathan A. Jacoby
Title: Vice President

[SIGNATURE PAGE TO LIMITED LIABILITY COMPANY AGREEMENT OF FC PIONEER HOLDING COMPANY, LLC]

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement of FC Pioneer Holding Company, LLC as of the date and year first above written.

**CLASS S UNIT HOLDERS:**                    CA/PIONEER INVESTOR, LLC

By: _____

Name: Arion Robbins
Title: President

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Agreement of FC Pioneer Holding Company, LLC as of the date and year first above written.

**CLASS S UNIT HOLDERS:**                    WP TS BLOCKER, LLC

By: _____

Name:   Gregory S. Oberholtzer
Title:    Authorized Signatory

<u>Schedule 1</u>

**CLASS S UNIT HOLDERS**

1. GCM Grosvenor Co-Investment Opportunities Fund, L.P.
2. GCM Saint Paul SPV, LLC
3. CA/Pioneer Investor, LLC
4. WP TS Blocker, LLC

<u>Schedule 19.22</u>

## PUT RIGHT EMPLOYEES
## AND PUT UNITS

**<u>Put Right Employee</u>**

Mark Parrish
Thomas McCaffery
Alan Morrison
David Pohl
Meyer Tollen
David Williams
Anthony Zingarelli
William Glynn

**<u>Company/FCT Health Holdings LLC Equity Interests</u>**

| Name | P-1 Units | P-1.5 Units | P-2 Units | P-2.5 Units | P-3 Units | P-3.5 Units | P-4 Units | P-4.5 Units | P-5 Units |
|---|---|---|---|---|---|---|---|---|---|
| Alan Morrison | 602.09 | 158.44 | 327.11 | 341.49 | 356.84 | 184.50 | 188.74 | 193.13 | 197.68 |
| Anthony Zingarelli | 602.09 | 158.44 | 327.11 | 341.49 | 356.84 | 184.50 | 188.74 | 193.13 | 197.68 |
| David Pohl | 401.39 | 105.63 | 218.07 | 227.66 | 237.89 | 123.00 | 125.83 | 128.75 | 131.78 |
| David Williams | 112.39 | 29.58 | 61.06 | 63.74 | 66.61 | 34.44 | 35.23 | 36.05 | 36.90 |
| Mark Parrish | 5,619.51 | 1,478.82 | 3,053.05 | 3,187.25 | 3,330.49 | 1,722.02 | 1,761.60 | 1,802.57 | 1,844.98 |
| Meyer Tollen | 401.39 | 105.63 | 218.07 | 227.66 | 237.89 | 123.00 | 125.83 | 128.75 | 131.78 |
| William Glynn | 802.79 | 211.26 | 436.15 | 455.32 | 475.78 | 246.00 | 251.66 | 257.51 | 263.57 |
| Thomas McCaffery | 160.55 | 42.25 | 87.22 | 91.06 | 95.16 | 49.20 | 50.33 | 51.50 | 52.71 |

**<u>NTH Equity Interests</u>**

| Name | A Units |
|---|---|
| Mark Parrish | 7,500.000 |
| William Glynn | 673.229 |
| Alan Morrison | 55.269 |
| Tony Zingarelli | 55.269 |
| David Pohl | 1,182.828 |
| Meyer Tollen | 43.775 |
| Tom McCaffery | 573.878 |
| David Williams | 11.237 |

<u>Exhibit 1.1</u>

**INVESTMENT BANK SELECTION PROCESS**

1.      (a) For Approved Acquisitions, the Company or (b) under <u>Section 12.3</u>, (i) Schryver if FC or NTH is the Prospective Drag Seller or (ii) FC if Schryver is the Prospective Drag Seller, as applicable, will select five investment banks from the list below:

Bank of America Merrill Lynch
Cain Brothers & Company
Citigroup
Credit Suisse
Goldman Sachs
Harris Williams & Company
Houlihan Lokey
Jefferies & Co.
JP Morgan Chase
RBC Capital Markets

2.      Then the NTH Representative or the Schryver Representative (for Approved Acquisitions), as applicable, or the Prospective Drag Seller (under <u>Section 12.3</u>), as applicable, will select one of the investment banks from the subset of five selected by the Company.

Exhibit 1.2

## REGISTRATION RIGHTS MEMBERS

Mark Parrish
New Trident Health, LLC
FC Trident, LLC
National Hospice Holdings, LLC
National Hospice Holdings II, LLC

Amended as of December 6, 2017

Exhibit 3.1

### UNIT HOLDERS OF THE COMPANY

| Member | Capital Contribution | Class of Units | Number of Units |
|---|---|---|---|
| Formax Health Holdings, LLC | $381,320,425.00 | A | 381,320.425000 |
| Schryver/Trident Investors, LLC | $36,000,000.00 | A | 36,000.000000 |
| Schryver Medical Holdings, LLC | $63,096,692.45 | A | 63,096.692450 |
| Yukon Capital Partners II, L.P. | $13.44 | A | 1,344.0686 |
| Schryver Medical Blocker, Inc. | $8.70 | A | 869.9800 |
| WP TS Blocker, LLC | $73.08 | A | 7,307.5031 |
| GCM SPV 14B, LLC | $37.47 | A | 3,746.7682 |
| Leerink Swann Co-Investment Fund LLC | $1.26 | A | 126.2035 |
| Leerink Holdings LLC | $2.26 | A | 225.5280 |
| Lipschutz Management | $0.14 | A | 13.9868 |
| RCP Schryver Co-Invest Fund Blocker, Inc. | $41.85 | A | 4,185.3526 |
| RCP Schryver Fund I Blocker, Inc. | $167.41 | A | 16,741.4082 |
| Dave Paison | $0.07 | A | 7.3085 |
| Jennifer Holt | $0.02 | A | 1.8271 |
| Bruce Dakin | $0.05 | A | 5.4813 |
| CA/Pioneer Investor, | $17.92 | A | 1,792.2889 |

| Member | Capital Contribution | Class of Units | Number of Units |
| --- | --- | --- | --- |
| LLC | | | |
| Safanad Star Midco Inc. | $128.87 | A | 12,887.1165 |
| FC PAC Holdings, LLC | $172.22 | A | 17,221.9033 |
| Mark Parrish | $2.15 | A | 214.7853 |
| David Smith | $2.15 | A | 214.7853 |
| Thomas McCaffery | $2.15 | A | 214.7853 |
| Anthony Zingarelli | $1.07 | A | 107.3926 |
| MDK Investment Holdings, LLC | $2.20 | A | 220.3100 |
| Senior Care Hospice, LLC | $2.18 | A | 218.2218 |
| MCP Aria, LLC | $2.12 | A | 211.5013 |
| H Gross Family, LP | $1.97 | A | 196.8564 |
| HCCF Management Group, Inc. | $2.03 | A | 202.6499 |
| Epoch Holdings Investors, LLC | $1.26 | A | 126.3260 |
| 23 Associates, LLC | $3.01 | A | 300.6994 |
| DZA Family, LLC | $0.74 | A | 73.5471 |
| SEF Compassus III, LLC | $8.59 | A | 859.1411 |
| Joseph A. Williamson | $0.59 | A | 58.7493 |
| Ray Wirta | $0.55 | A | 54.5252 |
| Neuwing, LLC | $0.26 | A | 26.4279 |
| Virginia Investment Partners, LLC | $0.13 | A | 13.2139 |

| Member | Capital Contribution | Class of Units | Number of Units |
|---|---|---|---|
| Esther Schonfeld | $0.11 | A | 10.5711 |
| GAHH, LLC | $8.23 | A | 823.4751 |
| FBH Healthcare, LLC | $2.55 | A | 254.6431 |
| K/O Aria, LLC | $0.64 | A | 63.6608 |
| Metro HC, LLC | $0.37 | A | 36.7183 |
| GCM Grosvenor Co-Investment Opportunities Fund, L.P. | $136.36 | S | 1,959.659740 |
| GCM Saint Paul SPV, LLC | $363.64 | S | 5,225.759304 |
| CA/Pioneer Investor, LLC | $20.00 | S | 287.416762 |
| WP TS Blocker, LLC | $50.00 | S | 718.541904 |
| TOTAL | $480,418,397.25 | N/A | 559,588.20596 |

<u>Amended as of January 30, 2018</u>

<u>Exhibit 7.1</u>

## BOARD OF MANAGERS

1.    <u>Number; Appointment</u>. Subject to <u>Sections 3</u> and <u>16</u> of this Exhibit 7.1, the authorized number of members of the Board of Managers (each, a "<u>Board Member</u>") will be seven (7) Board Members. The Board Members will consist of the following:

a.    one (1) Board Member elected by NTH, and who initially is Adam Abramson (the "<u>NTH Representative</u>" or the "<u>NTH Manager</u>");

b.    two (2) Board Members elected by FC, and who initially are Steven Fishman and Craig Kahler (the "<u>FC Managers</u>" and each as an "<u>FC Manager</u>");

c.    one (1) Board Member elected by HCN, and who initially is Bryan Hickman (the "<u>HCN Manager</u>");

d.    one (1) Board Member elected by Schryver, and who initially is Simon Bachleda (the "<u>Schryver Representative</u>" or the "<u>Schryver Manager</u>");

e.    the Chief Executive Officer of the Company, who initially is Mark Parrish; and

f.    an individual who is independent from the Company's management, Audax Fund III, Audax Fund IV, FC, NTH, STI, Schryver, HCN and each Class S Unit Holder and who initially is Alex Greene (any such individual, the "<u>Independent Manager</u>").

Subject to <u>Section 3.4</u>, the composition or size of the Board of Managers after the Original Date may be increased or decreased from time to time by the Board of Managers.

2.    <u>Voting</u>. Each Board Member shall have one (1) vote; except that each FC Manager shall have three (3) votes.

3.    <u>Tenure</u>. Except as otherwise provided by law or by this Agreement, each Board Member will hold office until he or she sooner dies or resigns, or is removed by the party entitled to elect such Board Member; <u>provided</u>, <u>however</u>, that upon the termination of the Independent Manager's engagement with the Company, the Independent Manager shall be automatically removed from the Board of Managers without any further action required.

4.    <u>Vacancies</u>. Any vacancy of a board seat held by the NTH Manager, an FC Manager, the HCN Manager or the Schryver Manager, if any, will be filled by NTH, FC, HCN or Schryver, as applicable; <u>provided</u>, <u>however</u>, that in the event that HCN no longer owns at least 5% of a direct or indirect ownership interest in the Company, any such vacancy of a board seat held by an HCN Manager shall be filled as set forth in the immediately following sentence. Any other vacancy will be filled by the Board of Managers. The Board of Managers will have and may exercise all their powers notwithstanding the existence of one or more vacancies in their

number, subject to any requirements of law or of this Agreement as to the number of Board
Members required for a quorum or for any vote or other actions.

5.  Special Meetings. Special meetings of the Board of Managers may be held at any
time and at any place within or without the State of Delaware designated in the notice of the
meeting, when called by the Chair of the Board of Managers, the President, or by any two
members of the Board of Managers, reasonable notice thereof being given to each Board
Member by the Secretary or by the Chair of the Board of Managers, if any, the President or any
one of the Board Members calling the meeting.

6.  Notice. Notice of each Meeting shall be sent to a Board Member by overnight
delivery, e-mail or by facsimile at least two (2) days before the meeting addressed to such Board
Member at such Board Member's usual or last known business or residential address or in person
or by telephone at least two (2) days before the meeting, provided, that the Board of Managers
shall reasonably accommodate the NTH Representative's or the Schryver Representative's
request to reschedule the date and time of the meeting at any time within forty-eight (48) hours
of the noticed meeting date and time. Notice of a meeting need not be given to any Board
Member if a written waiver of notice, executed by such Board Member before or after the
meeting, is filed with the records of the meeting, or to any Board Member who attends the
meeting without protesting prior thereto or at its commencement the lack of notice to such Board
Member. Notice of any meeting shall be accompanied by a proposed agenda for the meeting.
Any Board Members scheduling monthly operating review discussions with the Company will
use good faith efforts to provide reasonable advance notice to the other Board Members of such
discussions in order to permit such other Board Members to participate with the Company or
when similar discussions are to be held with the Company.

7.  Quorum. No action may be taken at a meeting of the Board of Managers or at a
meeting of a committee of the Board of Managers unless a quorum is present. Except as may be
otherwise required by law, at any meeting of the Board of Managers or a committee thereof a
majority of the Board Members then in office, including at least one (1) NTH Manager and one
(1) Schryver Manager, will constitute a quorum. Any meeting may be adjourned from time to
time by a majority of the votes cast upon the question, whether or not a quorum is present, and
the meeting may be held as adjourned without further notice.

8.  Action by Vote. Subject to Section 3.4, except as may be otherwise required by
law, when a quorum is present at any meeting the vote of a majority of the Board Members will
be the act of the Board of Managers.

9.  Proxies. A Board Member may vote at a meeting of the Board of Managers or any
committee thereof either in person or by proxy executed in writing by such Board Member.
Proxies for use at any meeting of the Board of Managers or any committee thereof or in
connection with the taking of any action by written consent will be filed with the Board of
Managers, before or at the time of the meeting or execution of the written consent as the case
may be.

10.  Action Without a Meeting. Any action required or permitted to be taken at any
meeting of the Board of Managers may be taken without a meeting if all Board Members consent

thereto in writing or by electronic communication and such writing or writings are filed with the records of the meetings of the Board of Managers. Such consent will be treated for all purposes as the act of the Board of Managers.

11.     <u>Participation in Meetings by Conference Telephone</u>. Board Members may participate in a meeting of the Board of Managers by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law. Such participation will constitute presence in person at such meeting.

12.     <u>Compensation</u>. Each Board Member will be reimbursed for such Board Member's reasonable out-of-pocket expenses incurred in the performance of such Board Member's duties as a Board Member. Nothing contained in this <u>Section 12</u> of this Exhibit 7.1 will be construed to preclude any Board Member from serving the Company in any other capacity and receiving reasonable compensation therefor.

13.     <u>Committees</u>. The Board of Managers may, by vote of a majority of the whole board, (a) designate, change the membership of or terminate the existence of any committee or committees, each committee to consist of two or more of the Board Members, one (1) of whom must be the NTH Representative and one (1) of whom must be the Schryver Representative, (b) designate one or more Board Members as alternate members of any such committee who may replace any absent or disqualified member at any meeting of the committee and (c) determine the extent to which each such committee will have and may exercise the powers of the Board of Managers in the management of the business and affairs of the Company, excepting, however, such powers which by law or by this Agreement they are prohibited from so delegating. In the absence or disqualification of any member of such committee and his or her alternate, if any, the member or members thereof present at any meeting and not disqualified from voting, whether or not constituting a quorum, may unanimously appoint another member of the Board of Managers to act at the meeting in the place of any such absent or disqualified member. Except as the Board of Managers may otherwise determine, any committee may make rules for the conduct of its business, but unless otherwise provided by the Board of Managers or such rules, its business will be conducted as nearly as may be in the same manner as is provided by this Agreement for the conduct of business by the Board of Managers. Each committee will keep regular minutes of its meetings and report the same to the Board of Managers upon request.

14.     <u>Conflicts Policy</u>. Within a reasonable time after the Original Date, the Board of Managers shall cause the Company to develop and implement an official policy of the Company addressing conflicts of interests.

15.     <u>Observers</u>. The Board of Managers shall permit (a) Audax Fund IV to designate one (1) observer, without voting rights, who shall be an employee or affiliate of Audax Fund IV or an employee of an Affiliate of Audax Fund IV, as applicable, and (b) STI to designate one (1) observer, without voting rights, and each such observer will be entitled to attend all meetings of the Board of Managers. Each such observer shall be entitled to notice of all meetings of the Board of Managers and to information provided to the Managers; <u>provided</u>, <u>however</u>, that the Board of Managers may elect not to provide any information that may be subject to attorney-client privilege.  In addition, pursuant to Section 5.10 of the Investment Agreement, the Investor

Representative (as defined in the Investment Agreement) has the right (but not the obligation) to appoint a non-voting observer to the Board of Managers on the terms and subject to the conditions set forth therein.

16.      <u>Interest Adjustment Event</u>. Upon the occurrence and during the continuance of an Interest Adjustment Event (as defined in the Investment Agreement), the Investor Representative (as defined in the Investment Agreement) shall have the right, but not the obligation, to elect one (1) Board Member. In the event that the Investor Representative exercises such right, the number of Board Members constituting the Board of Managers shall be increased by one (1), and the individual elected by the Investor Representative (the "<u>Investor Representative Manager</u>") shall become a Board Member.

<u>Exhibit 8.1</u>

# OFFICERS

<u>Election</u>. The officers may be elected by the Board of Managers at any time. At any time or from time to time, the Board Members may delegate to any officer their power to elect or appoint any other officer or any agents.

1.    <u>Tenure</u>. Each officer will hold office until his or her respective successor is chosen and qualified unless a shorter period will have been specified by the terms of his or her election or appointment, or in each case until he or she sooner dies, resigns, is removed or becomes disqualified. Each agent will retain his or her authority at the pleasure of the Board of Managers, or the officer by whom he or she was appointed or by the officer who then holds agent appointive power.

2.    <u>Chair of the Board of Managers, President and Vice President</u>. The Chair of the Board of Managers, if any, will have such duties and powers as will be designated from time to time by the Board of Managers. Unless the Board of Managers otherwise specifies, the Chair of the Board of Managers, or if there is none the President, will preside, or designate the person who will preside, at all meetings of Members and of the Board of Managers. Unless the Board of Managers otherwise specifies, the President will be the Chief Executive Officer and will have direct charge of all business operations of the Company and, subject to the control of the Board of Managers, will have general charge and supervision of the business of the Company. Any Vice Presidents will have duties as will be designated from time to time by the Board of Managers, by the Chair of the Board of Managers or the President. At the option of Formax, the initial Chair of the Board of Managers shall be Steven Fishman or another person so designated by Formax.

3.    <u>Treasurer and Assistant Treasurers</u>. Unless the Board of Managers otherwise specifies, the Treasurer (or if no Treasurer is elected, the President) will be the Chief Financial Officer of the Company and will be in charge of its funds and valuable papers, and will have such other duties and powers as may be designated from time to time by the Board of Managers, the Chair of the Board of Managers, or the President. If no Controller is elected, the Treasurer (or if no Treasurer is elected, the President) will, unless the Board of Managers otherwise specifies, also have the duties and powers of the Controller. Any Assistant Treasurers will have such duties and powers as will be designated from time to time by the Board of Managers, the Chair of the Board of Managers, the President or the Treasurer.

4.    <u>Controller and Assistant Controllers</u>. If a Controller is elected, the Controller will, unless the Board of Managers otherwise specifies, be the Chief Accounting Officer of the Company and be in charge of its books of account and accounting records, and of its accounting procedures. The Controller will have such other duties and powers as may be designated from time to time by the Board of Managers, the Chair of the Board of Managers, the President or the Treasurer. Any Assistant Controller will have such duties and powers as will be designated from time to time by the Board of Managers, the Chair of the Board of Managers, the President, the Treasurer or the Controller.

5.      <u>Secretary and Assistant Secretaries</u>. The Secretary will record all proceedings of the Members and the Board of Managers in a book or series of books to be kept therefor and will file therein all actions by written consent of the Board of Managers. In the absence of the Secretary from any meeting, an Assistant Secretary, or if no Assistant Secretary is present, a temporary secretary chosen at the meeting, will record the proceedings thereof. The Secretary will keep or cause to be kept records, which will contain the names and record addresses of all Unit Holders. The Secretary will have such other duties and powers as may from time to time be designated by the Board of Managers, the Chair of the Board of Managers or the President. Any Assistant Secretaries will have such duties and powers as will be designated from time to time by the Board of Managers, the Chair of the Board of Managers, the President or the Secretary.

6.      <u>Vacancies</u>. If the office of any officer becomes vacant, any person or body empowered to elect or appoint that officer may choose a successor. Each such successor will hold office for the unexpired term, and until his or her successor is chosen and qualified or in each case until he or she sooner dies, resigns, is removed or becomes disqualified.

7.      <u>Resignation and Removal</u>. The Board of Managers may at any time remove any officer either with or without cause. The Board of Managers may at any time terminate or modify the authority of any agent. Any officer may resign at any time by delivering his or her resignation in writing to the Chair of the Board of Managers, the President or the Secretary or to a meeting of the Board of Managers. Such resignation will be effective upon receipt unless specified to be effective at some other time, and without in either case the necessity of its being accepted unless the resignation will so state.

Exhibit 12.2

## MANAGEMENT TAG HOLDERS

Mark Parrish

Exhibit 12.4(e)(i)

## FORMAX BLOCKER MEMBERS

1.      Audax Private Equity Fund IV Trident Splitter, LP

2.      Audax Private Equity Fund IV Clinical Splitter, LP

3.      Audax Private Equity Fund IV NHH Splitter, LP

4.      Audax Private Equity Fund IV AIV, LP

5.      AG FCT Holdings, LLC

6.      New Trident Health, LLC

7.      FC Trident, LLC

8.      AG Mobile Diagnostic Holdings, LLC

For purposes of clarity, the Formax Blocker Corporations the interests in which may be sold for
a purchase price for the Units indirectly represented by such shares are the following:

1.      Safanad Star-1, Inc.

2.      Safanad Star-2, Inc.

3.      Safanad Star-3, Inc.

Exhibit 12.4(e)(ii)

### STI/SCHRYVER BLOCKER MEMBERS

1. MLPF&S Custodian FBO Mark M. King RRA

2. MLPF&S Custodian FBO Dale J. Meyer RRA

3. MLPF&S Custodian FBO Simon A. Bachleda RRA

4. MLPF&S Custodian FBO Arion Robbins RRA

5. MLPF&S Custodian FBO Andrew Welch RRA

6. Revelstoke Capital Partners Co-Investment Fund I, L.P.

7. Revelstoke Capital Partners Fund I, L.P.

8. Mark Richard Schryver 2010 Dynasty Trust

9. Sara Nicole Dakin 2010 Trust

10. Jay Richard Schryver 2010 Trust

11. Mark Schryver

12. Yukon Capital Partners Parallel II, L.P.

13. Yukon Capital Partners 3(c)(7) Parallel II, L.P.

14. Committed Advisors Secondary Fund II, FIPS

15. WP Natural Resources Co-Invest Fund, L.P.

16. CORE*alpha* Private Equity Partners Co-Investment Fund V, L.P.

For purposes of clarity, the STI/Schryver Blocker Corporations the interests in which may be sold for a purchase price for the Units indirectly represented by such shares are the following:

1. RCP Schryver IRA Blocker, LLC

2. RCP Schryver Fund I Blocker, Inc.

3. RCP Schryver Co-Invest Fund Blocker, Inc.

4. Schryver Ventures, Inc.

5.  Schryver Medical Blocker, Inc.

6.  CA/Pioneer Investor, LLC

7.  WP TS Blocker, LLC

<u>Exhibit 12.4(e)(iii)</u>

## CLASS S BLOCKER MEMBERS

1. Committed Advisors Secondary Fund II, FIPS
2. WP Natural Resources Co-Invest Fund, L.P.
3. CORE*alpha* Private Equity Partners Co-Investment Fund V, L.P.
4. WP Private Debt Co-Investment Fund III LP

For purposes of clarity, the Class S Blocker Corporations the interests in which may be sold for a purchase price for the Units indirectly represented by such shares are the following:

1. CA/Pioneer Investor, LLC

2. WP TS Blocker, LLC